JOHN B. BULGOZDY (Cal. Bar No. 219897)
Email: bulgozdyj@sec.gov
KRISTIN S. ESCALANTE (Cal. Bar No. 169635)
Email: escalantek@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov
TODD BRILLIANT (Cal Bar No. 147727)
Email: brilliantt@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> PACIFIC WEST CAPITAL GROUP, INC.; ANDREW B CALHOUN IV; PWCG TRUST; BRENDA CHRISTINE BARRY; BAK WEST, INC.; ANDREW B CALHOUN JR.; ERIC CHRISTOPHER CANNON; CENTURY POINT, LLC; MICHAEL WAYNE DOTTA; and CALEB AUSTIN MOODY (dba SKY STONE), <br><br> Defendants. | Case No.: 2:15-cv-02563 <br><br> **COMPLAINT** |

COMPLAINT                                          1

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

1.     This case involves fraud in the unregistered offer and sale of securities consisting of fractionalized interests in universal life insurance policies, or "life settlements," by Defendants Pacific West Capital Group, Inc. ("Pacific West") and Andrew B Calhoun IV ("Calhoun").  Pacific West and Calhoun sell investments structured around when life insurance policies "mature" (the insured individual dies) and the benefits are paid.  Since Calhoun started Pacific West in 2004, they have raised approximately $99.9 million from over 3,200 investors who purchased life settlements in approximately 125 life insurance policies.  Since at least 2012, Pacific West and Calhoun have perpetrated a scheme to defraud investors by using money received from investors from the sale of new life settlements to pay premiums on life settlement investments sold years earlier which had not matured and had exhausted the "premium reserves" created by Pacific West and Calhoun to keep the policies in force.  Pacific West and Calhoun engaged in this conduct to create the false appearance that the life settlements they structured and sold had minimal risk and would pay off within the expected period.

2.     In addition, since at least 2012, Pacific West and Calhoun have

misrepresented the risks that investors would have to make future, out-of-pocket payments to keep the policies in force, and failed to disclose material information about the increased amount of future premiums.  Pacific West and Calhoun have also misled investors about their likely annual returns and falsely represented to investors that their investments had nothing to do with Pacific West's efforts and fortunes.  By engaging in this conduct, Pacific West and Calhoun facilitated their sale of new life settlements to unsuspecting investors, which generated substantial revenue for Pacific West and Calhoun.  Pacific West and Calhoun retained the "Sales Agent Defendants" (collectively, Defendants Brenda Barry; BAK West, Inc.; Andrew B. Calhoun Jr.; Eric Cannon; Century Point, LLC; Michael Dotta; and Caleb Moody) to offer and sell the life settlements to investors.

3.     The securitized life settlements are issued by Defendant PWCG Trust ("Trust"), and the offer and sale of these investments by Pacific West and Calhoun are not registered and have been, and are being, offered and sold in violation of the registration provisions of the federal securities laws by Pacific West, Calhoun, Trust, and the Sales Agent Defendants.  Defendants Pacific West, Calhoun, and the Sales Agent Defendants have been, and are, operating as unregistered brokers and dealers in the offer and sale of life settlements in violation of the broker-dealer registration provisions of the federal securities laws.

4.     Upon information and belief, the defendants' fraudulent conduct and unregistered offering is continuing, as are their violations of the broker-dealer registration provisions.

5.     With this Complaint, the SEC seeks permanent injunctive relief against Pacific West and Calhoun from violations of the antifraud provisions of the federal securities laws, disgorgement of ill-gotten gains with prejudgment interest thereon, and civil penalties.  In addition, the SEC seeks permanent injunctive relief against Pacific West, Calhoun, the Trust, and the Sales Agent Defendants, from violations of the registration provisions of the federal securities laws, disgorgement of ill-gotten

gains with prejudgment interest thereon, and civil penalties.  Finally, the SEC seeks permanent injunctive relief against Pacific West, Calhoun, and the Sales Agent Defendants, from violations of the broker-dealer registration provisions of the federal securities laws, disgorgement of ill-gotten gains with prejudgment interest thereon, and civil penalties.

## DEFENDANTS

6.    **Pacific West Capital Group, Inc.** ("Pacific West") is a privately-held California corporation formed in 2004 with its principal place of business in Los Angeles, California.  Pacific West is not registered with the Commission in any capacity.

7.    **Andrew B Calhoun IV** ("Calhoun") resides in Beverly Hills, California. He is the founder, sole owner, and president of Pacific West.  Calhoun graduated from the University of North Carolina, Chapel Hill, in 1992 with a degree in business administration.  Calhoun has been licensed in California as a life insurance agent since 2003.  Calhoun has never been registered with the Commission in any capacity or held any securities licenses.

8.    **PWCG Trust** ("Trust") is an Ohio business trust formed in 2004.  The Trust purchases life insurance policies in its name as instructed by Pacific West and issues interests in those policies to investors solicited by Pacific West.  The Trust (through its trustee) also maintains a bank account which holds premium reserves and maintains books and records accounting for those different reserves.

9.    **Brenda Christine Barry** ("Barry") resides in Issaquah, Washington. Barry has been a sales agent with Pacific West since 2004.  Barry has been licensed in California as a life insurance agent since 2004.  Barry has never been registered with the Commission in any capacity or held any securities licenses.

