JOHN B. BULGOZDY (Cal. Bar No. 219897)
Email:  bulgozdyj@sec.gov
KRISTIN S. ESCALANTE (Cal. Bar No. 169635)
Email:  escalantek@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email:  bowersk@sec.gov
TODD BRILLIANT (Cal Bar No. 147727)
Email:  brilliantt@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>              Plaintiff,<br><br>       vs.<br><br>PACIFIC WEST CAPITAL GROUP, INC.; ANDREW B CALHOUN IV; PWCG TRUST; BRENDA CHRSTINE BARRY; BAK WEST, INC.; ANDREW B CALHOUN JR.; ERIC CHRISTOPHER CANNON; CENTURY POINT, LLC; MICHAEL WAYNE DOTTA; and CALEB AUSTIN MOODY (dba SKY STONE),<br><br>              Defendants. | Case No.  2:15-cv-02563 (FMO) (FFMx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANTS PACIFIC WEST CAPITAL GROUP, INC., ANDREW B CALHOUN IV AND PWCG TRUST**<br><br>Date:      May 21, 2015<br>Time:     10:00 a.m.<br>Ctrm:     22<br>Judge:    Hon. Fernando M. Olguin |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS .......................................................................... 2

    A.   The Pacific West "Life Settlement" Securities ................................ 2

    B.   Life Settlement Returns and the Premium Reserves ....................... 3

    C.   The Defendants' Roles in the Life Settlements .............................. 5

    D.   The Solicitation of Pacific West Investors ..................................... 5

    E.   Limited Disclosures to Investors ................................................... 6

    F.   The Use of Investor Proceeds ....................................................... 7

    G.   The Undisclosed Risks of Pacific West Life Settlements ............... 8

    H.   Pacific West's and Calhoun's Ongoing Fraud .............................. 9

        1.   Pacific West's and Calhoun's fraudulent scheme ............... 9

        2.   Pacific West's and Calhoun's false statements and omissions ........ 10

III.  ARGUMENT ........................................................................................... 14

    A.   The Standard for a Preliminary Injunction Is Different In SEC Enforcement Actions ................................................................... 14

    B.   The SEC Has Made A *Prima Facie* Showing That Pacific West, The Trust and Calhoun Are Violating the Federal Securities Laws ................ 15

        1.   Life settlements are securities under the federal securities laws ..... 15

        2.   Pacific West and Calhoun are violating the antifraud provisions of the federal securities laws ..................................... 16

            a.   Pacific West's and Calhoun's fraudulent scheme ................. 16

            b.   Their misstatements and omissions ....................................... 17

            c.   The materiality of their fraud ................................................. 19

            d.   Their scienter, or at a minimum, their negligence ................ 19

        3.   Pacific West, the Trust and Calhoun are violating the registration provisions of Section 5 of the Securities Act .............. 22

        4.   Pacific West and Calhoun are operating as unregistered brokers in violation of Exchange Act Section 15(a) ................. 23

    C.   Defendants' Violations Are Likely To Continue Unless Restrained ........ 24

i

IV.    CONCLUSION.................................................................................................25

# **TABLE OF AUTHORITIES**

## **CASES**

*Aaron v. SEC*,
    446 U.S. 680 (1980)...................................................................................19

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)...................................................................................19

*Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*,
    No. 8:04CV586, 2006 WL 2620985 (D. Neb. Sept. 12, 2006).........................23

*FSLIC v. Sahni*,
    868 F.2d 1096 (9th Cir. 1989) ...................................................................14

*FTC v. H.N. Singer, Inc.*,
    668 F.2d 1107 (9th Cir. 1982) ...................................................................14

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) .....................................................................18

*Hollinger v. Titan Capital Corp.*,
    914 F.2d 1564 (9th Cir. 1990) ..............................................................19, 20

*In re Trade Partners, Inc. Investors Litig.*,
    No. 1:07–MD–1846, 2008 WL 3992168 (W.D. Mich. Aug. 22, 2008)...........16

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990).....................................................................................15

*SEC v. Alliance Leasing Corp.*,
    No. 98-CV-1810-J (CGA), 2000 WL 35612001
    (S.D. Cal. Mar. 20, 2000) ..........................................................................23

*SEC v. Allison*,
    No. C-81-19 RPA, 1982 WL 1322 (N.D. Cal. Aug. 11, 1982)......................25

*SEC v. Banc de Binary Ltd.*,
    964 F.Supp.2d 1229 (D. Nev. 2013) ...........................................................22

*SEC v. Benger*,
    697 F. Supp. 2d 932 (N.D. Ill. 2010)..........................................................24

*SEC v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) .........................................................16, 18, 20

*SEC v. Devon*,
    977 F. Supp. 510 (D. Me. 1997)..................................................................24

*SEC v. Edwards*,
    540 U.S. 389 (2004)...................................................................................15

*SEC v. Eurobond Exchange, Ltd.*,
    13 F.3d 1334 (9th Cir. 1994) ......................................................................22

*SEC v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996) ............................................................... 18, 24

*SEC v. Holschuh*,
    694 F.2d 130 (9th Cir. 1982) ...................................................................... 22

*SEC v. Homestead Props. L.P.*,
    No. SACV09-01331-CJC (MLGx), 2009 WL 5173685
    (C.D. Cal. Dec. 18, 2009) ......................................................................... 15

*SEC v. Hughes Capital Corp.*,
    124 F. 3d 449 (3rd Cir. 1997) .................................................................... 20

*SEC v. Interlink Data Network of Los Angeles, Inc.*,
    No. 93-3073 R, 1993 WL 603274 (C.D. Cal. Nov. 15, 1993) ...................... 23

*SEC v. Kenton Capital, Ltd.*,
    69 F. Supp. 2d 1 (D.D.C. 1998) ................................................................ 23

*SEC v. Life Partners Holdings, Inc.*,
    41 F.Supp.3d 550 (W.D. Tex. 2013) .......................................................... 16

*SEC v. Management Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975) ...................................................................... 14

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 (2d Cir. 1972) .................................................................... 21

*SEC v. Margolin*,
    1992 WL 279735 (S.D.N.Y. Sept. 30, 1992),
    *aff'd*, 7 F.3d 220 (2d Cir. 1993) ............................................................... 23

*SEC v. Martino*,
    255 F. Supp. 2d 268 (S.D.N.Y. 2003) ...................................................... 23

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) ............................................................ 15, 23, 24

*SEC v. Mutual Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) ................................................................... 16

*SEC v. National Executive Planners, Ltd.*,
    503 F. Supp. 1066 (M.D.N.C. 1980) ........................................................ 23

*SEC v. Nationwide Automated Systems, Inc.*,
    CV 14-07249 SJO (FFMx), Slip. Op. (C.D. Cal. Sept. 30, 2014) ............... 15

*SEC v. Pattison*,
    No. C-08-4238 EMC, 2011 WL 723600 (N.D. Cal. Feb. 23, 2011) ............. 24

*SEC v. Phan*,
    500 F.3d 895 (9th Cir. 2007) ...................................................................... 22

*SEC v. Platforms Wireless Intern. Corp.*,
    559 F. Supp. 2d 1091 (S.D. Cal. 2008),
    *aff'd*, 617 F.3d 1072 (9th Cir. 2010) ......................................................... 21

*SEC v. Platforms Wireless Intern. Corp.*,
   617 F.3d 10721092 (9th Cir. 2010) ................................................17, 19

*SEC v. R.G. Reynolds Enters.*,
   952 F.2d 1125 (9th Cir. 1991) ........................................................15

*SEC v. Rana Research, Inc.*,
   8 F.3d 1358 (9th Cir. 1993) ..........................................................17

*SEC v. Schooler*,
   902 F. Supp. 2d 1341 (S.D. Cal. 2012) ....................................14, 22, 25

*SEC v. Unique Financial Concepts, Inc.*,
   196 F.3d 1195 (11th Cir. 1999) ....................................................14