10.    **BAK West, Inc.** ("BAK West") was a California corporation formed by Barry in 2005.  Since at least August 2010, Pacific West has paid Barry's commissions to BAK West.  In 2011, BAK West's corporate status was suspended by

California.  BAK West has never been registered with the Commission in any capacity.

11.    **Andrew B Calhoun Jr.** ("Calhoun Jr.") resides in Anderson, South Carolina, and is Calhoun's father.  Calhoun Jr. has been a sales agent with Pacific West since 2006.  Calhoun Jr. has been licensed in California as a life insurance agent since 2006.  Calhoun Jr. has never been registered with the Commission in any capacity or held any securities licenses.

12.    **Eric Christopher Cannon** ("Cannon") resides in Lakewood, California. Cannon has been a sales agent with Pacific West since September 2010.  Cannon graduated from the University of Southern California in 1993 with a degree in business administration.  Cannon has been licensed in California as a life insurance agent since 2011.  Cannon has never been registered with the Commission in any capacity, but he has held securities licenses and was associated with various registered broker-dealers from 1993 to 2006.

13.    **Century Point, LLC**, ("Century Point") is an Arizona company formed in September 2011.  Since February 2012, Pacific West has paid Cannon's commissions to Century Point.  Century Point has never been registered with the Commission in any capacity.

14.    **Michael Wayne Dotta** ("Dotta") resides in Los Angeles, California. Dotta has been a sales agent with Pacific West since September 2011.  Dotta graduated from Pennsylvania State University in 1999 with a bachelor of arts degree. Dotta has been licensed in California as a life insurance agent since 2010.  Dotta has never been registered with the Commission in any capacity or held any securities licenses.

15.    **Caleb Austin Moody, dba Sky Stone** ("Moody"), resides in Los Angeles, California.  He has been a sales agent with Pacific West since approximately June 2012.  Moody graduated from Texas Christian University in 1999 with a bachelor of fine arts degree.  Since August 2013, Pacific West has paid Moody

his commissions in the fictitious business name "Sky Stone."  Moody has been

licensed in California as a life insurance agent since 2012.  Moody has never been

registered with the Commission in any capacity or held any securities licenses.

## ALLEGATIONS

**A.    Pacific West's Offer and Sale of Life Settlements**

16.    Pacific West and Calhoun offered and arranged the sale of life

settlements to investors, which are fractional interests in universal life insurance

policies.  In the life settlements offered and sold by Pacific West and Calhoun,

investors' money was pooled to buy a particular insurance policy on the life of a

person (the "Insured").  Pacific West represented to investors that they offer and sell

policies that they expect will mature in four to seven years, and pay a total return to

the investor of at least 100% to 150%.

17.    To pay the premiums necessary to keep a policy in force, Pacific West

represented to investors that it created three levels of "reserves" (a "Primary,"

"Secondary," and "Tertiary Premium Reserve") to pay premiums during a six to nine

year period, set by Calhoun (the "Contract Period"), during which time a policy was

expected to mature.

18.    Calhoun and Pacific West determined the length of the Contract Period

and the amount of investors' funds that was allocated to the Primary Premium

Reserve for each policy.

19.    While Pacific West and Calhoun told investors that they would be liable

for their pro rata share of any premium payments if the three levels of reserves ran

out (a "premium cash call"), at the same time Pacific West and Calhoun also told

investors that they had never touched the Secondary or Tertiary Premium Reserves

and had never made a premium call to investors.  Pacific West and Calhoun did not

disclose the actual amount of any pro rata premiums that would be owed if the

reserves ran out and there was a premium call.

20.    Pacific West and Calhoun also told investors that the success of their life

settlements was independent of Pacific West, and represented that Pacific West had no involvement after a policy was purchased.

21.     As compensation for offering and selling the life settlements, Calhoun and Pacific West allocated about 45% of the funds raised from investors to Pacific West as its "margin." Pacific West and Calhoun did not disclose to investors that they were realizing a 45% margin on the life settlements.

22.     Pacific West and Calhoun effected the sales using a Life Settlement Purchase Agreement ("Purchase Agreement") between the investor and Pacific West, and a Life Settlement Disclosure Form ("Disclosure Form") signed by the investor. The investors deposited their funds in escrow with the Trust, received the Purchase Agreement and Disclosure Form from Pacific West, and had seven days to rescind. Pacific West and Calhoun directed the Trust to purchase policies using the investors' funds, book a certain amount of reserve to pay the policies' premiums, and make the "margin" payments to Pacific West. The Trust purchased the policies, and maintained accounts for the premium reserves. Under the terms of the agreement with the Trust, the Trust informed Pacific West and Calhoun when the primary reserve for a particular policy was depleted. The Trust ultimately collected the death benefit when the policies matured and distributed a pro rata share of the death benefits to the life settlement investors.

23.     Calhoun controls Pacific West, and controlled all aspects of the process of its offer and sale of life settlements, including identifying life insurance policies to be offered, determining the amount of the Primary Premium Reserve by setting the Contract Period and the premiums paid during that period, directing the Trust to use money from the sale of new life settlements to pay premiums on older policies with depleted Primary Premium Reserves, and controlling the information provided to investors through the Sales Agent Defendants. Until in or around March 2014, Calhoun had not disclosed to the Sales Agent Defendants that he was using the proceeds from the sale of new life settlements to pay premiums on older policies that

had depleted their Primary Premium Reserve.