*SEC v. United Financial Group, Inc.*,
   474 F.2d 354 (9th Cir. 1973) ........................................................14

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)..............................................................15, 16

*SEC v. Wencke*,
   622 F.2d 1363 (9th Cir. 1980) ......................................................14

*Simpson v. AOL Time Warner, Inc.*,
   452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds sub nom.*,
   *Avis Budget Group Inc. v. Cal. State Teachers' Ret. System*, 552 U.S.
   1162 (2008)..........................................................................17

*Smith v. SEC*,
   653 F.3d 121 (2d Cir. 2011) ........................................................14

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008)................................................................16

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)................................................................19

*United States v. Odessa Union Warehouse Co-Op*,
   833 F.2d 172 (9th Cir. 1987) ......................................................24

*Vernazza v. SEC*,
   327 F.3d 851 (9th Cir. 2003) ......................................................19

*Wuliger v. Christie*,
   310 F.Supp.2d 897 (N.D. Ohio 2004) ............................................16

**FEDERAL STATUTES**

**Securities Act of 1933**

Section 2(a)(1)
   [15 U.S.C. § 77b(a)(1)]............................................................15

Section 5
   [15 U.S.C. § 77e] ................................................................22, 25

Section 5(a)
    [15 U.S.C. § 77e(a)].................................................................22

Section 5(c)
    [15 U.S.C. § 77e(c)].................................................................22

Section 17(a)
    [15 U.S.C. § 77q(a)] ....................................................16, 17, 25

Section 17(a)(1)
    [15 U.S.C. § 77q(a)(1)]..........................................................19

Section 17(a)(2)
    [15 U.S.C. § 77q(a)(2)]..........................................................19

Section 17(a)(3)
    [15 U.S.C. § 77q(a)(3)]..........................................................19

Section 20(b)
    [15 U.S.C. § 77t(b)].................................................................14

**Securities Exchange Act of 1934**

Section 3(a)(10)
    [15 U.S.C. § 78c(a)(10)].........................................................15

Section 3(a)(4)
    [15 U.S.C. § 78c(a)(4)]...........................................................23

Section 10(b)
    [15 U.S.C. § 78j(b)] ......................................................16, 17, 25

Section 15(a)
    [15 U.S.C. § 78o(a)] .........................................................23, 25

Section 15(a)(1)
    [15 U.S.C. § 78o(a)(1)].....................................................23, 24

Section 20(a)
    [15 U.S.C § 78t(a)] .................................................................24

Section 21(d)
    [15 U.S.C. § 78u(d)] ...............................................................14

**FEDERAL REGULATIONS**

Rule 10b-5
    [17 C.F.R. § 240.10b-5]....................................................16, 25

**CALIFORNIA CORPORATIONS CODE**

Cal. Corp. Code § 25019 (2014) ...................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I.      **INTRODUCTION**

The Securities and Exchange Commission ("SEC") moves to preliminarily enjoin defendants Andrew B Calhoun IV ("Calhoun"), Pacific West Capital Group, Inc. ("Pacific West") and PWCG Trust ("Trust") from continuing to violate the federal securities laws.  The defendants offer and sell securities called "life settlements," which are investments in life insurance policies.  Life settlements pay investors a return when the underlying life insurance policy "matures" and the policy benefits are paid—that is, when the insured dies—and defendants promise investors they will make at least 100% on these investments.  Since 2004, Calhoun and Pacific West have offered and sold life settlements to over 3,200 investors for proceeds of over $99 million.  Of that amount, almost half, or about $46 million, was distributed to Pacific West, and millions of dollars have been distributed to Calhoun and the Pacific West sales agents, who are also defendants in this action.

The Trust is the issuer of the life settlement securities, and Calhoun personally selects the underlying insurance policies.  He also determines how long the Trust will pay the policy premiums and how much investor funds should be set aside in cash reserves to cover these payments.  In selling these securities, the defendants claim Calhoun can pick policies that will mature before their allegedly "proprietary" three-tiered system of reserves runs out of money.  They also assure investors that they have never needed to tap into the backup, contingent reserves to pay premiums, and have never asked investors to make any premium payments.

But Pacific West and Calhoun are engaging in a scheme to conceal the truth behind these investments.  Unbeknownst to investors, an ever-increasing number of older policies have taken longer to mature—that is, the insureds are living longer than anticipated—and so the first levels of cash reserves normally used to pay premiums on these policies are being depleted.  To cover this up, since at least 2012, Pacific West and Calhoun are using money raised from new investors to pay the premiums for life settlements sold to investors years earlier.  By doing so, they avoided having

1   to empty the second and third levels of contingent reserves and asking their investors

2   to fork over another $750,000 just to keep the policies in force.  Pacific West and

3   Calhoun have thus created the false appearance that their life settlements and cash

4   reserve system are performing as promised, which has allowed them to continue to

5   raise money from investors and pocket millions in margin or commissions.

6     Pacific West and Calhoun have also misrepresented and omitted material facts

7   about the life settlements.  They have purposefully downplayed the significant risk

8   that investors will be required to pay their *pro rata* share of the policy premiums as

9   insureds live longer than expected and the reserves are insufficient to cover the

10  premiums.  Nor have they disclosed that these cash calls will be substantially higher

11  than the premium amounts initially disclosed to investors because the premiums spike

12  up if the insured lives longer than expected.  They are also misleading investors about

13  the total and annual returns that should be expected, and are falsely representing that

14  the profitability of the investments has nothing to do with Pacific West.

15    In addition to this ongoing fraud, Pacific West, the Trust and Calhoun are

16  violating the registration requirements of the federal securities laws by offering and

17  selling the life settlements without registering the offering with the SEC.  Moreover,

18  Pacific West and Calhoun are unlawfully operating as unregistered broker-dealers.

19    Accordingly, the SEC respectfully requests that the Court enter a preliminary

20  injunction to stop Pacific West's and Calhoun's ongoing fraud, to enjoin Pacific

21  West, the Trust and Calhoun from continuing the unregistered offering, and to enjoin

22  Pacific West and Calhoun from acting as unregistered broker-dealers.

23  **II.**  **STATEMENT OF FACTS**

24    **A.**  **The Pacific West "Life Settlement" Securities**

25    The life settlements that defendants sell are fractionalized interests in a type of

26  life insurance policy called "universal" or "flexible premium adjustable" life

27  insurance.  *See* Declaration of Todd Brilliant ("Brilliant Decl."), Ex. 1 at 19, 2 at 46,

28  Ex. 3 at 54 (letters, disclosures to investors explaining investment).  Universal life

1   insurance policies have both an insurance component (*i.e.*, they pay out when the

2   insured dies) and a savings component (*i.e.*, they accumulate investment returns).  *See*

3   *id.*, Ex. 4 (Calhoun Tr.) at 35:14-36:11.

4        When investors buy a Pacific West life settlement, they acquire a percentage

5   interest in the death benefit paid by the policy when the insured dies.  *See id.*, Ex. 1 at

6   19, Ex. 2 at 46, Ex. 3 at 54.  Investors deposit their funds with the Trust, which at the

7   direction of Calhoun and Pacific West, pools the investor funds and purchases an

8   insurance policy.  *See* Declaration of Dora Zaldivar ("Zaldivar Decl.") ¶¶ 11-12;

9   Brilliant Decl., Ex. 6 (trust agmt.) at 193-94, Ex. 7 (brochure) at 209.  The Trust, an

10  Ohio business trust, then becomes the policyholder and assigns fractionalized

11  interests in the policies to the investors.  *See* Brilliant Decl., Ex. 1 at 15, 19, Ex. 3 at

12  51, 54; Declaration of Ira Belsky ("Belsky Decl."), Ex. 2 at 8-9, Ex. 3 at 25-26.