24.     Pacific West and Calhoun have raised substantial funds from investors through the unregistered offer and sale of securities.  From late 2004 through at least November 2014, Pacific West and Calhoun raised more than $99.9 million from over 3,200 investors who had purchased interests in approximately 125 policies.  During that period, approximately $45.9 million, or about 46% of the total amount raised from investors, was paid to Pacific West as its self-described "margin."

25.     For the period beginning January 2012 through at least November 2014, Pacific West and Calhoun raised approximately $37.3 million from investors.  Of that amount, just over 15%, or about $5.7 million, was used to purchase policies, and just less than 34%, or about $12.6 million, was used to fund the Primary Premium Reserve.  About 4%, or over $1.5 million, was used to pay broker commissions and escrow fees.  Pacific West directed the Trust to pay it over $17.2 million, or over 46% of the total amount raised from investors, as its margin during this period.

26.     Of the $17.2 million that Pacific West received from January 2012 through November 2014, Calhoun personally received approximately $5.2 million – or about 13% of the total amount raised from investors – in salary, commissions, and transfers.  Another $2.3 million of Pacific West's margin was paid to the Sales Agent Defendants as commissions during this period.  Finally, approximately $1.9 million of Pacific West's margin was used to pay premiums on older policies that had depleted Primary Premium Reserves – or about 5% of all investor funds raised from January 2012 through November 2014.

**1.     Calhoun selected the policies to be offered to investors**

27.     Pacific West and Calhoun sold fractionalized interests in a type of life insurance policy called "universal life" or "flexible premium adjustable life" insurance.  These types of policies have an insurance component like a term life insurance policy, and a savings component like a whole life insurance policy.  The cost of the insurance component generally increases each year.  The policyholder can

determine the amount of premium that they wish to pay annually, but to keep the policy in force a policyholder must pay an amount equal to the insurance component. A universal life insurance policyholder may use a policy's accumulated cash value, if any, to subsidize and decrease the amount needed to be paid each year to keep the policy in force, which has the effect of depleting the cash value of the policy. Once the cash value reaches zero, it may no longer be used to subsidize annual payments to keep a policy in force.

28.     Calhoun personally selected each of the policies that Pacific West offered and sold to investors as life settlements.

29.     Pacific West and Calhoun represented to investors that Pacific West selects only policies that are non-contestable, have been issued by A-rated life insurance companies, and are on Insureds who are of "advanced ages and/or who typically experience chronic or degenerative health conditions." Pacific West and Calhoun, directly and through their sales agents, also represented to investors that Pacific West selects and offers policies that "typically," or they "estimate," "feel," or "target," will mature in four to seven years.

30.     In fact, Pacific West and Calhoun have no reasonable basis for their representations that the policies Calhoun selects are estimated or targeted to mature in four to seven years. Although Calhoun received some life expectancy reports from third parties, he claims not to have relied on any actuarial information to select the policies. Instead, Calhoun, who is not an actuary or medical doctor, selected policies based on his judgment and estimates. In a life settlement transaction, an actuarial-based estimate of an Insured's life expectancy is a critical factor in determining the present value of the policy and making a reasoned estimate of any premium reserve.

31.     While Calhoun reviewed information about an Insured when selecting a policy, Calhoun's selection of a policy depended largely on the premium cost to keep the policy in force. To determine that amount, Calhoun set a Contract Period based upon the Insured's age, health, and family history, and then calculated the amount

necessary to keep a policy in force during the Contract Period while using up the cash value of a policy.  Calhoun then used this calculation to set the amount of the Primary Premium Reserve.  In general, at the end of the Contract Period, the cash value of the policy sold by Pacific West was depleted.  Calhoun and Pacific West generally used a Contract Period of six to nine years.

32.     Since 2011, in connection with the selection and purchase of five policies, the insurance broker offering the policy provided Pacific West and Calhoun with life expectancy reports prepared by third parties as part of a package of materials provided to prospective buyers.  According to Calhoun, he never used actuarial charts or looked at life expectancies in selecting policies.  But, the estimated life expectancies of the insureds in the five reports provided to Pacific West and Calhoun were years longer than Contract Periods set by Calhoun for the corresponding life settlements offered and sold by Pacific West.

**2.     Pacific West and Calhoun represented to investors that they have three levels of reserves available to pay premiums**

33.     Pacific West and Calhoun represented in sales materials and presentations to investors that three levels of premium reserves protected the investors' investment:  (i) a "Primary Premium Reserve" which was to contain sufficient funds to pay premiums for a policy during the entire Contract Period, funded from the proceeds of the sale of the fractional interests in the specific underlying life insurance policy; (ii) a "Secondary Premium Reserve" which was a general reserve available for all policies sold by Pacific West that was funded by 1% of all investment proceeds from all life settlements sold by Pacific West; and (iii) a "Tertiary Premium Reserve" which was a general reserve available for all policies sold by Pacific West and was funded by any unused Primary Premium Reserves remaining on policies that mature before those primary reserves are depleted.

34.     Calhoun was personally responsible for determining the method used by Pacific West to set the amount of the "Primary Premium Reserves" for each life

1  settlement offered and sold by Pacific West.