13  **B.    Life Settlement Returns and the Premium Reserves**

14       Life settlements are complex securities products, with significant risks that are

15  neither obvious nor easily understood.  In general, life settlements pay an investment

16  return when the insureds die and death benefits are paid on the underlying policy.

17  *See* Brilliant Decl., Exs. 92 at 1185-1187, 93 (investor packages).  The policyholder

18  (the Trust) is responsible for paying the cost of insurance during the life of the policy,

19  to keep the policy in force.  *See id.,* Ex. 6 at 196.  With universal life insurance,

20  which is the type of insurance at issue here, the premiums—the payments that the

21  holder makes each year—can be adjusted.  *See id.*, Ex. 94 at 1240.  If the annual

22  premium is adjusted so that it exceeds the cost of keeping the policy in force, then the

23  policy accumulates the excess in the form of savings, which becomes the "cash

24  value" of the policy; on the other hand, if the annual premium paid is lower than the

25  annual insurance cost, then the accumulated cash value of the policy can be used to

26  pay the shortfall.  *See id.*, Ex. 4 (Calhoun Tr.) at 35:14-36:11.  Using the cash value

27  of a policy to subsidize the costs of the insurance each year reduces the policy's cash

28  value year-over-year, but once the cash value reaches zero, it can no longer be used to

pay the annual cost of insurance. *See id.* at 35:20-36:11., Ex. 87 at 143:23-144:9.

Pacific West claims its life settlements are backed by a "proprietary" system of cash reserves, which they represent are designed to pay premiums for periods longer than the anticipated date of maturity of the underlying policy. *E.g.*, Brilliant Decl.. Ex. 86 (email) at 1115, Ex. 7 (brochure) at 210. To accomplish this, Pacific West claims it "target[s]" policies that are "estimate[d]" to mature "typically" in just four to seven years. *Id.*, Ex. 48 at 877, Ex. 49 at 880, Ex. 50 at 883, Ex. 51 at 890, Ex. 52 at 892 Ex.53 at 895, Ex. 54 at 901, Ex. 86 at 1114 (email informing investors to expect "a reasonable investment time horizon of 4 to 7 years"). These "targeted" policies are for insureds who are "at least 75 years old with chronic or degenerative health conditions." *Id.*, Ex. 7 at 213; *see also id.*, Ex. 4 (Calhoun Tr.) at 44:14-46:4. Pacific West then claims to establish large enough reserves to provide the Trust with sufficient funds to pay the premiums on the underlying policies for periods of generally six to nine years, which are longer than the estimated four-to-seven year period for a policy to mature. *See id.* ,Ex. 2 at 47, Ex. 3 at 56, Ex. 4 (Calhoun Tr.) at 154:7-9, Ex. 7 (brochure) at 210, Ex. 20 at 409. The specific length of time that the Trust will be responsible for paying a policy's premium with the primary reserve (the "Contract Period") is set by Pacific West and Calhoun. *See id.*

Pacific West and Calhoun tell investors that their cash reserves minimize the risk that an investor will have to make future, out-of-pocket premium payments. *See id.*, Ex. 7 at 210. They use three levels of reserves: (1) a "Primary Premium Reserve," which is a policy-specific reserve funded from the proceeds of the sale of the life settlement for the policy underlying the life settlement, and is supposed to be sufficient to pay premiums during the Contract Period set by Calhoun; (2) a "Secondary Premium Reserve," which is a reserve that is funded with 1% of the proceeds from the sale of all life settlements sold by Pacific West; and (3) the "Tertiary Premium Reserve," which is funded with any unused Primary Premium Reserves from all life settlements sold by Pacific West. *See id.*

### C.   The Defendants' Roles in the Life Settlements

Calhoun personally selects the policies to be purchased and sold to investors. *See id*., Ex. 4 (Calhoun Tr.) at 44:14-46:4, Ex. 7 at 206, 209, 213.  He also determines the price Pacific West will pay for a policy.  *See id*., Ex. 4 at 43:9-48:17.  In addition, he sets the length of the Contract Period and the amount of premium to be paid by the Trust during that period.  *See id*., Ex. 4 at 154:7-9, Ex. 6 at 196, Ex. 60.

In addition, the Trust operates under the direction of Pacific West and Calhoun. *See id.*, Exs. 5-6.  A trust agreement governs the relationship between the Trust and Pacific West, and the trustee performs his functions at the direction of Calhoun and Pacific West—including purchasing policies, issuing the life settlements, establishing and accounting for cash reserves for the premiums, paying the premiums on policies, and distributing returns to investors.  *See id*., Ex. 6 at 195-196.

### D.   The Solicitation of Pacific West Investors

Pacific West, wholly-owned and controlled by Calhoun, is not registered as a broker-dealer with the SEC.  *See id*., Ex. 4 at 26:6-27:24, Ex. 90.  The firm solicits prospective investors through radio, television, internet advertising, its website, and mass mailings inviting individuals to attend seminars.  *See id*., Ex. 4 at 30:9-33:3, Exs. 20-23.  Its website, www.pwcapital.net, is currently operational, and offers purported reasons to invest in Pacific West life settlements, provides answers to "frequently asked questions" about the investments, invites investors to request a free brochure, and provides contact information for Pacific West, Calhoun and the Pacific West sales agents.  *See id.*, Ex. 91 at 1155, 1158-59, 1167, 1172, 1175, 1178-84C.

The Pacific West sales agents, along with Calhoun, directly solicit investors. Calhoun and the sales agents receive calls from prospective investors, make presentations at Pacific West's seminars, arrange for investors to receive investment closing documents, and sell life settlements to investors.  *See id*., Ex. 4 (Calhoun Tr.) at 30:9-33:3, Ex. 24 (Barry Tr.) at 18:10-23, Ex. 25 (Calhoun Jr. Tr.) at 18:10-19:14, Ex. 26 (Cannon Tr.) at 56:4-57:14, Ex. 27 (Dotta Tr.) at 10:20-11:14.

1    Calhoun and the sales agent are paid 8% commissions on the sales of life

2    settlements, and can receive a 2% override commission of any amounts raised from

3    investors by outside sales representatives working with them.  *See id.,* Ex. 4 (Calhoun

4    Tr.) at 27:25-28:6, Ex. 27 (Dotta Tr.) at 82:6-19.

5        **E.    Limited Disclosures to Investors**

6        The offer and sale of the Pacific West life settlements have never been

7    registered with the SEC (*see id*., Ex. 88), and so fulsome disclosures required under

8    the SEC rules have never been provided to the investors.  Instead, the defendants

9    provide information to investors through communications and discussions with sales

10   agents or in brochures (*see*, *e.g.*, *id*., Exs. 7, 86), as well as in a Life "Settlement

11   Purchase Agreement" and a "Life Settlement Disclosure Form" that the investors

12   sign.  *See* Belsky Decl., ¶¶ 3-4, Exs. 2-3.  Defendants also tout their three-tiered

13   premium reserves to investors in sales materials, investor presentations and the

14   purchase agreements signed by investors when they buy life settlements.  *See*

15   Brilliant Decl., Ex. 1, Ex. 3, Ex. 7 at 210, Ex. 20.

16       In these disclosures to investors, Pacific West and Calhoun promise investors

17   that they will make "total fixed returns" of between 100% and 150%.  *See* Brilliant

18   Decl. Ex. 7 at 207.  The disclosure form signed by an investor states the specific total

19   fixed return for that investor's life settlement, as well as the specific terms of the

20   underlying policy and the percentage of the fractional interest being purchased.  *See*

21   *id.,* Ex. 2 at 46-47; Belsky Decl. Ex. 2 at 9-11.  The disclosure form also states the

22   annual premium amount that will be paid on the underlying policy and the Contract

23   Period (that is, how many years the primary reserve will be used to pay these

24   premiums).  *See*, *e.g.*, Belsky Decl., Ex. 2 at 10, Ex. 3 at 27.  For example, one

25   disclosure form for a life settlement investment in a policy that insures an 80-year old

26   male and has a face value (*i.e.*, death benefit) of $4 million states that a $20,000

27   investment gave the investor a "1.66%" stake in the "death benefit under this policy."