2       35.    One of the selling points to potential investors used by Pacific West and

3  Calhoun was the existence of the Secondary Premium Reserve and Tertiary Premium

4  Reserve.  Pacific West and Calhoun, directly and indirectly through sales agents,

5  informed investors that they have never used funds from either the Secondary

6  Premium Reserve or the Tertiary Premium Reserve.  Pacific West and Calhoun also

7  represented, directly and indirectly through sales agents, to investors that they never

8  had to make a cash premium call, that is, to ask investors to make a cash payment to

9  pay their pro rata share of any premiums to keep a policy in force, beyond the initial

10  investment.

11      **3.**    **Pacific West and Calhoun solicited investors using means of**

12           **interstate commerce**

13       36.    Pacific West and Calhoun solicited prospective investors through radio,

14  television, and internet advertising, and through mass mailings inviting individuals to

15  attend seminars.  Pacific West maintained a website, pwcapital.net, which offered

16  information about life settlements and provided contact information for Pacific West.

17       37.    The Sales Agent Defendants and Calhoun received calls from

18  prospective investors, made presentations at Pacific West's seminars, arranged for

19  investors to receive life settlement investment closing documents, and sold life

20  settlements to investors.

21       38.    Calhoun trained, supervised, and provided to the Sales Agent Defendants

22  information about Pacific West's business and life settlements being offered.

23       39.    Pacific West and Calhoun paid the Sales Agent Defendants an 8%

24  commission on sales of life settlements.

25       40.    The Sales Agent Defendants also worked with outside sales persons, and

26  the Sales Agent Defendants received a 2% override commission of the amounts

27  raised from investors by the outside sales representatives.

28

COMPLAINT            11

**4.    Pacific West and Calhoun offered investors a "total fixed return" of at least 100% to 150%**

41.    In their brochure offering life settlements, Pacific West and Calhoun offered "total fixed returns" of between 100% and 150%.

42.    In one of their sales brochures, Pacific West and Calhoun showed how an investor who made a $100,000 investment for a "100% total fixed return" would receive a payment when the policy matured of $200,000.  Pacific West and Calhoun also provided examples showing a "simple annual rate" of between 100% if the policy matured in one year, which decreased to a 20% annual return if the policy matured in 5 years, and decreased to 10% annual return if a policy matured in ten years.

**5.    Pacific West's sales process**

43.    When an investor decided to purchase a fractionalized interest in a policy from Pacific West, the investor was instructed to deposit money in escrow with the Trust.

44.    After an investor deposited funds with the Trust, Pacific West and Calhoun disclosed specific information about the policy and transaction in a nine-page Purchase Agreement between Pacific West as seller and the investor as purchaser, and a three-page Disclosure Form.

45.    The Purchase Agreement represented that Pacific West "has established a five (5) level plan in order to provide that premium payments are made until the date of maturity of the [underlying life insurance] policy."   One of those five levels of reserves was a "disability rider" that did not have a practical effect on any policies sold by Pacific West.  Three of the levels were the Primary, Secondary, and Tertiary Premium Reserves.  The fifth level was a premium call to investors in a particular life settlement investment, in which investors would have to pay their pro rata share of a premium to keep a policy in force.

46.    The investor then had seven days after receipt of the Purchase

Agreement and Disclosure Form to rescind their investment.

**6.    The Trust's role**

47.    Pacific West and Calhoun entered into a Trust Agreement dated November 9, 2004 ("2004 Trust Agreement"), and an Amended and Restated Trust Agreement dated April 29, 2011 ("2011 Trust Agreement"), with the trustee of the Trust.

48.    The 2004 Trust Agreement and the 2011 Trust Agreement each provided, among other things, that Pacific West will direct the payment by the trustee from the Premium Account of all premiums required to keep the policies in force and to prevent the policies from lapsing or terminating.  The 2004 Trust Agreement and the 2011 Trust Agreement also provided that in the event the funds on deposit in the Premium Account for a given policy are insufficient to pay a premium that is due, then the trustee shall notify Pacific West, which then has the option to deposit funds in the Premium Account sufficient to satisfy the deficiency, or instruct the trustee not to make the payment if there is sufficient cash value in the policy, or instruct the trustee to make a cash call to investors for funds sufficient to pay the premium due on the policy.

49.    The 2004 Trust Agreement and 2011 Trust Agreement were not part of the offering materials distributed by Pacific West.  In general, the 2004 Trust Agreement and the 2011 Trust Agreement were not provided to potential investors.

50.    As instructed by Pacific West and Calhoun, the Trust issued interests in a policy or fractional shares in a policy to investors.

51.    The Trust maintained a single bank account in which the Primary, Secondary, and Tertiary Premium Reserves were commingled and maintained for all life settlements offered and sold by Pacific West.

52.    The Trust maintained a ledger showing the amounts in the Primary, Secondary, and Tertiary Reserves.

**7.      Pacific West and Calhoun have a continuing role in the success of the life settlements**

53.      Once Pacific West and Calhoun raised enough money from investors to purchase a policy, but in some cases before they raised sufficient money to completely fund the Primary Premium Reserve, Pacific West and Calhoun instructed the Trust to purchase a policy, allocate funds to the Primary and Secondary Premium Reserves as available, and pay some portion of the investors' funds to Pacific West as its margin.  The Trust recorded a receivable in the full amount of the Primary Premium Reserve based on Calhoun's calculation, and the Secondary Premium Reserve based on a percentage of the funds raised.  If all the interests in the life settlement have been sold, the Trust then recorded the receipt of cash which is deposited into the single bank account that holds all of the reserve funds.