28   *Id.*, Ex. 2 at 9.  The form also states that the "total fixed return" for that life settlement

was 150%, and that "based upon your purchase in [$]20,000 amount, you will receive [$]50,000 upon maturity." *Id*. at 10.  In addition, it states that the annual premium for the policy will be $33,930 each year, and that "[f]unds will be escrowed to pay the premiums due on this policy for 8 years and will be paid by the Trustee." *Id*. at 10.

Calhoun drafted or reviewed and approved the purchase agreement and disclosure forms signed by investors, as well as the brochures and presentations given to investors.  *See* Brilliant Decl., Ex. 4 (Calhoun Tr.) at 132:4-13, 169:22-170:1, 143:18-144:6.  He also trains, supervises and provides the sales agents with information about Pacific West's business and its life settlements, and instructs them on what to say to investors.  *See id.,* at 29:2-19, 27:23-24; *see also id*. Ex. 24 (Barry Tr.) at 18:1-9, 19:6-16, 37:15-24, Ex. 25 (Calhoun Jr. Tr.) at 16:3-7, Ex. 26 (Cannon Tr.) at 57:22-23, 81:4-83:23, Ex. 27 (Dotta Tr.) at 10:16-19, 13:19-18:6, 18:14-19:18, 26:19-27:21, 32:14-33:22, Ex. 50 at 883 (Calhoun instructing sales agent).

## F.    The Use of Investor Proceeds

From late 2004 through November 2014, Pacific West and Calhoun raised more than $99.9 million from over 3,200 investors who purchased interests in about 125 policies.  *See* Zaldivar Decl., ¶ 12.  Pacific West and Calhoun used less than a third of that amount—about $29.3 million—to purchase policies and to cover related expenses.  *See id.,*¶ 12-13.  About $24.7 million, or about 25% of the money raised from investors, was used to fund the premium reserves.  *See id.,* Calhoun then instructs the Trust to pay Pacific West a so-called "margin" with the remainder of investor money not used to purchase policies or fund reserves.  *Id*., Exs. 2-3.  From late 2004 to November 2014, the Trust paid Pacific West about $45.9 million, or 46% of the $99.9 million raised from investors, as its margin.  *See id.,*¶¶ 12-13.

Calhoun and the sales agents are paid from Pacific West's margin.  *See* Zaldivar Decl., ¶¶ 14-15.  These payments are substantial.  During the two-year period from early 2012 to late 2014, Pacific West and Calhoun set aside $17.3 million of the $37.3 million raised from investors to pay Pacific West's margin.  *See id.,*¶ 13.

1   Calhoun received about $5.2 million of that amount, and the sales agents received

2   about $2.4 million in commissions.  *See id*., ¶ 14-15.  Pacific West also paid the

3   trustee about $237,510 in trustee fees.  *See id*., ¶¶ 17-18.

4       **G.**    **The Undisclosed Risks of Pacific West Life Settlements**

5           One key investment risk with Pacific West's life settlements is the risk that the

6   three-level system of reserves will not be enough to cover the annual premium

7   payments.  If that happens, an investor may be subjected to a "premium cash call,"

8   and asked to pay his or her *pro rata* share of these payments to prevent a policy from

9   lapsing or being terminated.  *See*, *e.g.*, Belsky Decl., Ex. 2 at 11.  While investors are

10   generally informed about the risk of premium cash calls, Calhoun and his sales agents

11   downplayed the risk, calling it "negligible."  Brilliant Decl., Ex. 86 at 1115.

12           This risk is exacerbated by the fact that the annual premiums increase

13   significantly after the Contract Period.  The cost of maintaining any underlying policy

14   rises during the Contract Period.  *See id*., Ex. 4 (Calhoun Tr.) at 91:1-93:1.  Although

15   Pacific West and Calhoun tell investors they may try to use a policy's cash value to

16   pay premiums beyond the Contract Period (*see id*., Ex. 7 at 210), they are actually

17   using that cash value to help the Trust pay the rising insurance costs during the six-to-

18   nine year Contract Period.  *See id.*, Ex. 4 at 85:19-87:6.  By using the cash value to

19   subsidize the insurance costs, Pacific West and Calhoun can then report to investors

20   low annual premiums that do not change year-to-year during the Contract Period.

21   *See*, *e.g.*, Belsky Decl., Ex. 2 at 10 (disclosing one annual premium for the eight-year

22   Contract Period).  But by the end of the Contract Periods, the cash values of the

23   policies underlying the life settlements will generally be fully depleted.  *See id.*, at

24   Ex. 4 at 95:11-97:6.  With little or no cash value available at the end of the period to

25   subsidize the insurance costs and reduce the annual premiums, the premiums increase

26   dramatically after the Contract Period.  *See id.*, at Ex. 61 at 983.  So, to the extent

27   investors are called upon to pay premiums, the premiums will be substantially higher

28   than the premiums disclosed to investors in the disclosure form and paid during the

Contract Period.  *See id.*, Ex. 58 at 920, Ex. 60, Ex. 61 at 983.  For example, for a life settlement on one $2 million policy, the investor disclosure form stated that the annual premium would be $15,000, and that it would be paid by the Trust for eight years.  *See id.*, Ex. 62 at 993.  However, what the investor does not know is that if the insured outlives that eight-year period, then, with no cash value remaining on the policy, the annual premium for the following year jumps up about 500%.  *See id.*, Ex. 64 at 1031 (insurance company letter to trustee explaining that the premium for this policy is $7,794 per month, or $93,500 per year, after the eight-year Contract Period).

### H.   Pacific West's and Calhoun's Ongoing Fraud

#### 1.   Pacific West's and Calhoun's fraudulent scheme

Since the beginning of 2012, Calhoun and Pacific West have engaged in a fraudulent scheme to hide a major deficiency in their product offering—that the underlying policies they selected are not maturing as quickly as they predicted, and so the Primary Premium Reserves established to pay these premiums are being depleted. Calhoun and Pacific West have been well aware of this problem for some time.  In October 2011, the trustee notified Pacific West and Calhoun that the Primary Premium Reserves set aside for some policies would soon be running out of money. *See id.*, Ex. 33 (trustee's email).  For example, the trustee informed Calhoun that "one of our first policies for PWCG" will not have enough premium reserve to keep the policy in force to "its original time frame [*i.e.*, through the end of the Contract Period]," and that the policy would soon lapse if a premium payment was not paid by February 2012.  *Id.* at 2.  By March 2013, the trustee warned Calhoun that about 85 of the 91 policies held at that time "may run out of cash value or will have premium reserves ending soon."  *Id.*, Ex. 40 (trustee's email) at 1.  In fact, by the second quarter of 2014, 21 of the 39 policies underlying the life settlements sold between 2004 and 2007 did not have any more primary reserves to pay their premiums during their Contract Periods.  *See* Zaldivar Decl. ¶¶ 26.

Rather using the secondary and tertiary reserves, or making investors pay

1  premium cash calls—both of which defendants assure investors they have never

2  done—Calhoun instructed the Trust in 2012 to pay the premium shortfalls with

3  proceeds from the sale of new life settlements.  *See, e.g.,* Brilliant Decl., Exs. 33-39;

4  Zaldivar Decl. ¶ 16.  Between 2012 and 2014, Calhoun instructed the Trust to use

5  about $1.9 million of investor proceeds to pay the premiums on policies where the

6  primary premium reserve had been depleted.  *See* Zaldivar Decl. ¶ 16.  As of

7  November 2014, the total balance of the Secondary and Tertiary Reserves was only

8  $1,147,196.  *See id.,*¶ 20.  Therefore, if Calhoun and Pacific West had followed the

9  disclosed protocol for paying premiums when the primary reserve was depleted, and

10  used the other two levels of reserves, they would have wiped out the Secondary and

11  Tertiary Reserves and been required to make cash calls to investors to cover the

12  shortfall of more than $750,000.