54.      In some instances, Pacific West and Calhoun instructed the Trust to purchase a policy before they sold all of the fractional interests to investors.  In such cases, the premium receivable booked by the Trust remained outstanding.  Pacific West and Calhoun continued to offer interests in the policy to investors, and as funds were received, Pacific West and Calhoun instructed the Trust on the amount of new investor funds that should be booked to pay down the outstanding Primary Premium Reserve receivable, and the amount to be disbursed to Pacific West as its margin.  In these instances, the investors were dependent on Pacific West's and Calhoun's ability to sell the remaining interests in the policy to generate sufficient money to fund the Primary Premium Reserve.  In some cases, Pacific West directed payments of new investor cash to itself even while the Primary Premium Reserve was not fully funded.

**8.      The life settlements offered and sold by Defendants are securities**

55.      The life settlements offered and sold by Defendants are securities.  The investors' funds are pooled for the purposes of purchasing the policies underlying the life settlements.  Pacific West and Calhoun selected the policies to be purchased with the money raised from investors, and negotiated the purchase prices for those

policies.  The Trust also assumed the responsibility of making premium payments for the life settlements.

56.     The returns paid to investors depend in significant part upon the ability of Pacific West and Calhoun to estimate a reasonably accurate Contract Period and calculate a sufficient Primary Premium Reserve.  If they underestimated the length of the Contract Period, then the chances increased that the investors would realize substantially lower net and annual returns.

57.     Pacific West and Calhoun also set up the reserve structure to pay the premiums on the underlying policies.  They determined how much money should be placed in these reserves, and they determined how much of the reserves should be used to pay the policy premiums.  For example, the Secondary Premium Reserves are funded with 1% of all sales, and that percentage was set by Pacific West and Calhoun.  In addition, Pacific West sometimes retains fractional interests in some of the policies sold to investors.

58.     Finally, beginning in 2012, Pacific West used a substantial portion of the funds it received from the sale of new life settlements to pay premiums on older policies where the Primary Premium Reserves had been depleted.

59.     The Purchase Agreement used by Pacific West referred to the sale of securities in discussing the life settlements, and brochures distributed by Pacific West informed potential investors that life settlements are considered securities in California.  In fact, the life settlements sold by Pacific West and Calhoun are defined as "securities" under the California Corporations Code.

60.     The life settlements sold by Pacific West and Calhoun are a single offer and sale of securities.  Pacific West and Calhoun have conducted the offering continuously since 2004, have sold the same class of securities consisting of life settlements, under the same general terms, and using the same basic offering materials, and all sales involved cash.  One of the main selling points was the existence of the Secondary Premium Reserves, which were funded by a percentage of

all life settlements sold by Pacific West, and the Tertiary Premium Reserves which were funded by any unused Primary Premium Reserves on other life settlements.

**B.    Pacific West's and Calhoun's Scheme to Defraud Investors**

61.    Beginning no later than early 2012 and continuing to at least November 2014, an increasing number of life settlements sold from 2004 through 2008 by Pacific West and Calhoun ran out of funds in their Primary Premium Reserves.  The Primary Premium Reserves were depleted because Calhoun set up a Primary Premium Reserve that was insufficient to cover premiums necessary to keep policies in force during the Contract Period, and/or because the Insureds had outlived the Contract Period.

62.    Beginning in 2012 and continuing through at least November 2014, Pacific West and Calhoun directed the Trust to use a portion of Pacific West's margin from the sale of new life settlements to pay premiums on older policies where the Primary Premium Reserve account had been depleted.  Pacific West and Calhoun did not follow the disclosed protocol of drawing funds from the Secondary and Tertiary Premium Reserves, and if those were depleted, then requiring investors to pay additional amounts consisting of their pro rata share of premiums to keep policies in force.

63.    Between January 1, 2012 and November 14, 2014, Pacific West and Calhoun directed the Trust to use approximately $1.9 million of new investor funds from the sale of life settlements during that period, to pay premiums on policies they had sold to investors between 2004 and 2008.  The $1.9 million represented approximately 5% of all funds Pacific West and Calhoun raised from investors during that period, and approximately 11% of the approximately $17.2 million that Pacific West received from the sale of life settlements during that period.

64.    By paying the premiums from the margin generated from the sale of new life settlements to investors, Pacific West and Calhoun avoided using any funds from the Secondary or Tertiary Premium Reserves, and avoided making a premium cash

call to any investor. In fact, the Secondary and Tertiary Premium Reserves totaled slightly over $1.1 million as of November 2014, so that the contingent reserves were insufficient to pay the over $1.9 million in premiums that Pacific West and Calhoun paid from new investor money. If Pacific West and Calhoun had followed the protocol disclosed to investors, the Secondary and Tertiary Premium Reserves would have been completely depleted, and they would have needed to make premium calls for over $780,000 to investors. Such a course of events would have put a significant damper on their sales efforts and their ability to raise money from new investors.

65.     During the same period, Pacific West and Calhoun, directly and through the Sales Agents, told new and existing investors that it had never used any funds from the Secondary or Tertiary Premium Reserves to pay premiums on any policy they had sold as life settlements, and had never made a premium cash call to investors for additional funds to pay premiums. They also told investors that Pacific West offered and sold life settlements on policies that they estimated would mature in four to seven years, and that Pacific West did not have any continuing involvement in the success of the life settlements once the policies were purchased by the Trust.