13       Pacific West's and Calhoun's use of new investor money to hide the problem

14  has increased each year since 2012.  This is true because the number of older policies

15  with depleted primary reserves is increasing every year, as are the premiums for those

16  older policies.  Therefore, the percentage of new investor funds that Pacific West and

17  Calhoun have used to pay the premiums has increased from 1.20% in 2012 to 8.65%

18  in 2014.  *See id.*, ¶ 16.

19       Investors, however, are not being told about this.  Pacific West and Calhoun

20  have never informed them that money from new investors was used to hide the fact

21  that policies were not maturing as quickly as they thought, that the reserves were

22  inadequate, or that the only reason premium cash calls were not being made was

23  because of this undisclosed practice.  *See*, *e.g.*, Declaration of Francis Enderle

24  ("Enderle Decl."), ¶ 20.  This scheme thus maintains this false appearance, so the

25  defendants can continue to sell life settlements to unsuspecting new investors, and to

26  keep cash flowing into their pockets.

27       **2.  Pacific West's and Calhoun's false statements and omissions**

28  In addition to this deceptive practice, Pacific West and Calhoun are making

materially false and misleading statements, and omitting material facts, to investors.

***First, Pacific West and Calhoun mislead investors about the likelihood and magnitude of premium cash calls***.  Because premium cash calls can significantly reduce the investment returns, investors repeatedly ask defendants about their exposure to these calls.  *See, e.g., id.*, Exs. 65-73 (emails to investors); Belsky Decl. ¶ 3; Enderle Decl., ¶¶ 19; Declaration of Ryan Young ("Young Decl.") ¶¶ 5-6.  Pacific West, Calhoun and the sales agents, however, routinely downplay the significant risk that investors will be subjected to make large premium cash calls to keep the underlying policies in force.  Indeed, while the investor disclosure forms acknowledge that these premium calls could happen, Calhoun and the sales agents tell investors that the risk of a premium cash call is small.  As one sales agent explained to an investor, "under our proprietary premium reserve structure, this risk is negligible."  Brilliant Decl., Ex. 86 at 1115; *see also* Belsky Decl., ¶ 3.

To reassure investors, Pacific West, Calhoun and the sales agents claim that Pacific West investors have never been required to make premium calls.  *See* Brilliant Decl., Ex. 86 at 1115 ("During our nine years in business, we have never had to use the assets in continent premium reserves.  Thus, we've never exercised a premium call.").  They also emphasize that there are millions of dollars in the premium reserves, and claim that Pacific West has never dipped into the second or third levels of reserves to cover premium payments.  *See, e.g., id.*, Exs. 41-47, 74-83.  But Pacific West and Calhoun do not tell investors that they have used money from the sale of new life settlements to pay premiums that would otherwise have depleted the secondary and tertiary reserves, and resulted in substantial cash calls.

In addition, Pacific West and Calhoun generally do not disclose to investors that the premiums will be substantially higher than the disclosed premium if there is a premium call after the Contract Period.  *See id.*, Ex. 4 (Calhoun Tr.) at 99:8-19.  Nor do they typically disclose that the premiums increase substantially each subsequent year.  *See id.,* at 98:22-99:22.  In the instances when sales agents do mention the

1   possibility  of premium increases, they have claimed that any increase would only be

2   "a few percentage points."  Enderle Decl. ¶ 12.  Defendants also generally do not

3   disclose that they use a policy's cash value to subsidize the payment of premiums

4   during the Contract Period, or that this reduces the disclosed amount of the annual

5   premium. *See, e.g.,* Brilliant Decl., Exs. 1-3.

6          ***Second, Pacific West and Calhoun are misleading investors about the***

7   ***returns and the maturity of the life settlements***.  One key part of Pacific West's and

8   Calhoun's purported investment strategy is their claim that their "proprietary" system

9   of reserves will cover the cost of keeping the policies in force because they select

10   policies that will reach maturity before these reserves run out of cash.  Indeed, they

11   tell investors the Secondary and Tertiary Premium Reserves had never been drawn on

12   to make premium payments, and that they have never made premium calls to

13   investors.  But by early 2012, Pacific West and Calhoun had learned that the policies

14   Calhoun had selected and sold from 2004 to 2007 were not maturing in the "targeted"

15   four to seven years. *See id*., Ex. 33; Zaldivar Decl. ¶ 27.  In fact, by November 2014,

16   only 6.22% of the life settlements sold during 2004 to 2007, based on face value, had

17   matured within seven years. *See* Zaldivar Decl. ¶ 27.  However, they have never

18   disclosed to investors this fact, nor have they told investors that the only reason they

19   have not dipped into the second and third level reserves or made premium calls is

20   because they are using new investor proceeds to make the premium payments. *See*

21   *supra*.  Moreover, Calhoun admits he selects policies without reviewing or relying on

22   any actuarial analysis of the life expectancies of insureds. *See id.,* Ex. 4 (Calhoun

23   Tr.) at 39:10-40:4.  So he has no reasonable basis to claim he can "target" policies

24   that will mature within four to seven years and before the six-to-nine year Contract

25   Periods.

26          All of this is critical information for investors.  If a policy takes longer to

27   mature than the "targeted" four-to-seven years, then the annual returns will be lower.

28   And if a policy matures after the Contract Period, the return will also be lower if there

are not enough cash reserves to pay the ever-increasing premiums.  Indeed, if a policy matures well after the end of a Contract Period, then the rising premiums or cash calls could wipe out any return, rendering the investment worthless.  Yet Pacific West and Calhoun do not disclose this to their investors.  *See* Enderle Decl. ¶¶ 11-18.

**Third, Pacific West and Calhoun are misleading investors about their role in the life settlements**.  Pacific West and Calhoun represent to investors that the success of an investment in a life settlement "will not be derived from the efforts of any person or entity employed by or associated with [Pacific West]."  *E.g.*, Brilliant Decl., Ex. 3 at 60.  Similarly, in at least one sales brochure, investors are told that the life settlements are "independent" of Pacific West, and that the "prosperity" of Pacific West "does not affect you at all."  *Id.*, 7 at 214; *see also id.*, Exs. 55-57.

That is not true.  Pacific West and Calhoun remain intimately involved in the success of the life settlement investments long after they are sold.  The trust agreement expressly provides that Pacific West must become involved whenever the Primary Premium Reserve is insufficient to cover an annual premium payment on any policy.  *See id.*, Ex. 6.  Indeed, Pacific West has funneled $1.9 million of new investor proceeds that its sales agents raised to cover the premium shortfalls on numerous older policies.  *See* Zaldivar Decl. ¶ 16.  Pacific West also pays the trustee fees for its continued oversight of the life settlements, its payment of the premiums, its accounting for and maintaining the reserves, its maintenance of the underlying policies, and for its other services.  *See* Brilliant Decl., Ex. 6 at 5, Ex. 95 at 5-7.  But Pacific West and Calhoun do not disclose this to investors.  *See* Enderle Decl. ¶ 23.

In addition, Pacific West and Calhoun represent to investors that their "investment is implemented at the direction of the trustee before distributions are made to us."  Brilliant Decl., Ex. 7 at 214.  That too is not true.  For some life settlements, Pacific West and Calhoun instructed the Trust to purchase the underlying policies before Pacific West had raised sufficient funds from investors to fund fully the primary reserve.  *See* Zaldivar Decl. ¶ 22.  In fact, as of November 2014, when

the primary reserve accounts had a shortfall of $1.1 million of unfunded reserves, Calhoun caused Pacific West to be paid a margin of over $3.7 million for sales of life settlements in the policies with unfunded reserves. *See id.*, ¶ 22. So, for these policies, the life settlements were not fully "implemented before distributions were made," because the reserves were not yet fully funded.