66.     Pacific West and Calhoun engaged in this conduct to generate additional sales of life settlements by creating the false appearance that they were successfully selecting policies that will mature within four to seven years, and that the life settlements they sold in fact matured during the Contract Period.

67.     Pacific West and Calhoun engaged in this conduct to create the false appearance that Pacific West was successful in estimating sufficient amounts of Primary Premium Reserves, so that there was a low risk that investors would need to pay additional sums as a consequence of a premium cash call and thereby realize lower annual returns.

68.     Pacific West and Calhoun engaged in this conduct to create the false appearance that Pacific West did not have a continuing involvement in the life settlements after policies were purchased by the Trust, and the life settlement

investors would not be affected if Pacific West went out of business.

69.     In perpetrating this fraudulent scheme, Calhoun acted with scienter.  As the control person of Pacific West, Calhoun's scienter is imputed to Pacific West.

70.     Through at least early 2014, Calhoun had not informed the Sales Agent Defendants that Pacific West and Calhoun were using funds from the sale of new life settlements to pay premiums on older policies which had depleted their Primary Premium Reserve Account.  Calhoun disclosed this information to the Sales Agent Defendants during the course of the SEC's investigation after some of the Sales Agent Defendants had been subpoenaed to provide testimony.

71.     From at least early 2012 through at least March 2014, Pacific West and Calhoun had not informed potential investors that Pacific West used money from the sale of new life settlements to pay premiums on older policies sold from 2004 to 2008.  Pacific West and Calhoun also failed to tell potential investors that in so doing, Pacific West disregarded the disclosed procedure for paying premiums when the Primary Premium Reserve had been depleted.

72.     At all relevant times, Calhoun knowingly, recklessly or negligently perpetrated this fraudulent scheme.  As the founder, sole owner, and president of Pacific West, Calhoun's knowledge, recklessness and negligence are imputed to Pacific West.

**C.     Pacific West's and Calhoun's Materially False and Misleading Statements, and Omission of Material Facts**

**1.     Pacific West and Calhoun misled investors about the risk of having to make future, out-of-pocket, premium payments**

73.     Pacific West and Calhoun made materially false and misleading statements, and omitted material facts, regarding the investors' risk of having to make future, out-of-pocket, premium payments that would be substantially higher than the premiums disclosed in the Disclosure Form.  Pacific West and Calhoun knew, or were reckless or negligent in not knowing, that these material misstatements and

1   omissions were false when made.

2       74.    In the Disclosure Form, Pacific West and Calhoun stated the annual

3   premium amount, the premium due date, and the Contract Period covered by the

4   Primary Premium Reserve.  Pacific West's Purchase Agreement and Disclosure Form

5   stated that if the reserves were exhausted, then investors were liable for their pro rata

6   share of premiums needed to keep a policy in force.

7       75.    These disclosures were misleading because they omitted material

8   information that if there was a premium call, the premiums would be substantially

9   higher than the premium amount disclosed in the Disclosure Form.  The premiums

10   would be substantially higher because the premiums necessary to keep the policies in

11   force increase substantially over time; and Pacific West and Calhoun used up any

12   cash value in the policies to subsidize the disclosed premium amount.

13       76.    Calhoun and Pacific West knew, or were reckless or negligent in not

14   knowing, that premiums would spike at the end of the Contract Period.  If an investor

15   were required to pay pro rata shares of a substantially higher premium, then that

16   would negatively impact the investor's returns.  Pacific West and Calhoun generally

17   did not disclose the premium spike, the amount of the spike, or the reasons for the

18   spike.

19       77.    Pacific West and Calhoun also misled investors by omitting material

20   information about the likelihood that investors will have to meet a premium cash call.

21   Pacific West and Calhoun, directly and through the Sales Agent Defendants,

22   represented to investors that the Secondary and Tertiary Premium Reserves had never

23   been used to pay policy premiums.  Pacific West and Calhoun failed to disclose

24   material information that the reason that the Secondary and Tertiary Premium

25   Reserves had not been used was because Pacific West and Calhoun were using funds

26   from the sale of new life settlements to pay premiums on older policies.

27       78.    When a potential investor asked about the likelihood of a premium call,

28   Pacific West, directly and through the Sales Agent Defendants, stated that the

Secondary and Tertiary Premium Reserves had never been touched.  In general, Pacific West refused to disclose the amount in those reserves, and refused to disclose the number of life settlements that had not paid off during the Contract Period.

79.    Information about the risks relating to the amount and likelihood of a premium call was material to investors because, among other reasons, it could significantly impact the returns the investors received on their investments in the life settlements.

**2.    Pacific West and Calhoun made misleading statements and omitted material information about the investors' annual returns and the maturity of the policies**

80.    Pacific West and Calhoun made misleading statements and omissions to investors about the investors' annual returns and the maturity of the policies that they offered and sold.  Pacific West and Calhoun knew, or were reckless or negligent in not knowing, that these material misstatements and omissions were false and misleading when made.

81.    Pacific West, through Calhoun and the Sale Agent Defendants, represented to potential investors orally and through emails that Pacific West selected policies that "typically," or it "estimate[s]," "feel[s]," or "target[s]" will mature (e.g., pay a death benefit) in four to seven years.  Pacific West and Calhoun omitted material information that they had no reasonable basis to make those representations, because they did not rely on life expectancies or other actuarial data in selecting policies or setting Contract Periods.