## III.   <u>ARGUMENT</u>

### A.   The Standard for a Preliminary Injunction Is Different In SEC Enforcement Actions

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act authorize the SEC to obtain injunctive relief. *See* 15 U.S.C. §§ 77t(b) & 78u(d); *see SEC v. Wencke*, 622 F.2d 1363, 1375 (9th Cir. 1980). In seeking this relief, the SEC appears before the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). "[W]hen 'the public interest is involved in a proceeding of this nature, [the district court's] equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989) (*quoting FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982)).

Therefore, unlike for private litigants, "injunctions sought by the SEC do not require a showing of irreparable harm or the unavailability of remedies at law. Rather, the SEC need only make a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *Smith v. SEC*, 653 F.3d 121, 127-128 (2d Cir. 2011) (internal quotations omitted). Accordingly, for a preliminary injunction, the SEC must make two showings: (1) a *prima facie* case that a violation of federal securities laws has occurred, and (2) a reasonable likelihood that the violation will be repeated. *See SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999); *SEC v. United Financial Group, Inc.*, 474 F.2d 354, 358 (9th Cir. 1973); *SEC v. Schooler*, 902 F. Supp. 2d 1341, 1344 (S.D. Cal. 2012);

*SEC v. Homestead Props. L.P.*, No. SACV09-01331-CJC (MLGx), 2009 WL 5173685, at *2 (C.D. Cal. Dec. 18, 2009); *SEC v. Nationwide Automated Systems, Inc.*, CV 14-07249 SJO (FFMx), Slip. Op., at 4-5 (C.D. Cal. Sept. 30, 2014); *see also SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  As outlined below, the SEC readily makes this showing.

**B.     The SEC Has Made A *Prima Facie* Showing That Pacific West, The Trust and Calhoun Are Violating the Federal Securities Laws**

**1.     Life settlements are securities under the federal securities laws**

There can be no dispute that the Pacific West life settlements are securities that subject Pacific West, the Trust and Calhoun to the federal securities laws.  Indeed, Pacific West's brochures sent to investors, and the purchase agreements signed by investors, state that the life settlements are "securities."  Brilliant Decl., Ex. 7 at 209, Belsky Decl. Ex.2 at 15.[1]  In any event, as the Supreme Court explained, in enacting the federal securities laws, Congress "enacted a broad definition of 'security,' sufficient 'to encompass virtually any instrument that might be sold as an investment.'"  *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (*quoting Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)).  Under the Securities Act and Exchange Act, the term "security" includes "investment contracts" (*see* 15 U.S.C. § 77b(a)(1), 15 U.S.C. § 78c(a)(10)), which the Supreme Court in *SEC v. W.J. Howey Co.* defined to mean any "contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. 293, 298-99 (1946); *see also SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130 (9th Cir. 1991).

The Pacific West life settlements fall squarely within that broad definition.  Investors in life settlements invest their money expecting a return tied directly to the

---

[1] The brochure states that life settlements are "considered securities and therefore are regulated" by the California Department of Corporations.  Brilliant Decl., Ex.7 at 209; *see also* Cal. Corp. Code § 25019 (2014).

efforts of Pacific West and Calhoun, who "target" and select specific underlying policies, set up a "proprietary" system of cash reserves, pay the trustee to keep the policies in force, and use investor money raised by Pacific West sales agents to cover the policy premiums as the reserves are being depleted.  This conclusion is consistent with the holdings of several courts that, following *Howey*, have held that life settlements are "investment contracts," and thus securities.  *See SEC v. Mutual Benefits Corp.*, 408 F.3d 737, 742-745 (11th Cir. 2005) (holding that viaticals, which are life settlements for insurance policies of the terminally ill, are securities); *SEC v. Life Partners Holdings, Inc.*, 41 F.Supp.3d 550, 555-556 (W.D. Tex. 2013) (same); *Wuliger v. Christie*, 310 F.Supp.2d 897 (N.D. Ohio 2004) (same); *In re Trade Partners, Inc. Investors Litig.*, No. 1:07–MD–1846, 2008 WL 3992168, *5-6 (W.D. Mich. Aug. 22, 2008) (holding that viaticals are securities under Oklahoma state law, which follows the *Howey* test) (*citing Mutual Benefits*, 408 F.3d at 742-745)).

## 2.   Pacific West and Calhoun are violating the antifraud provisions of the federal securities laws

The SEC has established a *prima facie* case that Pacific West and Calhoun are violating the antifraud provisions of the federal securities laws, and therefore should be preliminarily enjoined.  Section 10(b) and Rule 10b-5 of the Exchange Act prohibit fraud in connection with the purchase or sale of any security, and Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 77q(a); *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001).  Moreover, both Section 10(b) and Section 17(a) prohibit the making of false and misleading statements, as well as engaging in deceptive conduct or fraudulent schemes.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157-58 (2008).  A *prima facie* case of each type of fraud is established here.

### a.   Pacific West's and Calhoun's fraudulent scheme

Pacific West and Calhoun are engaging in a scheme to defraud new investors.

1    To be liable for a scheme to defraud, a defendant must have engaged in conduct that

2    had the principal purpose and effect of creating a false appearance of fact in

3    furtherance of the scheme.  *See Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040,

4    1048 (9th Cir. 2006), *vacated on other grounds sub nom.*, *Avis Budget Group Inc. v.*

5    *Cal. State Teachers' Ret. System*, 552 U.S. 1162 (2008).

6         Pacific West's and Calhoun's fraudulent scheme centers on their undisclosed

7    use of $1.9 million of newly raised investor proceeds to pay the premiums on older

8    policies.  By engaging in this conduct, Pacific West and Calhoun have avoided using

9    the secondary and tertiary cash reserves, or making premium cash calls to the

10   investors, to keep policies in force.  But for this conduct, the Secondary and Tertiary

11   Premium Reserves would have been wiped out and Pacific West and the Trust would

12   have had to make substantial premium cash calls to investors totaling more than

13   $750,000.  This scheme has therefore allowed defendants to continue to tell investors

14   that the reserves have never been tapped and that premiums calls have never been

15   made.  In making these claims, Pacific West and Calhoun create the false appearance

16   that they select, offer and sell life settlements that mature as predicted and are backed

17   by sufficient reserves, thus minimizing the risk to investors of lower or no returns.

18   This allows them to continue to sell new life settlements to new investors, and with a

19   margin of approximately 46%, funnel more investor money into their pockets.

20              **b.    Their misstatements and omissions**

21         The SEC has also established a *prima facie* case against Pacific West and

22   Calhoun for making material misstatements and omissions to the investors.

23   Generally, to establish a claim under Section 10(b) or Section 17(a) for fraudulent

24   misrepresentations and omissions, it must be shown that defendants made material

25   misrepresentations or omissions, with the requisite state of mind, in connection with

26   the purchase or sale of a security, or to obtain money in the offer or sale of a security.

27   *See SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010);

28   *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993).  Liability arises not

only from affirmative representations but also from failures to disclose material information.  *See Dain Rauscher*, 254 F.3d at 855-56.  The antifraud provisions impose "'a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or voluntered, not misleading.'"  *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (*quoting Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992)).

The evidence establishes that Pacific West and Calhoun are misrepresenting and omitting the truth that there is a substantial risk that there will be premium cash calls.  They have also not disclosed that they are subsidizing the premiums during the Contract Period with the policies' cash values, thus making the disclosed annual premiums substantially lower than the premiums that the investors will be required to pay after the Contract Period.  They also fail to disclose the premium will spike, or increase substantially, if the life settlement does not mature within the Contract Period, and decrease the investors' returns.