82.    Pacific West, through Calhoun and the Sales Agent Defendants, represented that Secondary and Tertiary Premium Reserves had never been drawn on to make premium payments, which while true, omitted material information that the reserves had not been used only because Calhoun was using money from the sale of new life settlements to pay premiums on older policies to create the façade that he never had to touch the reserves.

83.     Beginning in early 2012, these representations were also misleading because they omitted material information that only a small percentage of the life settlements sold matured with seven years.  As of November 2014, just 7.6% of the life settlements sold during 2004 and 2007, representing just over 6% of the total face value, matured within seven years.

84.     Information that Pacific West and Calhoun were using new investor proceeds to pay premiums on older policies was material to their statements that they had not used reserves to make premium payments.  Information about the accuracy of the estimates of when a policy would mature was material to investors because it could significantly affect the length of time until an investor received a return, the net annual return, the cost of the investment, and the risk that the life settlement would expire before the policy paid a death benefit.

**3.    Pacific West and Calhoun omitted material information relating to Pacific West's role in the life settlements**

85.     Pacific West and Calhoun falsely represented that the success of an investment in a life settlement was completely independent of Pacific West's efforts or fortunes, and omitted material information regarding their continuing role in the success of the life settlements they offered and sold.  Pacific West and Calhoun knew, or were reckless or negligent in not knowing, that these misrepresentations and omissions were false and misleading when made.

86.     Pacific West's Purchase Agreement stated "that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with" Pacific West.

87.     Pacific West represented to investors in at least one sales brochure that the life settlements are "independent" of Pacific West, that the "prosperity" of Pacific West "does not affect you at all," and that "your investment is implemented before

1  distributions are made to us."

2      88.    The statements were false and misleading because the investors'

3  economic benefit is dependent upon Calhoun's and Pacific West's ability accurately

4  to estimate a Contract Period and a sufficient Primary Premium Reserve.

5      89.    The statements were false and misleading, and omitted material facts,

6  because the investors' economic benefit depends on Pacific West's ability to raise

7  new investor funds and its willingness to use a portion of those funds to pay the

8  Trust's fees and premiums on policies where the Primary Premium Reserve is

9  depleted.  In fact, Pacific West has paid the Trust's fees and expenses, and used

10  approximately $1.9 million to pay premiums on older policies.  If Pacific West went

11  out of business, then investors would have to pay these fees and premiums which

12  would negatively affect the investors' returns.

13      90.    The statements were also false and misleading, and omitted material

14  facts, for those policies where Pacific West and Calhoun had paid themselves

15  distributions before fully funding the reserves.  In certain instances, Pacific West and

16  Calhoun instructed the Trust to purchase policies before Pacific West raised sufficient

17  funds from investors to fund fully the Primary Premium Reserve.  As of November

18  2014, the books and records of the Trust showed that the Primary Premium Reserve

19  for life settlements sold by Pacific West was owed approximately $1.1 million to

20  satisfy unfunded reserves.  At the same time that Calhoun and Pacific West allowed

21  these Primary Premium Reserve receivables to remain unfunded, Calhoun caused

22  Pacific West to be paid over $3.7 million in connection with the sales of life

23  settlements in the policies with unfunded Primary Premium Reserves.  As a

24  consequence of this conduct, Pacific West's representations to investors that

25  investments were "implemented before distributions are made to us" was false.

26      91.    Information concerning risks relating to Pacific West's continuing role

27  in the life settlements, and the effect of Pacific West's going out of business, was

28  material to investors, and in fact, investors asked for this information.  In response to

such inquiries, Pacific West reassured potential investors that its going out of business would have no effect because the life settlements and policies and premium reserves were held by the Trust.

92.     At all relevant times with regard to the above-alleged false and misleading statements, and omissions of material fact, Calhoun acted with knowledge, recklessness or negligence.  Calhoun's knowledge, recklessness and negligence are imputed to Pacific West.

**D.    The Defendants' Unregistered Offer and Sale of Securities**

93.     The life settlements offered and sold by Defendants beginning in 2004 and continuing to the present, and issued by the Trust, are a single offering of securities.

94.     Defendants used means and instrumentalities of interstate commerce to effect the offer, sale, and issuance of the life settlements.  Pacific West and Calhoun advertised using radio, television, and internet advertising, and documents were sent through the mails and using the internet.  Pacific West and Calhoun are located in California, and the Trust is an Ohio business with its principal place of business in Cleveland.  Calhoun and Pacific West used means and instrumentalities of interstate commerce to direct investors' funds to the Trust, to communicate with the trustee, and to receive payments of Pacific West's margin from the Trust and trustee.

95.     The Sales Agent Defendants each emailed, telephoned and/or met in person with investors and potential investors in connection with the offer and sale of Pacific West life settlements.  The Sales Agent Defendants are located in California, Washington, and South Carolina.

96.     There is no registration statement on file or in effect with the SEC for the offer or sale of life settlements by Defendants.

**E.    Pacific West, Calhoun, and the Sales Agent Defendants Are Unregistered Broker-Dealers**

97.     Pacific West, Calhoun, and the Sales Agent Defendants are acting as

brokers by effecting transactions in life settlements for the account of others by soliciting investors, providing investors with disclosure documents, and participating in taking investors' orders.