Moreover, beginning in 2012, Pacific West and Calhoun know, but never tell investors, that the vast majority of the policies they offered and sold in 2004 through 2007 are not maturing within the four to seven years that they "targeted."  Investors are thus misled into believing that Pacific West and Calhoun have a proven track record and ability to deliver the promised total and annual returns, even though Calhoun and Pacific West know that they have been singularly unsuccessful in offering and selling policies that live up to their promises to investors.

Finally, Pacific West and Calhoun falsely claim that the investment returns on the life settlement are wholly independent of Pacific West's involvement and fortunes.  But Pacific West and Calhoun are intimately involved, funneling new investor money to cover reserve shortfalls, overseeing and paying the trustee and selecting the underlying policies and establishing the reserves.  Pacific West and Calhoun also falsely represent that they will not pay themselves distributions until the reserves on life settlements are fully implemented and funded, when in fact Calhoun

has caused the Trust to pay Pacific West millions of dollars in "margin" before the primary reserves on several life settlements were fully funded.

### c.     The materiality of their fraud

Pacific West's and Calhoun's fraud concerns material information.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See TSC Indus., Inc.*, 426 U.S. at 449; *Platforms Wireless*, 617 F.2d at 1092.

Here, there is no question that the defendants' misstatements and omissions were material.  The evidence establishes that investors asked Pacific West about the amount of premiums after the Contract Period, the risk of premium cash calls, the status of the reserves, the track record of Pacific West in estimating the maturity of the policies it selects, and the role Pacific West played in their investments, and that Pacific West and Calhoun either misrepresented the facts and/or omitted material information needed to make their statements otherwise not misleading.  Several investors have provided sworn statements attesting to the importance of the information that was misrepresented to them, or that defendants omitted to disclose. *See Belsky Decl., ¶¶ 3, 6; Enderle Decl., ¶¶ 5-7, 11-12, 14-23; Young Decl., ¶¶ 4-7.*

### d.     Their scienter, or at a minimum, their negligence

Pacific West and Calhoun have also committed their fraud with the requisite state of mind.  While claims under Section 10(b) and Section 17(a)(1) require a showing of scienter, Sections 17(a)(2) and (3) only require a showing of negligence. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *Vernazza v. SEC*, 327 F.3d 851, 859-60 (9th Cir. 2003).  Scienter is proven with "'knowing or reckless conduct,' without a showing of 'willful intent to defraud.'"  *Vernazza*, 327 F.3d at 860; *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (*en banc*). "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the

standards of ordinary care, and which presents a danger of misleading buyers … that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger*, 914 F.2d at 1569.  And negligence involves a lesser *mens rea*, where a defendant "fails to exercise reasonable care or competence in obtaining or communicating the information."  *SEC v. Hughes Capital Corp.*, 124 F. 3d 449, 453-54 (3rd Cir. 1997) (quotations omitted) (*citing Dain Rauscher*, 254 F.3d at 859).

Here, Pacific West and Calhoun are acting with a high degree of scienter in perpetrating their scheme to defraud, and in making false misrepresentations and omissions.  Calhoun knows that the Primary Premium Reserve on many policies has been exhausted, and has consciously directed the Trust to use money Pacific West has raised from new investors to pay premiums to keep older policies in force, rather than exhausting the Secondary and Tertiary Reserves and making substantial premium cash calls to investors.  Indeed, there can be little question that following the disclosed protocol, exhausting the reserves, and making cash calls, would have significantly impinged on Pacific West's continuing sales effort—and Calhoun's ability to realize a "margin" of 46% of investors' funds.  In fact, Calhoun did not even disclose to his sales agents until March 2014, during the SEC's investigation, that he was using new investor money to pay premiums on older policies, which demonstrates his high level of scienter.  *See* Brilliant Decl. Exs. 24 (Barry Tr.) at 25:20-27:20, 25 (Calhoun Jr. Tr.) at 33:10-34:17, 26 (Cannon Tr.) at 79:21-84:17, 27 (Dotta Tr.) at 39:17-41:23.  The reason to engage in such conduct is to create a false appearance that the offered investment performs as promised, with little risk and a high return over the promised period.

Calhoun knows that the representations to investors that Pacific West has never had to touch the second or third levels of reserves, and has never made a premium cash call to investors, while technically true, omits material information about why that is the case.  After all, it is Calhoun's actions in diverting money from new investors to pay the premiums on the older policies that has allowed Pacific West to

Case No. 2:15-cv-02563 (FMO) (FFM)

avoid exhausting its Secondary and Tertiary Reserves and making substantial cash calls to investors.  The only reason to fail to disclose this material information is to mislead investors about the security and risk of the offered life settlements.

Calhoun also knows that premiums will increase substantially after the Contract Period because he uses up the cash value of the policies during the Contract Period to subsidize the cost of insurance.  Thus, Calhoun knows that if there is a premium cash call at the end of a Contract Period, it will be for a much higher amount than the premium amount disclosed to investors.  Yet Calhoun does not disclose this information to investors, or disclose the material effect that such substantial cash calls could have on annual returns or total returns.

Calhoun also knows that he and Pacific West play a major, continuing role in the success of the life settlements that they offer and sell.  Calhoun knows this because of his personal involvement in overseeing and paying the trustee, and in directing new investor funds to keep policies in force without touching the Secondary or Tertiary Premium Reserves or making a premium cash call, thus taking direct responsibility for the continued viability of those life settlements.

Calhoun also drafts, or reviews and approves, all investor disclosures, and trains and supervises the sales agents, and so is intimately familiar with what investors are being told.[2]  There can be little dispute that Calhoun has acted with a high level of scienter.  At a minimum, Calhoun is either reckless in not disclosing this material information, or is negligent in not knowing that the information is material to investors.   Finally, Calhoun's state of mind is imputed to Pacific West, since he owns and controls it.  *See SEC v. Platforms Wireless Intern. Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008), *aff'd*, 617 F.3d 1072 (9th Cir. 2010) (*citing SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096 n.16 (2d Cir. 1972)).

---

[2] While Calhoun is directly liable because he has ultimate authority over the statements issued or made here, he is also liable as a control person for Pacific West's fraud under Section 20(a) of the Exchange Act.  *See* 15 U.S.C § 78t(a).

### 3. Pacific West, the Trust and Calhoun are violating the registration provisions of Section 5 of the Securities Act

Pacific West, the Trust and Calhoun are also violating the registration provisions in Sections 5(a) and 5(c) of the Securities Act.  Section 5 prohibits the unregistered offer or sale of securities in interstate commerce, unless an exemption from registration applies.  *See SEC v. Eurobond Exchange, Ltd.*, 13 F.3d 1334, 1338 (9th Cir. 1994).  A defendant violates Section 5 when (1) the defendant, directly or indirectly, offers or sells securities; (2) no registration is in effect or filed with the SEC for those securities; and (3) interstate transportation or communication or the mails are used in connection with the offer and sale.  *See* 15 U.S.C. §§ 77e(a), 77e(c); *SEC v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007).   The SEC does not need to show scienter to establish a Section 5 violation because Section 5 operates as a strict liability statute.  *See SEC v. Holschuh*, 694 F.2d 130, 137 n.10 (9th Cir. 1982).