98.     Pacific West, Calhoun, and the Sales Agent Defendants receive transaction-based compensation from the sale of life settlements to investors. Calhoun and the Sales Agent Defendants receive 8% commission on the dollar value of the fractional interests they each sell.  The Sales Agent Defendants also receive a 2% override commission on sales of outside agents with whom they work.  Pacific West receives a percentage of all sales, which on average was 46% of the amounts raised from investors.

99.     During the period from 2004 through November 2014, Pacific West received approximately $45.9 million of the total $99.9 million raised from investors as its "margin," on the sales of life settlements.

100.   During the period from 2010 through November 2014 for which records are available, Calhoun personally received at least $7.6 million in salary, commissions, and other transfers from Pacific West.

101.   During the period from 2011 through November 2014 for which records are available, Barry received at least $681,000 in commissions from Pacific West directly and/or indirectly through her corporation BAK West.

102.   During the period from 2011 through November 2014 for which records are available, Calhoun Jr. received at least $485,000 in commissions from Pacific West.

103.   During the period from 2011 through November 2014 for which records are available, Cannon received at least $658,000 in commissions from Pacific West directly and/or indirectly through his corporation Century Point.

104.   During the period from 2011 through November 2014 for which records are available, Dotta received at least $438,000 in commissions from Pacific West.

105.   During the period from 2011 through November 2014 for which records

are available, Moody, doing business as Sky Stone, received at least $540,000 in commissions from Pacific West.

106.   Pacific West is not registered with the Securities and Exchange Commission as a broker or dealer.

107.   Calhoun, and the Sales Agent Defendants are not associated with a registered broker or dealer.

## FIRST CLAIM FOR RELIEF

### Fraud In Connection With the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder
### (Against Pacific West and Calhoun)

108.   The SEC realleges and incorporates by reference paragraphs 1 through 107 above.

109.   The defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a)   employed devices, schemes, or artifices to defraud;

(b)   made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

110.   By engaging in the conduct described above, the defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

1

2

3

4

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a) of the Securities Act

### (Against Pacific West and Calhoun)

5

6

111.   The SEC realleges and incorporates by reference paragraphs 1 through 107 above.

7

8

9

10

112.   The defendants, and each of them, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:

11

(a)   with scienter, employed devices, schemes, or artifices to defraud;

12

13

14

15

(b)   obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

16

17

(c)   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

18

19

20

21

113.   By engaging in the conduct described above, all of the defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

22

## THIRD CLAIM FOR RELIEF

23

### Unregistered Broker-Dealer

24

### Violations of Section 15(a) of the Exchange Act

25

26

### (Against Pacific West; Calhoun; Barry; BAK West, Inc.; Calhoun Jr.; Cannon; Century Point, LLC; Dotta; and Moody)

27

28

114.   The Commission realleges and incorporates by reference paragraphs 1 through 107 above.

115.   Defendants Pacific West, Calhoun; Barry; BAK West, Inc.; Calhoun Jr.; Cannon; Century Point, LLC; Dotta, and Moody, by engaging in the conduct described above, used the mails and the means and instrumentalities of interstate commerce, to effect transactions in, or induct or attempt to induce the purchase or sale of securities, without registering being with the Commission as a broker.

116.   By engaging in the conduct described above, defendants violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

### FOURTH CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities in Violation of**

**Section 5(a) and 5(c) of the Securities Act**

**(Against All Defendants)**

117.   The Commission realleges and incorporates by reference paragraphs 1 through 107 above.

118.   Defendants, by engaging in the conduct described above, directly or indirectly, and without a registration statement in effect as to such securities:

(a)   made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise; or

(b)   carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale.

119.   Defendants, by engaging in the conduct described above, also directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise securities, without a registration statement having been filed as to those securities.

120.   By engaging in the foregoing conduct, Defendants directly or indirectly,

COMPLAINT                                27

violated, and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## FIFTH CLAIM FOR RELIEF

### Controlling Person Liability

### Under Section 20(a) of the Exchange Act

### (Against Calhoun)

121.   The Commission realleges and incorporates by reference paragraphs 1 through 107 above.

122.   Alternatively, defendant Calhoun is, or was at the time the acts and conduct set forth herein were committed, directly or indirectly, a person who controlled Pacific West and who sold securities through fraudulent means in violation of the Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

123.   Defendant Calhoun is, or was at the time the acts and conduct set forth herein were committed, directly or indirectly, a person who controlled Pacific West who effected securities transactions without being registered with the Commission as a broker in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

124.   By engaging in the conduct described above, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), defendant Calhoun is jointly and severally liable with, and to the same extent as, the persons they controlled for violations of Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the

alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, preliminarily and permanently enjoining the defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c), and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and 77q(a), and Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a), and Rules 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

## III.

Order defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## IV.

Order defendants Pacific West, Calhoun, and the Sales Agent Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. 78u(d)(3).

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

///
///
///
///
///
///

1

**VI.**

2       Grant such other and further relief as this Court may determine to be just and

3 necessary.

4 Dated:  April 7, 2015

5                          */s/  John B. Bulgozdy*

6                          John B. Bulgozdy

7                          Kristin S. Escalante

8                          Kelly C. Bowers
                          Todd Brilliant

9                          Attorneys for Plaintiff
                          Securities and Exchange Commission

COMPLAINT

30