There is no dispute that ongoing offer and sale of life settlements by Pacific West and Calhoun have never been registered with the SEC.  *See* Brilliant Decl., Ex. 88.  There can also be no dispute that defendants are offering and selling these securities in interstate commerce.  Pacific West and Calhoun offer and sell the securities in California, and the issuer, the Trust, is located in Ohio.  Defendants advertise the sale of life settlements through television and radio, use the internet and email to sell them, and offer and sell them to investors across the United States.  This *prima facie* violation of Section 5 alone justifies injunctive relief.  *See*, *e.g.*, *SEC v. Banc de Binary Ltd.*, 964 F.Supp.2d 1229, 1231, 1238 (D. Nev. 2013) (granting preliminary injunction for violations of Section 5 and Section 15(a)); *Schooler*, 902 F. Supp. 2d at 1345-46 (granting preliminary injunction where defendants "are certainly on the hook for the unregistered offer and sale of securities, and, depending on the facts, they may be on the hook for securities fraud as well").[3]

---

[3] Having established the *prima facie* elements of a Section 5 violation, the burden

1

**4.      Pacific West and Calhoun are operating as unregistered**

2

**brokers in violation of Exchange Act Section 15(a)**

3      Pacific West and Calhoun are not SEC-registered brokers or dealers, and

4    Calhoun is not associated with any registered broker or dealer.  They are therefore

5    violating Section 15(a)(1) of the Exchange Act, which provides that, absent an

6    exception or exemption, any person acting as a "broker or dealer" who uses any

7    means of interstate commerce to effect transactions in, or to induce or attempt to

8    induce purchases or sales of securities, must register or be associated with a broker or

9    dealer who is registered with the SEC.  *See* 15 U.S.C. § 78o(a)(1).  The SEC is not

10   required to show scienter to establish a violation of Sections 15(a).  *See, e.g.*, *SEC v.*

11   *Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Alliance Leasing Corp.*,

12   No. 98-CV-1810-J (CGA), 2000 WL 35612001, at *6 (S.D. Cal. Mar. 20, 2000); *SEC*

13   *v. Interlink Data Network of Los Angeles, Inc.*, No. 93-3073 R, 1993 WL 603274,

14   *10 (C.D. Cal. Nov. 15, 1993).

15      Under the Exchange Act, a "broker" is "any person engaged in the business of

16   effecting transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4).

17   Although the phrase "engaged in the business" is not defined in the statute, courts

18   have held that regularly participating in the trading of securities on behalf of someone

19   is the primary indicia of being "engaged in the business."  *SEC v. Kenton Capital,*

20   *Ltd.*, 69 F. Supp. 2d 1, 12-13 (D.D.C. 1998) ; *see also SEC v. National Executive*

21   *Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980); *SEC v. Margolin*, 1992

22   WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992), *aff'd*, 7 F.3d 220 (2d Cir. 1993).

23   "Transaction-based compensation, or commissions, are one of the hallmarks of being

24   a broker-dealer."  *Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*,

25   No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006); *see also SEC v.*

26

27   shifts to the defendants to prove that an exemption from registration somehow
     applies.  *See Murphy*, 626 F.2d at 641.  In view of all the facts, defendants will be

28   unable to prove that their offering was exempt from registration.

1    *Benger*, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010).

2         Here, there is no question that Pacific West and Calhoun are acting as brokers-

3    dealers in offering and selling life settlements.  They effect transactions in life

4    settlements for the account of others by soliciting and encouraging investors to buy,

5    taking investors' orders and by consummating the purchases.  *See SEC v. Devon*, 977

6    F. Supp. 510, 518 (D. Me. 1997).  They also receive transaction-based compensation.

7    Pacific West has received on average about 46% from each sale of a life settlement,

8    and Calhoun receives 8% commissions on their sales.  And neither Pacific West nor

9    Calhoun are registered as brokers or dealers with the SEC.  *See* Brilliant Decl. ¶ 90.

10   As such, they are violating Section 15(a)(1) of the Exchange Act.  Calhoun is

11   alternatively liable as a "control person" of Pacific West for its registration failure

12   under Section 20(a) of the Exchange Act.  *See* 15 U.S.C § 78t(a).

13        **C.    Defendants' Violations Are Likely To Continue Unless Restrained**

14        In addition to establishing the existence of *prima facie* violations of the federal

15   securities laws, the SEC has also shown that these violations are likely to be repeated.

16   Whether a likelihood of future violations exists depends upon the totality of the

17   circumstances.  *See Murphy*, 626 F.2d at 655; *Fehn*, 97 F.3d at 1295-96.  The

18   existence of past violations may give rise to an inference that there will be future

19   violations.  *See Murphy*, 626 F.2d at 655; *see also United States v. Odessa Union*

20   *Warehouse Co-Op*, 833 F.2d 172, 176 (9th Cir. 1987).  Indeed, "the fact that the

21   defendant is currently complying with the securities laws does not preclude an

22   injunction."  *Murphy*, 626 F.2d at 655.  Courts also consider factors such as the

23   degree of scienter involved, the isolated or recurrent nature of the violative conduct,

24   the defendant's recognition of the wrongful nature of the conduct, the likelihood that,

25   because of the defendant's occupation, future violations may occur, and the sincerity

26   of defendant's assurances (if any) against future violations.  *See Murphy*, 626 F.2d at

27   655; *SEC v. Pattison*, No. C-08-4238 EMC, 2011 WL 723600, at *1 (N.D. Cal. Feb.

28   23, 2011) (*citing Fehn*, 97 F.3d at 1295-96).

1    Here, the totality of the circumstances weigh heavily in favor of finding a

2 likelihood of future violations by the defendants.  Pacific West and Calhoun are

3 materially misleading thousands of investors, while reaping millions of dollars.  The

4 degree of scienter is thus significant.  It is also not some isolated fraud, as it spans

5 many years, involves over a hundred different life settlement products, multiple sales

6 agents, and repeated deceit.  It is also likely to continue without court intervention,

7 since the defendants have shown no indication that they will stop fraudulently and

8 unlawfully selling these securities.  *See, e.g.,* Brilliant Decl., Ex. 91 (website

9 continuing to offer life settlements, and to make misrepresentations and omissions).

10    Moreover, their failure to register their offer and sale of the life settlements,

11 and their failure to register themselves as brokers or dealers are ongoing violations

12 that began over a decade ago.  They know of these failures—they openly

13 acknowledge that their life settlements are "securities" but have never registered

14 them, and they do not deny that they receive commissions when selling these

15 securities—yet they have done nothing to stop this illegal activity.  That alone

16 warrants injunctive relief.  *See Schooler*, 902 F.Supp.2d at 1359; *SEC v. Allison*, No.

17 C-81-19 RPA, 1982 WL 1322, at *6 (N.D. Cal. Aug. 11, 1982).

18   **IV.   CONCLUSION**

19    Therefore, the SEC respectfully requests that the Court grant the SEC's

20 motion, and preliminarily enjoin Pacific West, the Trust and Calhoun from violating

21 Section 5 of the Securities Act, and preliminarily enjoin Pacific West and Calhoun

22 from violating Section 17(a) of the Securities Act, and Section 10(b), Rule 10b-5 and

23 Section 15(a) of the Exchange Act, as well as any other appropriate relief.

24   Dated:  April 17, 2015                    Respectfully submitted,

25

26                                            TODD BRILLIANT

27                                            Attorney for Plaintiff
                                             Securities and Exchange Commission
28

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
400 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On April 17, 2015, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** on all the parties to this action addressed as stated on the attached service list:

☐   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☒   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☐   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  April 17, 2015

Todd Brilliant

1

*SEC v. Pacific West Capital Group, Inc., et al.*
**United States District Court—Central District of California**

2

**Case No. 2:15-cv-02563 (FMO) (FFM)**

3

**<u>SERVICE LIST</u>**

4

5

Jason S. Lewis, Esq. (served via electronic mail and UPS)

6

Greenberg Traurig
2200 Ross Ave., #5200
Dallas, TX 75201

7

lewisjs@gtlaw.com

8

***Attorney for Defendants Pacific West Capital Group, Inc., Andrew B. Calhoun IV, Brenda Christine Barry, BAK West, Inc.,  Andrew B. Calhoun Jr., Eric Christopher***

9

***Cannon,  Century Point, LLC, Michael Wayne Dotta, and Caleb Austin Moody (dba Sky Stone)***

10

James K. Roosa, Esq. (served via electronic mail and UPS)

11

Roosa Co., LPA
3723 Pearl Road, Ste 200

12

Cleveland, OH 44109
jkr@roosalaw.com

13

***Attorney for Defendant PWCG Trust***

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:15-cv-02563 (FMO) (FFM)