ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
DAVID R. ZARO (BAR NO. 124334)
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone:  (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  dzaro@allenmatkins.com

ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
EDWARD G. FATES (BAR NO. 227809)
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone:  (619) 233-1155
Fax:  (619) 233-1158
E-Mail:  tfates@allenmatkins.com

Attorneys for Receiver
THOMAS HEBRANK

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC WEST CAPITAL GROUP, INC.; ANDREW B CALHOUN IV; PWCG TRUST; BRENDA CHRISTINE BARRY; BAK WEST, INC.; ANDREW B CALHOUN JR.; ERIC CHRISTOPHER CANNON; CENTURY POINT, LLC; MICHAEL WAYNE DOTTA; and CALEB AUSTIN MOODY (dba SKY STONE),<br><br>Defendants. | Case No.  2:15-cv-02563-FMO (FFMx)<br><br>**DECLARATION OF THOMAS C. HEBRANK IN SUPPORT OF MOTION FOR AUTHORITY TO:**<br><br>**(A) ENGAGE PORTFOLIO MANAGEMENT AND VALUATION CONSULTANT;**<br><br>**(B) TERMINATE MILLS, POTOCZAK & COMPANY; AND**<br><br>**(C) USE PWCG TRUST RESERVE FUNDS TO COVER UNFUNDED PREMIUM PAYMENTS FOR AN ADDITIONAL FIVE MONTHS;**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  May 31, 2018<br>Time:  10:00 a.m.<br>Ctrm:  6D<br>Judge:  Hon. Fernando M. Olguin |

I, Thomas C. Hebrank, declare,

1.      I am the Court-appointed receiver for PWCG Trust.  I make this declaration in support of my Motion for Authority to (A) Engage Portfolio Management and Valuation Consultant; (B) Terminate Mills, Potoczak & Company; and (C) Use PWCG Trust Reserve Funds to Cover Unfunded Premium Payments for an Additional Five Months ("Motion").  I have personal knowledge of the facts stated herein, and if called upon to do so, I could and would personally and competently testify to them.

Shortfalls in Policy Reserves

2.      As discussed in my *Ex Parte* Application filed on March 1, 2018 (Dkt. No. 146), when life insurance policies were acquired by PWCG Trust ("Policies") and fractionalized interests in them were sold to investors, a specific amount was allocated as the reserve to be used to fund premium payments. Although these reserves were deposited into one bank account, they were separately accounted for and allocated to each Policy on a ledger.

3.      The reserves set aside for many Policies, however, were insufficient and therefore have been exhausted, with premium payments continuing to come due ("Unfunded Premium Payments").  For a period of time, Pacific West Capital Group, Inc. ("Pacific West") and Andrew B. Calhoun, IV ("Calhoun") were funding the shortfalls.

4.      At some point in time, Pacific West Capital Group, Inc. ("Pacific West") and Andrew B. Calhoun, IV ("Calhoun") stopped covering the shortfalls themselves.  In August 2015, Pacific West instructed PWCG Trust, through Mills, Potoczak & Company ("MPC") as Trustee, to make cash calls on investors to pay their shares of the total necessary to cover the shortfalls.  Some investors paid cash calls and some did not.  Pacific West treated the fractionalized interests of investors who did not pay in response to cash calls as "forfeited," meaning ownership of the interests reverted back to Pacific West.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

869847.01/SD

5.     Then, in July 2017, Pacific West purportedly sold certain of the forfeited investor interests to Cook Street Master Trust, which is managed by an investment firm called BroadRiver Asset Management ("BroadRiver").  Under the Agreement, BroadRiver was to pay $1.5 million to Pacific West to acquire the forfeited investor interests, which collectively have the right to receive over $28 million in death benefits.

6.     According to BroadRiver's principal, it has since paid an additional approximately $875,000 to fund premium payments for the forfeited interests it acquired in July 2017, as well as additional forfeited interests acquired when investors subsequently failed to meet cash calls.  It is not known whether these payments were made directly to Pacific West and Calhoun or were included in the amounts paid to PWCG Trust.  MPC has advised me that, prior to my appointment, BroadRiver paid a total of approximately $1.4 million to PWCG Trust for premiums, including Unfunded Premium Payments.  Due to the acquisition of additional forfeited interests since July 2017, BroadRiver now claims to hold forfeited interests entitling it to approximately $32 million in death benefits.  To the detriment of the investors, prior to my appointment, BroadRiver had been acquiring more and more forfeited investor interests, and potentially the right to receive a greater and greater share of the total death benefits for Policies held by PWCG Trust.

Unfunded Premium Payments Coming Due

7.     As reflected in the Schedule of Unfunded Premium Payments attached hereto as Exhibit A, there are 63 Policies with premiums coming due during the months of June through October 2018 for which the reserves currently available are insufficient to make the required payments.  The total amount needed to cover the shortfalls is approximately $3.37 million.  The death benefits associated with these Policies total $126,650,578.  The large increase in the monthly amount necessary to cover Unfunded Premium Payments (in comparison

1 to March, April, and May) is due to the fact that cash calls are no longer being

2 sent to investors and, as time goes on, more and more Policy reserves are being

3 exhausted.

4     <u>Long-Term Plan to Maximize Value of Policies</u>

5     8.    Although I cannot fully formulate or propose a long-term plan for

6 maximizing the value of the Policies and distributions to investors without

7 obtaining proper life expectancy reports ("LE Reports") and other valuation data,

8 certain facts are clear based on my investigation and analysis thus far.  Most

9 importantly, the existing reserves (which totaled $7,980,330 as of March 31,

10 2018) are only sufficient to cover policy premiums coming due (both funded and

11 unfunded) for approximately the next 10.5 months.  My analysis of cash flow

12 over the next 12 months indicates that a total of $9,132,057 is needed to cover

13 premium payments for all Policies through March 31, 2019.  Therefore, I expect

14 the long-term plan will need to include either financing from a third party to cover

15 Unfunded Premium Payments or a sale of a portion of the portfolio, or possibly a

16 combination of the two.

17     9.    It should be noted that when death benefits are received, those funds

18 may extend the point at which the reserves will be fully exhausted, but only for a

19 limited time.  Although no death benefits have been received to date, there have

20 been some Policy "maturities" and I expect to receive approximately $5 million in

21 death benefits in the next two months.  The Court has not authorized me to

22 distribute any funds to investors, nor has a proper analysis or approval of investor

23 claims taken place.  Accordingly, I will segregate all death benefits received from

24 policy reserves and hold them pending further orders of the Court.

25     <u>Engagement of ITM Twentyfirst ("21st")</u>

26     10.    After consulting with MPC and Professor Bauer, I determined that

27 obtaining LE Reports for each of the insureds for each Policy was necessary to

28 create a cash flow projection for PWCG Trust, determine the value of the

Policies, and formulate a proposal for how to maximize the value of the Policies for the benefit of investors.  Accordingly, I contacted two well-known companies in the life settlement services industry and asked them to prepare proposals for the portfolio management and portfolio valuation services (including providing LE Reports).  I spoke to a third company called Fasano, but Fasano only provides LE Reports (no other valuation services) and would not provide a flat fee per LE Report.  Fasano's charges for LE Reports are based on the number of pages of medical records for each insured, which is not known at this point.  I also asked MPC for a proposal to continue performing the management services, as well as their cost to add the portfolio valuation services.

11.    The proposals received from 21st, another outside consultant called AVS Group ("AVS"), and MPC are summarized as follows:[1]

| Company | Annual Portfolio Management Fee | Portfolio Valuation Cost |
|---------|--------------------------------|-------------------------|
| AVS | $125,400 | N/A[2] |
| 21st | $111,150 | $52,875 |
| MPC | $144,000 | $206,280 |

Based on the proposals, I determined that 21st could provide both the management services and valuation services at the best price.  21st has extensive experience and expertise in the management and valuation of life settlement portfolios and was recommended as one of several leading companies in the industry by Professor Bauer.  Accordingly, 21st and I negotiated a proposed contract for management services and a proposed contract for valuation services, which are attached hereto as Exhibit B.

12.    The management services to be performed by 21st, which are stated on Exhibit A to the proposed contract, include the following:

---

[1]  It should be noted that there are also incidental costs included in the proposals for fees such as obtaining medical records and death certificates.  In addition, Portfolio Valuation costs could increase based on the condition of the insured and the volume of medical records to be reviewed.

[2]  AVS does not provide policy valuation services.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

- Maintain Policy records;
- Handle all direct communications with insureds and insurers;
- Provide annual policy illustrations;
- Make premium payments from PWCG Trust funds and ensure all Policies remain in force;
- Provide annual premium optimizations;
- Monitor and track insureds;
- File claims and collect death benefits; and
- Provide monthly reports to the Receiver

Additionally, 21st will provide valuation services, which are stated on Exhibit A to the proposed contract, including the following:

- Obtain HIPAA medical record releases from insureds;
- Obtain current medical records for insureds;
- Provide LE Reports pursuant to the separate pricing terms stated on Exhibit C to the proposed contract; and
- Provide annual valuations for all Policies, including an initial round of Policy valuations within four months of Court approval.

13. These terms and conditions are the most favorable offered by the life settlements industry service providers recommended by Professor Bauer and will also generate a significant cost savings in comparison to continuing with MPC. Accordingly, I request authorization to enter into the proposed contracts and to pay 21st pursuant thereto.

14. Finally, I request that, just as MPC has been, 21st be protected by the stay of litigation and other legal actions under Section VI of the Judgment Against Defendant PWCG Trust entered on February 16, 2018 ("Appointment Order"). Dkt. No. 145. Under the proposed servicing contract, the receivership estate must indemnify 21st for certain claims asserted against it by investors or other third

parties.[3]  This is reasonable considering the potential harm investors are facing and the existing lawsuits filed by investors.  If 21st is brought into investor lawsuits, which lawsuits are stayed as to PWCG Trust and MPC as Trustee, the defense of such suits by the receivership estate pursuant to the indemnity in the proposed servicing contract could be a drain on the limited assets of the receivership estate and could become a major distraction to the performance of my duties under the Appointment Order.  Under Section VI of the Appointment Order, persons seeking relief against PWCG Trust must obtain leave of Court before pursuing legal proceedings or taking legal actions against PWCG Trust or its Trustee.  This is an appropriate measure of protection to conserve assets of the receivership estate and it should be extended to 21st, which will be performing many of the same functions MPC has been performing.

Termination of MPC and Payment of Post-Receivership Management Fees

15.     As discussed above, 21st is able to provide the necessary portfolio management services and valuation services at lower prices than MPC. Therefore, I propose to transition the portfolio management functions from MPC to 21st and then terminate MPC as trustee.  Although MPC will be terminated and will no longer provide services to PWCG Trust or the receivership estate, it has provided important management services, without interruption, since the date of my appointment and should be fairly compensated for that work.  Therefore, I propose to pay MPC on an hourly basis for its post-receivership work, subject to Court approval of the actual fees and costs.  MPC's hourly rates range from $105 to $285, which I believe are reasonable and competitive in the industry considering the skill and care required.  MPC will file fee applications with the Court, as I and my counsel are required to do.

---

[3]   This is provided in Section 8.1 of the proposed servicing contract.

16.     It should be noted that MPC claims to be owed a substantial amount in unpaid fees for pre-receivership work.  I am gathering information about these unpaid fees, but I believe the appropriate time to address this claim is in connection with the overall claims process, at which time all claims against the receivership estate – from investors and creditors – can be considered and, to the extent there are disputes, they can be decided by the Court.

Use of Reserve Funds to Pay Unfunded Premium Payments for Additional Five Months

17.     As discussed above, I request authority to use existing policy reserves allocated to other Policies held by PWCG Trust to pay the Unfunded Premium Payments coming due during the months of June through October 2018. It is important to note that all of these funds have been and currently are held in a single bank account, so no account transfers are necessary, only journal entries on the PWCG Trust ledger.  Without such relief, the applicable Policies will lapse and PWCG Trust, and therefore the investors, will lose the right to receive over $126 million in death benefits when the Policies mature.

18.     Since my appointment on February 16, 2018, I have considered several alternatives, but believe none of them adequately address the problem or are in the best interest of the receivership estate.  One such possibility would be to borrow against the Policies from an outside lender.  Having consulted with MPC, which has extensive experience in the administration of life settlements, I believe the interest rate for this type of loan would be very high.  Additionally, LE Reports (which 21st will provide under its proposed engagement) would need to be provided to prospective lenders.  It will take 21st approximately 90 days to provide the LE Reports for all insureds for all 114 active Policies held by PWCG Trust (factoring into time to obtain HIPAA releases, medical records, and policy premium information), which would be too late for the Unfunded Premium Payments coming due in June, July, and August 2018.

19.    Alternatively, I considered the possibility of selling a small number of Policies.  However, this is not a viable option at this time.  First, I would need to analyze and select which Policies to sell.  Second, I would then need to assess and analyze the appropriate treatment of investors with fractionalized interests, and then, negotiate the sale itself.  Under the best circumstances, such a sale would take at least 90 days to complete.  As with potential loans, LE Reports, which 21st will provide under the proposed servicing contract, would need to be provided to prospective purchasers.

20.    Finally, I do not believe it is in the best interest of investors to allow BroadRiver to continue its purchase of fractional interests.  Investors have made substantial investments in their fractionalized interests.  According to the SEC's allegations, they did so believing the reserves would be sufficient and they would not be called on to fund premium payments.  If investors are unable or uncertain about meeting cash calls, they should not necessarily lose their entire investment while generating a windfall for BroadRiver.  This is particularly true if the facts regarding the reserves and the risk of having to pay policy premiums were misrepresented to investors, as the SEC alleges and Professor Bauer found in his report.

21.    For these same reasons, and because it is inequitable to have some investors continuing to put money into PWCG Trust and others not (when the treatment of investor claims and distribution of receivership estate assets has not yet been determined by the Court), I have suspended cash calls to investors.  Although this action promotes the equitable treatment of all investors, it would also result in investor interests being rapidly forfeited if I do not have a means of making Unfunded Premium Payments from existing reserves.

22.    Having weighed the various alternatives, and in the interests of treating all investors as fairly and equitably as possible, I believe using existing reserves to make Unfunded Premium Payments coming due during June through

October 2018 is the best available course of action.  I will borrow from Policies with the largest existing reserves, such that those Policies will not be immediately put at risk in terms of funding their own premium payments.  Accordingly, the risk of harm to investors with fractionalized interests in those Policies is minimal.

23.    Investors with fractionalized interests in Policies acquired more recently, which therefore still have reserves, may argue the reserves allocated to those Policies should not be used (or loaned) to cover Unfunded Premium Payments for other policies.  In other words, they might argue it is not their fault that other investors may lose the entire investments, so the reserves for their Policies should not be used.  This misses several critical points.  All investors purchased their fractionalized interests through Pacific West and Calhoun. Pacific West and Calhoun determined the amount of the original reserve for each Policy.  Pacific West and Calhoun then took approximately 45% of the total purchase price paid by investors as their payment.  As Policies began to exhaust their reserves, Pacific West and Calhoun funded the shortfalls themselves.  In this way, the misrepresentations made to investors were covered up and funds raised from investors were commingled amongst the various Policies so that Pacific West and Calhoun could continue to sell fractionalized interests in new policies to new investors.

24.    Moreover, there is no evidence that any one Policy was treated differently from the rest or that the representations made to investors about any one Policy were different than the rest.  This means they all suffer from the same basic problems of (a) insufficient reserves in relation to the life expectancies of the insureds, and (b) the likelihood that the risks investors faced in connection with their investments were misrepresented to them.  Some Policies have simply been held for a longer time, so their reserves have already been exhausted. However, it is clear from my analysis that the vast majority of Policies, regardless of when they were acquired, will exhaust their reserves before they mature.  This

1    means the Policies that currently have reserves will eventually be in the same

2    position as the Policies with no reserves.

3            25.    Attached hereto as Exhibit C is a list of the 114 active Policies

4    organized by the date they were acquired by PWCG Trust.  The column entitled

5    "Reserves as of 2/22/18" reflects the amount remaining from the original reserve

6    for each Policy as of February 22, 2018.[4]  As the exhibit shows, all active Policies

7    acquired between January 1, 2005, and June 1, 2011, of which there are 57, have

8    exhausted their reserves.  Further, of the 83 active Policies acquired between

9    January 1, 2005, and June 1, 2013, only 13 have any reserves remaining, with the

10   majority of those 13 having a reserve of less than $35,000 remaining.

11           26.    This confirms that the vast majority of Policies will exhaust their

12   reserves before they mature and that all investors will eventually be in the

13   position of losing their investments if there is no alternate source of funding to

14   pay premiums.  Therefore, the fact that some Policies currently have reserves and

15   some do not is simply an issue of timing.  All Policies are in the same situation

16   and the portfolio as a whole will need substantially more cash than is available to

17   avoid Policies lapsing and investors losing their investments, including the few

18   Policies that still have reserves.

19           27.    Accordingly, it is clear that any long-term strategy to maximize the

20   value of the Policies must involve an alternate source of funding to pay

21   premiums, whether it be through a loan or sale of a portion of the portfolio (or

22   possibly both).  Viewing the Policies as 114 isolated policies, each with its own

23   separate reserve, will only further harm investors.

24           28.    As noted above, I will propose a long-term, comprehensive means of

25   addressing the issue of Unfunded Premium Payments within approximately

26

27   _____

28   [4]   This reflects only the remaining balance of the original reserve and does not
     include amounts raised from subsequent cash calls to investors.  As of
     February 22, 2018, the total reserve balance was approximately $8.6 million.

1  possibly both).  Viewing the Policies as 114 isolated policies, each with its own

2  separate reserve, will only further harm investors.

3      28.   As noted above, I will propose a long-term, comprehensive means of

4  addressing the issue of Unfunded Premium Payments within approximately

5  120 days of 21st's engagement.  The proposal will be based, in part, on the

6  LE Reports and other valuation data to be provided by 21st, as well as a long-term

7  cash flow projection for the portfolio as a whole.

8      I declare under penalty of perjury under the laws of the State of California

9  that the foregoing is true and correct.

10      Executed this 2nd day of May 2018, at San Diego, California.

11

12                      THOMAS C. HEBRANK

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**PWCG Trust - Unfunded Premium Payments - June - Oct 2018**

| Policy Number (last 4 digits) | Insurance Carrier | Policy Face Value | Premium Payments Due | | | | | | Premium Reserves | Reserve Deficiency |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Total | | |
| 0024 | Hartford Life Insurance & Annuity Co. | $3,000,000 | | | $11,000 | $11,000 | $11,000 | $33,000 | $0 | ($33,000) |
| 8472 | Lincoln Financial Group | $3,980,000 | | $100,000 | | | $100,000 | $200,000 | $0 | ($200,000) |
| 3343 | The Lincoln National Life Insurance Co. | $5,000,000 | | | $82,000 | | | $82,000 | $0 | ($82,000) |
| 4084 | Lincoln National Life Insurance Co. | $2,212,200 | | $37,000 | | | $37,000 | $74,000 | $0 | ($74,000) |
| 5043 | Lincoln Financial Insurance Company | $4,699,204 | | | $77,000 | | | $77,000 | $0 | ($77,000) |
| 3790 | Pacific Life Insurance Company | $4,000,000 | | | $100,000 | | | $100,000 | $0 | ($100,000) |
| 4800 | Pacific Life Insurance Company | $1,000,000 | | | $28,500 | | | $28,500 | $0 | ($28,500) |
| 7558 | Lincoln National Life Insurance Company | $379,000 | | $12,000 | | | $12,000 | $24,000 | $0 | ($24,000) |
| 245L | United States Life Insurance Co. | $1,000,000 | | $15,300 | | | $15,300 | $30,600 | $0 | ($30,600) |
| 0777 | United of Omaha Life Insurance Co. | $1,400,000 | | | | $35,000 | | $35,000 | $0 | ($35,000) |
| 1273 | United of Omaha Life Insurance Co. | $932,000 | | | | $23,500 | | $23,500 | $0 | ($23,500) |
| 9865 | Transamerica Life Insurance Co. | $300,000 | $1,260 | $870 | $870 | $870 | $870 | $4,740 | $0 | ($4,740) |
| 3107 | Lincoln Financial Group | $10,000,000 | $82,300 | | | $108,600 | | $190,900 | $0 | ($190,900) |
| 7823 | Lincoln National Life Insurance Co. | $2,000,000 | | $47,000 | | | $47,000 | $94,000 | $0 | ($94,000) |
| 0379 | MONY Life Insurance Company | $1,000,000 | | $19,200 | | | $19,200 | $38,400 | $0 | ($38,400) |
| 6052 | The Lincoln National Life Insurance Co. | $5,500,000 | | | $43,200 | | | $43,200 | $0 | ($43,200) |
| 3190 | Mass Mutual Financial Group | $2,000,000 | $3,900 | $3,900 | $3,900 | $3,900 | $3,900 | $19,500 | $0 | ($19,500) |
| 9831 | Lincoln Financial Group | $850,000 | | | $13,200 | | | $13,200 | $0 | ($13,200) |
| 152U | Columbus Life Insurance Co. | $1,000,000 | | $11,100 | | | $11,100 | $22,200 | $0 | ($22,200) |
| 1378 | Lincoln National Life Insurance Company | $3,400,000 | | $57,600 | | | $57,600 | $115,200 | $0 | ($115,200) |
| 9397 | Lincoln National Life Insurance Company | $1,375,000 | | $31,800 | | | $31,800 | $63,600 | $0 | ($63,600) |
| 0002 | The Lincoln National Life Insurance Co. | $1,000,000 | | $25,500 | | | $25,500 | $51,000 | $0 | ($51,000) |
| 4836 | Lincoln Financial Group | $300,000 | | $2,400 | | | $2,600 | $5,000 | $0 | ($5,000) |
| 4375 | West Coast Life Insurance Co. | $650,000 | | $7,800 | | | $7,800 | $15,600 | $0 | ($15,600) |
| 7592 | Genworth Life Insurance Company | $4,750,000 | | | $117,000 | | | $117,000 | $0 | ($117,000) |
| 6776 | AXA Equitable Life Insurance | $5,000,000 | $139,800 | | | $139,800 | | $279,600 | $0 | ($279,600) |
| 5490 | Mass Mutual Financial Group | $4,450,000 | $23,500 | $23,500 | $23,500 | $28,200 | $28,200 | $126,900 | $0 | ($126,900) |
| 1631 | Beneficial Life Insurance Co. | $900,000 | $11,700 | | | $11,700 | | $23,400 | $0 | ($23,400) |
| 6716 | Jackson National Life Insurance Co. | $1,000,000 | | | | $25,200 | | $25,200 | $0 | ($25,200) |
| 6726 | Jackson National Life Insurance Company | $1,000,000 | | $24,700 | | | | $24,700 | $0 | ($24,700) |
| 492L | American General Life Insurance Co. | $6,000,000 | $53,000 | | | $53,000 | | $106,000 | $0 | ($106,000) |
| 3209 | AXA Equitable Life Insurance Co. | $950,000 | | $10,800 | | | $10,800 | $21,600 | $0 | ($21,600) |
| 166L | American General Life Ins. | $500,000 | | | $5,250 | | | $5,250 | $0 | ($5,250) |
| 711L | American General Life Ins. Co. | $2,000,000 | | | | | $20,200 | $20,200 | $0 | ($20,200) |
| 0246 | New York Life Insurance Co. | $1,000,000 | | $15,000 | | | $17,300 | $32,300 | $0 | ($32,300) |
| 1846 | John Hancock Estate Protection Unit | $366,000 | $4,700 | | $5,200 | | $5,200 | $15,100 | $0 | ($15,100) |
| 7988 | Lincoln Financial Insurance Co. | $1,000,000 | | | $25,200 | | | $25,200 | $0 | ($25,200) |
| 7134 | Sun Life Financial | $1,500,000 | $35,700 | | | $35,700 | | $71,400 | $0 | ($71,400) |
| 2131 | Lincoln National Life Insurance Co. | $500,000 | | $18,500 | | | $20,100 | $38,600 | $0 | ($38,600) |

| Policy Number (last 4 digits) | Insurance Carrier | Face Value | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Total | Reserves | Deficiency |
|---|---|---|---|---|---|---|---|---|---|---|
| 626D | ING Service Center | $500,000 | | | $12,100 | | | $12,100 | $0 | ($12,100) |
| 9122 | Mass Mutual Life Insurance Co. | $2,500,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $50,000 | $0 | ($50,000) |
| 0887 | West Coast Life Insurance Co. | $2,000,000 | | $41,600 | | | | $41,600 | $0 | ($41,600) |
| 3458 | Transamerica Life Insurance Co. | $250,000 | $3,800 | | $3,800 | | $4,000 | $11,600 | $0 | ($11,600) |
| 2128 | Lincoln National Life Insurance Co. | $2,500,000 | | $54,600 | | | | $54,600 | $109,200 | $0 | ($109,200) |
| 3390 | Pacific Life Insurance Company | $2,250,000 | $45,600 | | | | $45,600 | $91,200 | $0 | ($91,200) |
| 0993 | John Hancock Life Insurance Co. | $3,700,000 | | | $71,400 | | | $71,400 | $0 | ($71,400) |
| 5588 | Beneficial Life Insurance Co. | $1,100,000 | | $20,070 | | | $20,070 | $40,140 | $0 | ($40,140) |
| 9430 | Pacific Life Insurance Company | $1,320,000 | | | $18,800 | | | $18,800 | $0 | ($18,800) |
| 5463 | Genworth Life & Annuity Ins. Co. | $2,000,000 | $35,200 | | $35,200 | | $35,200 | $105,600 | $0 | ($105,600) |
| 1757 | Banner Life Insurance Co. | $2,000,000 | $16,200 | | | $16,200 | | $32,400 | $0 | ($32,400) |
| 9145 | West Coast Life Insurance Co | $750,000 | | $31,500 | | | $34,800 | $66,300 | $0 | ($66,300) |
| 5542 | New York Life Insurance Co. | $3,000,000 | | $6,565 | | | $6,565 | $13,130 | $0 | ($13,130) |
| 862L | American General | $1,760,456 | | $21,300 | | $21,800 | | $43,100 | $0 | ($43,100) |
| 1928 | Transamerica Life Insurance Co. | $1,000,000 | | $12,800 | | $12,800 | | $25,600 | $0 | ($25,600) |
| 5253 | Lincoln Financial Group | $1,691,718 | | $24,000 | | | $24,000 | $48,000 | $0 | ($48,000) |
| 59NL | United States Life Insurance Co. | $1,900,000 | | | $15,684 | | | $15,684 | $0 | ($15,684) |
| 82NL | United States Life Insurance Company | $1,875,000 | $14,800 | | | $14,800 | | $29,600 | $0 | ($29,600) |
| 3988 | Sun Life Assurance Co. | $2,000,000 | $22,200 | | | $22,200 | | $44,400 | $0 | ($44,400) |
| 6462 | Lincoln Financial Group | $400,000 | | $5,900 | | | $6,900 | $12,800 | $0 | ($12,800) |
| 2456 | West Coast Life Insurance Co. | $500,000 | $5,100 | | | $5,100 | | $10,200 | $0 | ($10,200) |
| 4274 | Transamerica Life Insurance Co. | $1,500,000 | $16,000 | | | $18,600 | | $34,600 | $0 | ($34,600) |
| 1870 | Pacific Life Insurance Company | $1,300,000 | $50,800 | | | | $50,800 | $101,600 | $0 | ($101,600) |
| 8039 | North American Company | $960,000 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $21,500 | $0 | ($21,500) |
| | | $126,650,578 | $579,860 | $696,605 | $707,104 | $602,270 | $781,305 | $3,367,144 | $0 | ($3,367,144) |

# **EXHIBIT** B

SERVICING AGREEMENT

between

THOMAS C. HEBRANK, in his capacity as permanent receiver for PWCG Trust

and

ITM TWENTYFIRST, LLC

Dated as of May [____], 2018

This SERVICING AGREEMENT (this "Agreement") is entered into as of *[date]* by and between ITM TwentyFirst, LLC (formerly known as 21st Services, LLC), a limited liability company organized under the laws of Delaware (the "Servicer"), and Thomas C. Hebrank, in his capacity as permanent receiver for PWCG Trust ("Client"). Each of Client and the Servicer are sometimes referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, Client desires to appoint the Servicer to provide the services (the "Services") set forth on **Exhibit A** to this Agreement for each policy identified by Client through a secure web portal as mutually agreed upon the Parties which list may be updated from time to time by Client in writing (each, a "Covered Policy"). The Servicer hereby accepts such appointment and agrees to perform the services set forth on **Exhibit A**, all on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for and in consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND CONSTRUCTION

SECTION 1.1  Definitions.  As used in this Agreement:

"Action" means any claim, action, suit, proceeding, arbitral action, inquiry from a Governmental Authority, criminal prosecution or other investigation, whether or not filed or commenced in any court or tribunal.

"Affiliate" means, with respect to any Person, any other Person controlling or controlled by or under common control with such specified Person. For purposes of this definition, "control," when used with respect to a specific Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the term "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" has the meaning set forth in the introductory paragraph.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"Confidential Information" means all confidential or non-public information and data, in whatever form, whether written, oral, electronic or otherwise furnished by the disclosing Party to the receiving Party.  Confidential Information does not include such information or data that can be shown to have been (i) previously obtained or known by the receiving Party with no obligation to keep such information or data confidential, (ii) in the public domain (either prior to or after the furnishing of such information or data under this Agreement) through no fault of such receiving Party, (iii) later acquired by the receiving Party from another source if the receiving Party is not aware that such source is under an obligation to another party to this Agreement to

keep such information or data confidential or (iv) is produced as a result of the receiving Party's independent development of the information without the use of any of the disclosing Party's confidential information.  Confidential Information shall exclude Covered Insured Information.

"Covered Insured Information" means personal information of a Covered Insured, including, without limitation, a Covered Insured's name, street or mailing address, electronic mail address, telephone or other contact information, employer, social security or tax identification number, date of birth, driver's license number, photograph or documentation of identity or residency (whether independently disclosed or contained in any disclosed document, life expectancy evaluation, life insurance application or viatical or life settlement application).

"Covered Insured" means a person whose life is insured under a Covered Policy.

"Covered Policy" has the meaning set forth in the Recitals of this Agreement.

"Death Benefit" means, with respect to a Covered Policy, the amount payable pursuant to the terms thereof by the related Issuing Insurance Company to the beneficiaries of such Covered Policy on the maturity date of such Covered Policy.

"Governmental Authority" means the United States of America, any state or other political subdivision thereof and any entity of competent jurisdiction exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Indemnitees" means, collectively, the Servicer, each Affiliate of the Servicer and each stockholder, member, partner, manager, officer, director, trustee, employee, agent and representative of the Servicer or any of its Affiliates.

"Insurance Policy" means a policy or contract of life insurance, including all riders, endorsements, amendments and supplements thereto.

"Insurance Policy File" means, with respect to any Covered Policy, collectively all data, information, records and documents delivered to the Servicer by, or caused to be delivered on behalf of, Client in connection with this Agreement.  Such documents shall include all documents and information reasonably requested by and delivered to the Servicer, including, but not limited to, all data, information, records and documents necessary or convenient for the Servicer to perform the Services under this Agreement.

"Issuing Insurance Company" means, with respect to any Insurance Policy, the insurance company that is obligated to pay the related Death Benefit upon the death of the related insured or any other benefit provided by the terms of such Insurance Policy (or the successor to such obligation).

"Joint Policy" means an Insurance Policy with two (2) insureds which pays a Death Benefit upon the death of the second insured.

"Law" means any law, constitution, statute, regulation, code, rule, ordinance, treaty or other pronouncement having the effect of law enacted or issued by any Governmental Authority.

"Order" means any subpoena, writ, judgment, decree (including any consent decree), injunction or similar order issued, promulgated or entered by or with any Governmental Authority (in each such case whether preliminary or final).

"Out-of-Pocket Expense" means (a) the actual amount of any expenses for postage or overnight mailing incurred in connection with the Services, (b) the actual costs of obtaining in death certificates, and (c) the actual out of pocket associated with obtaining medical records (facility fees).

"Party" or "Parties" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated association, Governmental Authority or any other entity.

"Portfolio Database" means the database maintained by the Servicer with respect to the Covered Policies, which database shall include all information and data necessary for the Servicer to perform the Services pursuant to and in accordance with the terms of this Agreement.

"Premium" means, with respect to any Insurance Policy, as indicated by the context, any past due premium with respect thereto, or any scheduled premium.

"Premium Payment Schedule" has the meaning set forth in item C of **Exhibit A** of this Agreement.

"SEC Action" means the enforcement action filed by the Securities and Exchange Commission entitled *SEC v. Pacific West Capital Group, Inc. et al.*, United States District Court for the Central District of California ("District Court"). Case No. 15-cv-02563 ("SEC Action"), pursuant to which Thomas C. Hebrank was appointed permanent receiver for PWCG Trust.

"Servicer" has the meaning set forth in the introductory paragraph of this Agreement.

"Services" has the meaning set forth in the Recitals of this Agreement.

"Servicing Fee" means $81.25 per month for each Covered Policy.

"Servicing Standard" has the meaning set forth in Section 2.1(b) of this Agreement.

"Servicing Term" means the period of time from the date this Agreement is entered into until the date that this Agreement is terminated pursuant to Article VII of this Agreement.

"Sub-Servicer" has the meaning set forth in Section 2.1(c) of this Agreement.

"Third Party Claim" means any claim or Action made or brought by any Person which is not a party to this Agreement or an Affiliate of a party to this Agreement.

"Client" has the meaning set forth in the Preamble of this Agreement.

SECTION 1.2  <u>Use of Terms</u>.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; article, section, subsection, exhibit and schedule references contained in this Agreement are references to articles, sections, subsections, exhibits and schedules in or to this Agreement unless otherwise specified; with respect to all terms in this Agreement, the singular includes the plural and the plural the singular; words importing any gender include the other gender; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments, amendments and restatements and supplements thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Agreement; references to Persons include their permitted successors and assigns; and the term "including" means "including, without limitation"; and all references to "$" refer to United States currency.

## ARTICLE II
## SERVICER'S RIGHTS AND DUTIES

SECTION 2.1  <u>Servicer to Act</u>.

(a)    <u>Appointment of Servicer</u>.  Client hereby appoints the Servicer to provide to Client the Services described on **Exhibit A** to this Agreement pursuant to, and in accordance with, the terms and provisions of this Agreement during the Servicing Term with respect to each Covered Policy and the Servicer hereby accepts such appointment on the terms and conditions set forth in this Agreement.  The Servicer shall, as an independent contractor on behalf of Client (and not as an agent thereof), perform the Services described on **Exhibit A** to this Agreement during the Servicing Term with respect to each Covered Policy, in all cases subject to and in accordance with the Servicing Standard.

(b)    <u>Servicing Standard</u>.  In performing the Services and the Servicer's other obligations under this Agreement, the Servicer shall exercise the same degree of skill and care used by other Persons of established reputation responsible for servicing life insurance policies that have been sold in the secondary or tertiary market and shall comply with all applicable Laws (the foregoing, the "<u>Servicing Standard</u>").

(c)    <u>Subservicing Agreements</u>.   In performing the Services under this Agreement, the Servicer may, at its sole discretion, enter into one or more subservicing agreements with its Affiliates and/or other Persons for the provision of Services (a "<u>Sub-Servicer</u>"); <u>provided</u>, <u>however</u>, notwithstanding any such subservicing agreement, and the performance of any Services or any of the Servicer's other obligations by any other Sub-Servicer, the Servicer shall remain obligated and liable for the performance of the Services and the Servicer's other obligations under this Agreement in accordance with the provisions of this Agreement, without diminution of any such obligation or liability by virtue of any such subservicing agreements, to the same extent and under the same terms as if the Servicer alone was performing the Services and its other obligations under this Agreement.  Unless otherwise agreed by Client in writing, the Servicer shall be solely responsible for the fees and costs of any such Sub-Servicer.

(d)     Instructions.

(i)     Client shall provide (or cause to be provided) to the Servicer any written instruction, approval, authorization or direction as the Servicer reasonably requests and reasonably believes to be appropriate in connection with the performance of the Servicer's duties and obligations under this Agreement (on which instructions, approvals, authorizations and directions the Servicer shall be entitled to rely), including, executing and delivering to the Servicer, if applicable to the Services, an authorization for the Issuing Insurance Company to provide information related to the Covered Policies directly to the Servicer in the form attached to this Agreement as **Exhibit B** (or such other form as required by the Issuing Insurance Company).  The Servicer shall have no duty to act pending the delivery of a response by Client to a written request received by the Client from the Servicer for any such instruction, approval, authorization or direction.

(ii)     In performing the Services and any other obligations under this Agreement, the Servicer shall in all cases be entitled to rely upon (A) the instructions of  Client and the Servicer shall not be liable to the Client or any other Person for any act taken, or any omission to act, in accordance with any such instruction, and (B) any notice, report or other communication (whether written or oral) delivered or made by the Client, any Covered Insured, any Issuing Insurance Company or any other Person to the Servicer with respect to any matter relating to this Agreement or any Covered Policy, and the Servicer shall not be liable, responsible or accountable for the accuracy or completeness of any such notice, report or other communication or have any responsibility to inquire into or determine the genuineness, authenticity or sufficiency of any such notice, report or other communication.

(iii)     Notwithstanding anything to the contrary in this Agreement, the Servicer shall not be obligated to take or refrain from taking any action, or to carry out or refrain from carrying out any direction given by the Client, at any time with respect to any Covered Policy or any matter relating to this Agreement that the Servicer believes is reasonably likely to (A) violate any Law applicable to the Servicer or any of its Affiliates, (B) lead to any investigation by any Governmental Authority, or (C) result in the Servicer or any of its Affiliates incurring, expending or risking any of its funds or any liability (financial or otherwise), unless the Servicer and its Affiliates shall be furnished with such security and indemnity against such expenses or liability, as the case may be, as the Servicer may reasonably require.  Without limiting the immediately preceding sentence, the Servicer may consult at its own cost with counsel and other professional advisors, and the advice or opinion of any such counsel or other professional advisor that has been engaged by the Servicer or any of its Affiliates in good faith shall be full and complete authorization and protection in respect of the Servicer taking or refraining from taking any action, or carrying out or refraining from carrying out any direction given by Client or any other Person, at any time with respect to any Covered Policy or any matter relating to this Agreement.

SECTION 2.2  Liability. NEITHER THE SERVICER NOR ANY AFFILIATE OF THE SERVICER SHALL BE LIABLE TO CLIENT OR ANY OTHER PERSON FOR ANY LOSS DIRECTLY OR INDIRECTLY ARISING OUT OF, IN CONNECTION WITH OR RELATED TO THE PERFORMANCE OF THE SERVICER'S OBLIGATIONS UNDER THIS AGREEMENT (INCLUDING THE PERFORMANCE OF THE SERVICES), EXCEPT TO

THE EXTENT SUCH LOSS RESULTED DIRECTLY FROM NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD OF THE SERVICER OR ITS AFFILIATES. EXCEPT AS SET FORTH IN THE LAST SENTENCE OF THIS SECTION 2.2, THE SOLE LIABILITY OF SERVICER (WHETHER IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY IN TORT, BY STATUTE OR OTHERWISE) FOR ANY AND ALL CLAIMS IN ANY MANNER RELATED TO OR ARISING UNDER THIS AGREEMENT WILL BE THE PAYMENT OF DIRECT DAMAGES, AND NOT CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES, NOT TO EXCEED THE GREATER OF (A) THE AMOUNT OF FEES PAID BY CLIENT TO SERVICER IN THE TWELVE (12) MONTHS PRIOR TO THE EVENT GIVING RISE TO SUCH LIABILITY OR (B) THE AMOUNT OF INSURANCE AVAILABLE WITH RESPECT TO THE EVENT GIVING RISE TO SUCH LIABILITY AS SET FORTH IN SECTION 5.3. THE LIMITATIONS IN LIABILITY IN THE IMMEDIATELY PRECEDING SENTENCE SHALL NOT APPLY TO DAMAGES FOR WILLFUL MISCONDUCT OR FRAUD OF THE SERVICE PROVIDER OR ITS PERSONNEL.

SECTION 2.3   Certain Limitations Upon the Services and Rights of the Servicer

(a)   Neither the Servicer nor any of its Affiliates is assuming any indebtedness or other liability or obligation of Client or any of its Affiliates pursuant to or as a result of this Agreement, and no provision of this Agreement shall be construed so as to imply that the Parties intended any such assumption.

(b)   The Servicer shall not be liable, responsible or accountable for any failure by any Issuing Insurance Company to perform any of its obligations under any Covered Policy, including any failure to pay the Death Benefit payable under any Covered Policy when due in accordance with the terms thereof.   In addition to Section 2.1(d)(iii) of this Agreement, the Servicer shall not be obligated to act in any manner that is inconsistent with terms of any Covered Policy or related agreements.

(c)   The Servicer shall be entitled to deem each signatory on any instrument, notice or document submitted to it with respect to this Agreement as being the signature of the individual authorized to sign such instrument, notice or document, as the case may be, on behalf of the respective party thereto, and the Servicer shall be entitled to rely upon the genuineness of each such signature (including facsimile and other similar electronic signatures) without inquiry and without requiring substantiating evidence of any kind.

(d)   If at any time the Servicer is served with any Order or other form of judicial or administrative process which in any way affects any Service or other obligation of the Servicer under this Agreement, or any funds or property with respect to any or all of the Covered Policies (including orders of attachment or garnishment or other forms of levies or injunctions or stays related to the transfer of any such funds or property), the Servicer shall promptly deliver a copy of such Order or a written notice of such judicial or administrative process to Client.   The Servicer is hereby authorized to comply with such Order or judicial or administrative process in any manner as it or its legal counsel of its own choosing deems appropriate; and if the Servicer complies with any such Order or other form of judicial or administrative process, the Servicer shall not be liable to Client or any other Person even though such Order or other form of judicial

or administrative process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

## ARTICLE III
## FEES

SECTION 3.1 <u>Servicing Fees</u>.  As compensation to the Servicer for performing the Services under this Agreement, Client shall pay to the Servicer (a) the Servicing Fee, monthly in arears, and (b) any Out-of-Pocket Expenses each when incurred.

SECTION 3.2 <u>Life Expectancy Certificate Fees</u>.  If the Servicer orders life expectancy reports on behalf of Client, Client shall pay to the Servicer its then-current fees for each life expectancy certificate completed by the Servicer, monthly in arrears.  Nothing herein shall be deemed to change the terms and conditions of the life expectancy certificates as set forth on such certificates or in the systems through which such certificates are ordered; provided that as of the Effective Date of this Agreement, the fees for life expectancy reports shall be as set forth in Exhibit C.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

SECTION 4.1 <u>Representations and Warranties of the Servicer</u>.  Servicer hereby represents and warrants to Client as of the date of this Agreement that:

(a)    <u>Organization and Good Standing</u>.  The Servicer is a Delaware limited liability company, duly organized, validly existing and in good standing under the Laws of the State of Delaware and has the organizational power and authority to own its properties and to conduct its business as such properties are then owned and such business is then conducted.

(b)    <u>Power and Authority</u>.  The Servicer has all necessary power and authority to execute and deliver this Agreement and has taken all necessary action to authorize and has duly authorized the execution and delivery of this Agreement and the performance of such obligations.

(c)    <u>Binding Obligation</u>.  This Agreement constitutes the legal, valid and binding obligations of the Servicer enforceable by Client against the Servicer in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting creditors' rights generally or by general principles of equity.

(d)    <u>No Violation</u>.  The execution and delivery of this Agreement and the fulfillment of the terms of this Agreement will not violate any applicable Law, violate, result in the breach of any terms and provisions of, nor constitute an event of default under, the certificate of formation or the operating agreement of the Servicer, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which the Servicer is a party or by which it shall be bound; nor violate any order, judgment or decree applicable to the Servicer of any Governmental Authority having jurisdiction over the Servicer or its properties.

(e)     No Proceedings.  There is no action, suit or proceeding before or by any Governmental Authority having jurisdiction over the Servicer and its properties, now pending, or to the Servicer's knowledge, threatened, against or affecting the Servicer: (i) asserting the invalidity of this Agreement, or (ii) seeking any determination or ruling that might materially and adversely affect the performance by the Servicer of its obligations under, or the validity or enforceability of, this Agreement.

SECTION 4.2 Representations and Warranties of Client.    Client hereby represents and warrants to the Servicer as of the date of this Agreement that:

(a)     Organization and Good Standing.  Client is a  Trust under the laws of Ohio and has the power and authority to own its properties and to conduct its business as such properties are owned and such business is conducted as of the date this Agreement.

(b)     Power and Authority.  Client has all necessary power and authority to execute and deliver this Agreement and has taken all necessary action to authorize and has duly authorized the execution and delivery of this Agreement.

(c)     Binding Obligation.  This Agreement constitutes the legal, valid and binding obligation of Client enforceable by the Servicer against Client in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting creditors' rights generally or by general principles of equity.

(d)     No Violation.  The execution and delivery of this Agreement and the fulfillment of the terms of this Agreement will not violate any applicable Law, violate, result in the breach of any terms and provisions of, nor constitute an event of default under, the certificate of formation or the operating agreement of Client, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which Client is a party or by which it shall be bound; nor violate any order, judgment or decree applicable to Client of any Governmental Authority having jurisdiction over Client or its properties.

(e)     No Proceedings.  There is no action, suit or proceeding before or by any Governmental Authority having jurisdiction over Client and its properties, now pending, or to Client's knowledge, threatened, against or affecting Client: (i) asserting the invalidity of this Agreement, or (ii) seeking any determination or ruling that might materially and adversely affect the performance by Client of its obligations under, or the validity or enforceability of, this Agreement.

(f)     No Consents.  Other than the authorization of the District Court in the SEC Action, no consent, approval, permit, license, authorization or order of or declaration or filing with any Governmental Authority or Covered Insured is required to be obtained by Client for performance of its obligations under this Agreement.  Except as notified in writing to Servicer, Client has the right and authority to obtain medical records on each Covered Insured.  Proof of such consent shall be delivered to Servicer within five (5) business days' of receipt by Client.

## ARTICLE V
## CERTAIN ACKNOWLEDGMENTS AND COVENANTS OF THE PARTIES

SECTION 5.1 <u>Compliance with Laws</u>.  The Servicer shall, in performing the Services, comply in all material respects with all Laws applicable to the Services.

SECTION 5.2 <u>Cooperation</u>. Client and its Affiliates shall at all times cooperate with the Servicer to enable the Servicer to provide the Services and to perform its other obligations under this Agreement.

SECTION 5.3 <u>Insurance</u>.  The Servicer covenants that it will maintain at all times during the term of this Agreement professional liability insurance covering claims related to alleged errors and omissions by the Servicer in the performance of its obligations hereunder with an aggregate limit of at least five million dollars ($5,000,000).  Proof of such insurance shall be provided to Client.

## ARTICLE VI
## CONFIDENTIALITY

SECTION 6.1 <u>Confidential Information</u>.  The Parties to this Agreement agree to hold, and use their respective best efforts to cause their respective Affiliates and Sub-Servicers, if applicable, and any representatives to hold, all Confidential Information concerning the other Parties or any of their respective Affiliates furnished to it by the other Party to this Agreement in connection with this Agreement, the services contemplated by this Agreement and the terms of this Agreement in strict confidence from, and not to disclose to, any Person (other than any such Affiliate or Sub-Servicer), unless (a) compelled to disclose by judicial or administrative process or by other requirements of Law or requests of Governmental Authorities in connection with any audit, examination or investigation by such Governmental Authorities, (b) disclosed in any action or proceeding brought by a party in pursuit of its rights or in the exercise of its remedies under this Agreement, (c) disclosed only to the extent necessary to perform any act or Services required or contemplated under this Agreement, or (d) as otherwise allowed under this Agreement, including pursuant to <u>Section 2.3(d)</u> or <u>Section 6.3</u> of this Agreement. However, either Party may disclose Confidential Information to those of its representatives who have a need to know such information in connection with this Agreement and the performance of such Party's obligations under this Agreement, or in connection with financing, merger, stock sale or acquisition of a Party, it being understood that such representatives or disclosees have an obligation of confidentiality to the disclosing Party.  In any event, the receiving Party of any Confidential Information of the disclosing Party shall be responsible for any breach of this Agreement by it or any of its employees, agents or representatives.  The obligation to preserve the confidentiality of the Confidential Information shall survive expiration or termination of this Agreement to the extent any such Confidential Information remains in the possession of the Party receiving the Confidential Information of the other Party.

SECTION 6.2 <u>Confidentiality of Covered Insured Information</u>.  Each of the Parties to this Agreement acknowledges that insurance regulations and other applicable Laws are structured to provide confidentiality to insureds with respect to Covered Insured Information. Each of the Parties to this Agreement agrees to comply with all applicable Laws with respect to

the confidentiality of Covered Insured Information; provided, however, that the Servicer may use such Covered Insured Information to search any applicable databases to perform the services contemplated herein and any Party may disclose such information to any Governmental Authority in response to a request therefor, in connection with any audit, examination or investigation by any Governmental Authority or as otherwise required by Law. The obligation to preserve the confidentiality of the Covered Insured Information shall survive expiration or termination of this Agreement to the extent any such Covered Insured Information remains in the possession of the Party receiving the Covered Insured Information of the other Party.

SECTION 6.3  Disclosure of Confidential Information or Covered Insured Information by any Party.  Nothing in this Agreement shall prevent either Party to this Agreement from sharing Confidential Information or Covered Insured Information with any affiliates, including their employees, officers and directors, federal or state regulator, outside legal counsel, auditors, or Sub-Servicers in the course of a confidential or privileged communication, as required by such federal or state regulator, legal counsel, auditors or Sub-Servicers, or other person to discharge their respective duties in connection with the Services contemplated by this Agreement so long as such person is bound, contractually or by professional duty, to adhere to the terms of confidentiality hereunder.  Except for disclosure to Governmental Authorities as contemplated by this Article VI, and as expressly provided in this Article VI, neither Party to this Agreement will disclose Confidential Information or Covered Insured Information to a third party, unless and until such third party enters into an agreement with such party containing provisions substantially similar to this Article VI.  Notwithstanding anything to the contrary, Client understands and agrees that from time to time Servicer creates anonymized datasets, which datasets are used by Servicer and disclosed, to Servicer's clients for statistical or analytical purposes.

## ARTICLE VII
## TERM; TERMINATION EVENTS

SECTION 7.1  Termination.  This Agreement shall continue until terminated as set forth below:

(a)     this Agreement may be terminated at any time on the mutual written consent of each Party to this Agreement;

(b)     this Agreement may be terminated by Client, by delivery of written notice of such termination to the Servicer upon the occurrence of any of the following:

(i)     a change in any applicable Law that causes it to be illegal for the Servicer to continue to perform its obligations under this Agreement;

(ii)     the material breach by the Servicer of any representation, warranty, covenant, condition or agreement of the Services under this Agreement (other than as covered by clause (i)) and such breach continues uncured for ten (10) days from the date notice thereof was first delivered to the Servicer;

(iii)     after the first anniversary of the date of this Agreement and in each contract year thereafter, the delivery of at least sixty (60) days prior written notice before the anniversary of this Agreement.

(c)     this Agreement may be terminated by the Servicer, at any time, by delivery of written notice of such termination to Client upon the occurrence of any of the following:

(i)     a change in any applicable Law that causes it to be illegal for the Servicer to continue to perform its obligations under this Agreement;

(ii)     the failure by Client to pay the Servicing Fee or any Out-of-Pocket Expense pursuant to Article III within thirty (30) days of the date of the applicable invoice;

(iv)     the material breach by Client of any representation, warranty, covenant, condition or agreement under this Agreement (other than as covered by clause (i)) and such breach continues uncured for ten (10) days from the date notice thereof was first delivered to Client; or

(v)     the delivery of at least sixty (60) days prior written notice of termination from Servicer to Client.

SECTION 7.2 <u>Cooperation with Successor Servicer</u>.  Promptly following the termination of this Agreement pursuant to <u>Section 7.1</u>, the Servicer shall cooperate with any successor servicer in delivering in accordance with and as permissible under applicable Law, any data maintained by the Servicer that is necessary to the servicing and monitoring of Covered Policies to the extent not already in the possession of Client.  For the avoidance of doubt, upon the termination or resignation of the Servicer pursuant to <u>Section 7.1</u>, the Servicer shall have no liability whatsoever for any action or omission of any successor servicer or Client's failure to appoint a successor servicer.

**ARTICLE VIII**
**INDEMNIFICATION**

SECTION 8.1 <u>Indemnification</u>.  Notwithstanding anything to the contrary set forth in this Agreement, Client hereby assumes liability for, and does hereby agree to reimburse, indemnify and hold harmless each Indemnitee against and in respect of, any and all direct losses that may be imposed upon, incurred by or asserted against any Indemnitee, directly or indirectly, arising out of, in connection with or related to the Servicer's performance under this Agreement; provided, however, that such indemnity shall not apply to the extent that such losses have been caused by fraud, willful misconduct or negligence of the Servicer or any Indemnitee or breach of the terms of this Agreement by Servicer or any Indemnitee.

SECTION 8.2 <u>Notice and Defense of Claims</u>.  If an Indemnitee receives notice or otherwise obtains knowledge of any matter with respect to which Client (the "<u>Indemnifying Party</u>") may become obligated to hold harmless or indemnify such Indemnitee under <u>Section 8.1</u>, then the Indemnitee shall promptly deliver to the Indemnifying Party a written notice describing in reasonable detail the basis for indemnification and the amount to be indemnified; provided,

that a failure to promptly deliver such notice shall not affect the indemnification obligation except to the extent Indemnifying Party is prejudiced or injured thereby.  The Indemnifying Party shall have the right, at its option, to assume the defense of such claim at its own expense and with its own counsel.  If the Indemnified Party elects to and does assume the defense of such matter, (i) the Indemnifying Party shall not be required to indemnify such Indemnitee against any attorneys' fees or other expenses incurred on behalf of such Indemnitee in connection with such matter following Indemnifying Party's election to assume the defense of such matter, (ii) such Indemnitee shall fully cooperate as reasonably requested by the Indemnifying Party in the defense or settlement of such matter and (iii) the Indemnifying Party shall keep such Indemnitee reasonably informed of developments and events relating to such matter.  So long as the Indemnifying Party is in good faith defending such Indemnitee in such matter, such Indemnitee shall not settle or compromise such matter.  In the event that the Indemnifying Party fails to defend such Indemnitee with respect to such matter, or fails to notify such Indemnitee that it is undertaking such defense, within thirty (30) days after receiving such written notice, such Indemnitee shall have the right (but not the obligation) to defend itself and to enter into any commercially reasonable settlement of such matter with the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld except in any instance in which such settlement requires the Indemnifying Party or any of its Affiliates to admit any breach of Law, involves an injunction of future activity of the Indemnifying Party or any of its Affiliates or requires the Indemnifying Party or any of its Affiliates to pay any money damages), without prejudice to any right of recovery against the Indemnifying Party pursuant to the provisions and limitations of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

SECTION 9.1  Amendment; Waiver.  No amendment, modification or discharge of this Agreement, and no waiver under this Agreement, shall be valid or binding unless set forth in a writing specifically referencing this Agreement and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.  Neither the waiver by either of the Parties to this Agreement of a breach of or a default under any of the provisions of this Agreement, nor the failure by either of the Parties, on one or more occasions to enforce any of the provisions of this Agreement or to exercise any right or privilege under this Agreement, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges under this Agreement.

SECTION 9.2  Governing Law.

(b)  THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH LAWS GOVERNING FEDERAL EQUITY RECEIVERSHIPS AND THE INTERNAL LAWS OF THE STATE OF CALIFORNIA, WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS PROVISIONS , AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AGREEMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DISTRICT COURT IN THE SEC ACTION IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

(d)     EACH PARTY TO THIS AGREEMENT HEREBY WAIVES THE RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR (II) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES TO THIS AGREEMENT, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

SECTION 9.3  Construction.   The Parties acknowledge and agree that this Agreement was negotiated at arm's length and on equal footing as between the Parties, that both Parties are sophisticated and that both Parties fully understand and agree to all of the terms and conditions contained in this Agreement.  Accordingly, in any dispute concerning construction of this Agreement, or any term or condition of this Agreement, the Parties agree that such dispute shall be resolved without any presumption or rule of construction in favor of one Party or the other or any similar doctrine (including the resolution of any claimed ambiguities against the drafting Party) and expressly waive the application of such presumption, rule of construction or other similar doctrine.

SECTION 9.4  Notices.  All demands, notices, reports and communications under this Agreement (except that the reports related to the Servicer may be delivered through the Service's secure web portal or other secure file transfer technology)  shall be in writing and shall be deemed to have been duly given if delivered in person, or duly sent by overnight mail, postage prepaid, or by facsimile with a confirmation copy by regular mail, to such Party at the address or facsimile number, as the case may be, set forth below, or such other address or facsimile number as shall be designated by such Person in a written notice to the other Party to this Agreement, or if requested by a Party electronically to the electronic mail address or secure website designated by such Party:

If to Client:


Thomas C. Hebrank, Receiver
E3 Advisors
401 West A Street, Suite 1830
San Diego, CA 92101
Email: thebrank@ethreeadvisors.com

With copy to:

Ted Fates
Allen Matkins Leck Gamble Mallory & Natsis, LLP
600 W. Broadway, 27th Floor
San Diego, CA 92101
Email: tfates@allenmatkins.com

If to the Servicer:

ITM TwentyFirst, LLC
333 South Seventh Street, Suite 300
Minneapolis, Minnesota 55402
Attention:  Servicing Team
Facsimile No: 612-454-2646
Email: servicing@itm21st.com

Notwithstanding the foregoing, notice of breach, service of legal process or other similar communications shall not be given electronically and will not be deemed duly given under this Agreement if delivered by such means.

SECTION 9.5  Assignment.  This Agreement may not be assigned by any of the Parties to this Agreement without the prior written consent of the other Party to this Agreement.

SECTION 9.6  Further Assurances.  Each Party to this Agreement agrees to do and perform, from time to time, any and all acts and to execute any and all further instruments required or reasonably requested by any other Party to this Agreement more fully to affect the purposes of this Agreement.

SECTION 9.7  No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of Client or the Servicer, of any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges in this Agreement provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by Law.

SECTION 9.8  Counterparts.  This Agreement may be executed in two or more counterparts (and by a different Party on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic mail image shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.9  Third-Party Beneficiaries.  This Agreement will inure to the benefit of and be binding upon the Parties to this Agreement, and no other Person, including any Insured, will have any right, remedy or obligation under this Agreement.

SECTION 9.10  <u>Entire Agreement</u>.  Except as specifically stated otherwise in this Agreement and the other documents to which the Parties to this Agreement are a party, this Agreement sets forth the entire understanding of the Parties to this Agreement relating to the subject matter of this Agreement, and all prior understandings, written or oral, with respect to the subject matter of this Agreement, are superseded by this Agreement.  This Agreement may not be modified, amended, waived or supplemented except as provided in this Agreement.

SECTION 9.11  <u>Force Majeure</u>.  Except with respect to payment obligations pursuant to Article III, neither Party shall be responsible for any delay or failure in performance resulting from acts beyond the reasonable control of such Party, including acts of God, acts of war, riot, epidemic, fire, flood, other disasters or acts of government; <u>provided</u>, <u>however</u>, that each Party shall undertake to discharge its obligation under this Agreement within a commercially reasonable time following the removal or conclusion of the acts beyond its reasonable control.

SECTION 9.12  <u>Headings</u>.  The headings in this Agreement are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision of this Agreement.

SECTION 9.13  <u>Survival</u>.  The obligations, covenants and rights contained in <u>Sections 2.2</u>, <u>6.1</u>, <u>6.2</u>, <u>6.3</u>, <u>8.1</u>, <u>8.2</u> and this Article IX shall survive and continue in full force and effect in accordance with their terms following the expiration or termination of this Agreement.

SECTION 9.14  <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any other term or provision of this Agreement in any other jurisdiction.  If any term or provision of this Agreement is so broad as to be invalid or unenforceable, the provision shall be interpreted to be only as broad as is valid or enforceable.  Subject to the foregoing provisions of this <u>Section 9.14</u>, if any term or provision of this Agreement is invalid or unenforceable for any reason, such circumstances shall not have the effect of rendering such term or provision invalid or unenforceable in any other case or circumstance.

[Remainder of page intentionally left blank.  Signature page follows.]

IN WITNESS WHEREOF, the Parties to this Agreement have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

THOMAS C. HEBRANK, in his capacity as permanent receiver for PWCG Trust By:

_____
Name:
Title:

ITM TWENTYFIRST, LLC

By:     _____

Name:  Kurt Gearhart
Title: CEO

**EXHIBIT A**

**SERVICES**

(A)     Maintenance of Records.

    (1)     With respect to each Covered Policy, the Servicer shall maintain accurate and current records of the information supplied to it in the related Insurance Policy File, as well as any other information that is received by the Servicer from Client, the Covered Insured, an Issuing Insurance Company, a Governmental Authority or any other Person, or that otherwise comes into the possession of the Servicer, in connection with its performance of the Services.   In furtherance of the foregoing, the Servicer shall maintain a Portfolio Database which shall include (and update) all information and data with respect to each Covered Policy in a manner consistent with the Servicing Standard, and in all cases, as may be required for the Servicer to perform the Services and its other obligations under this Agreement in accordance with their terms.

    (2)     The Servicer shall maintain policies, systems and procedures (consistent with the Servicing Standard and all applicable Laws) (i) to protect each Insurance Policy File and all other books and records (in whatever medium) maintained by or on behalf of the Servicer with respect to the Covered Policies (including the Portfolio Database) from damage or loss due to fire, flood, theft, computer or power failure and any other event which may cause loss, damage or destruction thereto and (ii) to prevent the disclosure of Confidential Information of Client (including Covered Insured Information regarding the Covered Insureds under the Covered Policies).

(B)     Initial Policy Maintenance.

As soon as practical following an Insurance Policy becoming a Covered Policy and the Servicer's receipt of the Insurance Policy File, the Servicer shall:

    (1)     (i) prepare an Authorization to Release Policy Information in the form attached to this Agreement as **Exhibit B** (or such other form as required by the Issuing Insurance Company), (ii) request Client to execute such form, (iii) file such form with the Issuing Insurance Company, (iv) obtain acknowledgment from the Issuing Insurance Company of receipt of such form, and (v) send to Client a copy of the acknowledgement from the Issuing Insurance Company;

    (2)     instruct the Issuing Insurance Company of such Covered Policy to deliver all notices and other communications in respect of such Covered Policy to the Servicer; and

    (3)     Inform Client and the Adviser (at such address as the Client may advise the Servicer in writing from time to time) in writing of the status or any inconvenience than may delay the process described in sections (1) and (2) above.

(C)   <u>Policy Illustrations.</u>

Annually, within a reasonable amount of time, prior to or after the anniversary date of the issuance of each Covered Policy, the Servicer shall arrange for the delivery of a new in-force policy illustration in respect of such Covered Policy with a Premium Payment Schedule setting forth the minimum level Premiums to keep such Covered Policy in force until the Covered Insured's 100th birthday or such other date specified by Client (the "<u>Premium Payment Schedule</u>").

(D)   <u>Monthly Status Checks; Payments of Premiums; Premium Optimization.</u>

(1)   The Servicer shall on a monthly basis, verify with the Issuing Insurance Company of each Covered Policy that such Covered Policy is in force, has not lapsed and is not in a state of default or grace.  If a policy is in a state of default or grace, the Servicer shall promptly notify Client and the Adviser and take all actions consistent with the Servicing Standard to cure any such state of default or grace; <u>provided</u>, <u>however</u>, the Servicer shall not be required to expend any of its own funds to pay any past-due or other Premium owing in respect of such Covered Policy).

(2)   Within ten (10) Business Days after the date upon which Client pays the Premiums with respect to a Covered Policy, the Servicer shall confirm with the related Issuing Insurance Company that such payment was received in full and credited correctly by such Issuing Insurance Company to such Covered Policy.  In the event the Servicer determines that such payment was not so received, the Servicer shall promptly notify Client and the Adviser of such event or occurrence and shall take all actions (consistent with the Servicing Standard) to remedy the situation; <u>provided</u>, <u>however</u>, the Servicer shall not be required to expend any of its own funds to pay any past-due or other Premium owing in respect of such Covered Policy.

(3)   The Servicer shall on a monthly basis, provide Client (with a copy to the Adviser) and Client's designee with the Premium Payment Schedules for each Covered Policy that has a premium payment due during that month.

(4)   Initially and then annually (on an as needed basis as applicable to the Covered Policy), using most recent policy illustration in the Portfolio Database and the Servicer's then-current actuarial pricing model, in consultation with Adviser, the Servicer shall determine, an optimal Premium Payment Schedule based on the projected minimum cost of insurance.  If there is any dispute between the Servicer and the Adviser as to the correct premium amounts to be set forth in such Premium Payment Schedule, the Servicer shall advise Client in writing (with a copy to the Adviser).  Client shall approve each Premium Payment Schedule and shall settle any disputes between the Servicer and the Adviser by determining whose recommendations should be incorporated into the Premium Payment Schedule.  Nothing in this Agreement shall be deemed to change the terms and conditions of the premium optimization report as set forth on such reports or in

the systems through which such reports are ordered.

(E)   Monitoring and Tracking of Covered Insureds.

In accordance with the Servicing Standard, the Servicer shall monitor the status of each Covered Insured of a Covered Policy, in each case in compliance with any restriction imposed by any applicable Law.  In performing such service:

(1)   the Servicer shall make periodic written, electronic or verbal communication (or make good faith attempts at the same) with each Covered Insured or one or more of his or her designated contacts, for the purposes of maintaining current information about the status and residence thereof and whether a death has occurred, such contact to be made no less often than quarterly, unless limited by applicable Law.  Upon detection of a death of such a Covered Insured, the Servicer shall promptly inform Client of such death and the date thereof.

(2)   the Servicer shall perform periodic checks of electronic databases consistent with the Servicing Standard and in compliance with any restriction imposed by any applicable Law to determine whether a death has occurred and upon detection of a death of such a Covered Insured, the Servicer shall promptly inform Client of such death and the date thereof.

(3)   the Servicer shall promptly inform Client and the Adviser if it has not been able to obtain the necessary information related to a Covered Insured in connection with this Section.

(F)   Procurement of Updated Medical Records, HIPAAs and Life Expectancy Reports.

(1)   Once per annum, the Servicer shall determine applicable doctors and obtain updated medical information of the underlying Covered Insured of such Covered Policy to the extent permissible by applicable Law and if updated HIPAA forms or other medical authorizations are needed, the Servicer shall use good faith efforts in accordance with the Servicing Standard to have such forms executed by the Covered Insureds.

(2)   As requested by Client or the Adviser, Servicer shall obtain on behalf of Client life expectancy reports prepared by any life expectancy provider that Client or the Adviser requests (no more than two life expectancy providers and reports per annum); provided, that Client shall be responsible for the costs of the life expectancy reports.

(G)   Claims Filing and Collection of Death Benefits.

(1)   Promptly upon the Servicer having knowledge of the death of the Covered Insured of a Covered Policy (or in the case of a Joint Policy, the death of the second Covered Insured), in accordance with the Servicing Standard and in compliance with all applicable Laws, the Servicer shall notify Client and the Adviser and take all actions, consistent with the Servicing Standard, to cause the

full amount of the Death Benefit (together with accrued interest thereon, if any, to the extent permitted by the terms of such Covered Policy and applicable Law) to be paid to Client as promptly as practicable, including by:

    a.    requesting from the representatives of the Covered Insured and/or applicable Governmental Authority a death certificate for such Covered Insured that conforms to the applicable Issuing Insurance Company's procedures and requirements for submission of claims for payment;

    b.    preparing and delivering to such Issuing Insurance Company appropriate policy claim forms and/or policy service forms for the submissions of a claim for payment; and

    c.    delivering to such Issuing Insurance Company all reasonably available documents or other information required by such Issuing Insurance Company in connection with its processing of the claim application.

(2)    In the event any Premium payment has been made to an Issuing Insurance Company in respect of a Covered Policy following the date of the Covered Insured's death, the Servicer shall take all actions consistent with the Servicing Standard to recoup such Premium payments (together with accrued interest thereon to the extent permitted by the terms of such Covered Policy and applicable Law) from such Issuing Insurance Company.

(H)    <u>Reporting.</u>

The Servicer shall provide to Client (with a copy to the Adviser) monthly reports on (i) premiums due, (ii) policy status and values, (iii) policy grace, (iv) death claim status and (v) mortality tracking.

(I)    <u>Valuation.</u>

The Service Provider will provide an estimated valuation for each serviced policy on an annual basis (provided that initially, the valuations shall be completed within four (4) months of the Effective Date) based on the assumed probabilistic internal rate of return and assumed life expectancy blend obtained from the Client. Due to the inclusion of assumptions and third party information in a valuation, Service Provider is unable to make any representations or warranties as to the accuracy of a valuation and expressly disclaims the same.

**EXHIBIT B**

**AUTHORIZATION TO RELEASE POLICY INFORMATION**

[_____], 20[__]

To each Insurer listed on **Schedule I** of this Agreement:

Reference is made to the Insurance Policies listed on **Schedule I** of this Agreement (as such **Schedule I** shall be amended, modified or supplemented from time to time upon the mutual agreement of ITM TwentyFirst, LLC and the undersigned) (each, a "Policy") which have been issued by the corresponding insurer listed opposite each Policy identified on **Schedule I** of this Agreement (each, an "Insurer").  The undersigned, as owner of each Policy, hereby authorizes the related Insurer to release, orally and/or in writing (as applicable under the circumstances), to ITM TwentyFirst, LLC and its affiliates and their respective successors and assigns (collectively, "Servicer"), and to each agent, representative and designee of Servicer (Servicer, together with its agents, representatives and designees, the "Authorized Persons"):

(i)     a copy of each Policy and all applications, riders, endorsements, supplements, amendments, renewals thereto and all other documents that modify or otherwise affect any term, provision or condition of such Policy;

(ii)    all policy and other illustrations, verifications of coverage (including verifications of coverage conducted via telephone) and analyses of cash value with respect to each Policy; and

(iii)   all other information concerning or otherwise relating to each Policy (including all riders, supplements and amendments thereto) or any application, policy or other illustration, verification of coverage or analysis of cash value in respect of each Policy,

in each case as any Authorized Person may request from the applicable Insurer from time to time.

The undersigned agrees that this authorization is valid for the maximum period permitted by applicable law and may not be revoked or modified by the undersigned; provided, that this authorization shall terminate upon your receipt of a written notice of termination of this Agreement signed by [            ].  A photocopy, facsimile or other electronic copy of this authorization is as valid as the original hereof.

[signature page follows]

Very truly yours,

[Policy Owner]


By: _____

    Name:

    Title:

 

**EXHIBIT C**
*Independent Life Insurance Experts*

# ITM TwentyFirst  Life Expectancy Underwriting

# Pricing – 2018*

| | |
|---|---|
| Secondary/Tertiary Life Expectancy Report | **$375** |
| Expedited Secondary/Expedited Tertiary Life Expectancy Report | **$600** |
| Clinical Review Report | **$600** |
| (need for clinical review is determined by ITM TwentyFirst's Underwriting Team – notification of additional charges will be sent to requesting party prior to being completed) | |
| Simplified Underwriting Report | **$150** |
| Surcharge for 1000+ pages of medical records submitted | **$175** |

**ITM TwentyFirst also reserves the right to charge the following fees:**

| | |
|---|---|
| Cancellation Fee (submission has already been processed by support) | **$100** |
| • If submission has more than 1000+ pages | **$175** |
| Miscellaneous Certificate Amendments | **$50** |
| (i.e., product changes, date changes) | |

| | |
|---|---|
| **Expedited Turnaround Time** | **1 business day** |
| • **If more than 750 pgs meds** | **2 business day** |
| **Standard Turnaround Time** | **subject to incoming business** |

*ITM TwentyFirst reserves the right to change the pricing of it's products and services

**itm** twentyfirst     Minneapolis, MN Office   T: 612.371.3008
                        New York, NY Office     T: 212.378.6730
                        Cedar Falls, IA Office  T: 866.384.2766

itm-twentyfirst.com
© ITM | TwentyFirst 2015. All rights reserved.

# EXHIBIT C

**PWCG TRUST - STATUS OF PRIMARY RESERVES**

| Settlement Date | Insurance Company | Policy Number (last 4 digits) | Face Value | Primary Reserve | End of PWCG Schedule Reserve Period (Date) | # Years Primary Reserves Set Aside | Status of Primary Reserves | Reserves as of 02/22/18 |
|---|---|---|---|---|---|---|---|---|
| 01/14/05 | Transamerica Occidental | 1928 | $ 1,000,000 | $ 20,000 | 01/14/13 | 8 | Expired | $ - |
| 02/08/05 | First Colony | 5463 | $ 2,000,000 | $ 120,000 | 02/08/13 | 8 | Expired | $ - |
| 03/22/05 | Southwestern Life | 46726 | $ 1,000,000 | $ - | 03/22/14 | 9 | Expired | $ - |
| 04/20/05 | Transamerica Occidental | 3458 | $ 250,000 | $ 21,000 | 04/20/13 | 8 | Expired | $ - |
| 05/15/05 | Southwestern Life | 6716 | $ 1,000,000 | $ - | 05/15/14 | 9 | Expired | $ - |
| 06/15/05 | Pacific Life | 3790 | $ 4,000,000 | $ 420,000 | 06/15/12 | 7 | Expired | $ - |
| 12/13/05 | North American for Life & Health | 8210 | $ 300,000 | $ 35,100 | 12/13/14 | 8 | Expired | $ - |
| 01/05/06 | Jefferson Pilot | 7558 | $ 379,000 | $ - | 01/05/12 | 6 | Expired | $ - |
| 01/09/06 | Pacific Life | 4800 | $ 1,000,000 | $ 184,998 | 01/09/12 | 8 | Expired | $ - |
| 01/25/06 | American General | 862L | $ 1,760,456 | $ 50,000 | 01/25/14 | 8 | Expired | $ - |
| 03/20/06 | New York Life | 246 | $ 1,000,000 | $ 73,984 | 03/20/14 | 8 | Expired | $ - |
| 03/28/06 | West Coast Life | 2456 | $ 500,000 | $ 31,005 | 03/28/15 | 9 | Expired | $ - |
| 06/09/06 | Jefferson Pilot | 0002 | $ 1,000,000 | $ 60,000 | 06/09/14 | 8 | Expired | $ - |
| 06/21/06 | Jefferson Pilot | 9397 | $ 1,375,000 | $ - | 06/21/14 | 8 | Expired | $ - |
| 07/19/06 | Jefferson Pilot | 1378 | $ 3,400,000 | $ - | 07/19/14 | 8 | Expired | $ - |
| 12/06/06 | Jefferson Pilot | 8472 | $ 3,980,000 | $ - | 12/06/14 | 8 | Expired | $ - |
| 03/28/07 | Jefferson Pilot | 4084 | $ 2,212,200 | $ - | 03/28/16 | 9 | Expired | $ - |
| 05/15/07 | Jefferson Pilot | 3343 | $ 5,000,000 | $ 20,007 | 05/15/16 | 9 | Expired | $ - |
| 05/23/07 | American General | 82NL | $ 1,875,000 | $ 77,496 | 05/23/15 | 8 | Expired | $ - |
| 05/23/07 | American General | 59NL | $ 1,900,000 | $ 49,904 | 05/23/15 | 8 | Expired | $ - |
| 06/15/07 | Aetna | 5253 | $ 1,691,718 | $ 306,288 | 06/15/15 | 8 | Expired | $ - |
| 08/01/07 | Jefferson Pilot | 5043 | $ 4,699,204 | $ 51,003 | 08/01/16 | 9 | Expired | $ - |
| 09/10/07 | Columbus Life | 152U | $ 1,000,000 | $ 46,530 | 09/10/16 | 9 | Expired | $ - |
| 10/11/07 | Pacific Life | 6630 | $ 1,300,000 | $ 159,467 | 10/11/13 | 6 | Expired | $ - |
| 10/12/07 | Lincoln National | 2131 | $ 500,000 | $ 35,924 | 10/12/14 | 7 | Expired | $ - |
| 10/19/07 | American General | 245L | $ 1,000,000 | $ 42,000 | 10/19/15 | 8 | Expired | $ - |
| 10/30/07 | West Coast Life | 9145/ *4780* | $ 750,000 | $ 76,048 | 10/30/15 | 8 | Expired | $ - |
| 12/03/07 | MONY | 0379 | $ 1,000,000 | $ 52,216 | 12/03/15 | 8 | Expired | $ - |
| 01/03/08 | ING/Reliastar | 626D | $ 500,000 | $ 57,064 | 01/03/15 | 7 | Expired | $ - |

| Settlement Date | Insurance Company | Policy Number (last 4 digits) | Face Value | Primary Reserve | End of PWCG Schedule Reserve Period (Date) | # Years Primary Reserves Set Aside | Status of Primary Reserves | Reserves as of 02/22/18 |
|---|---|---|---|---|---|---|---|---|
| 01/03/08 | American General Life | 492L | $ 6,000,000 | $ 1,046,420 | 01/03/16 | 8 | Expired | $ - |
| 02/13/08 | Pacific Life | 9430 | $ 1,320,000 | $ - | 02/13/16 | 8 | Expired | $ - |
| 03/07/08 | United Of Omaha | 0777 | $ 1,400,000 | $ - | 03/07/15 | 7 | Expired | $ - |
| 03/07/08 | United Of Omaha | 1273 | $ 932,000 | $ - | 03/07/15 | 7 | Expired | $ - |
| 05/23/08 | Sun Life Financial | 3988 | $ 2,000,000 | $ 372,248 | 05/23/16 | 8 | Expired | $ - |
| 06/21/08 | Mass Mutual | 9122 | $ 2,500,000 | $ 196,000 | 06/21/16 | 8 | Expired | $ - |
| 07/07/08 | ING/Reliastar | 432W | $ 950,000 | $ - | 07/07/17 | 9 | Expired | $ - |
| 07/11/08 | Protective Life | 8806 | $ 1,840,000 | $ - | 07/11/17 | 9 | Expired | $ - |
| 07/21/08 | Lincoln National Life | 9831 | $ 850,000 | $ 79,192 | 07/21/16 | 8 | Expired | $ - |
| 07/22/08 | Transamerica Occidental | 9865 | $ 300,000 | $ - | 07/22/16 | 8 | Expired | $ - |
| 07/25/08 | John Hancock | 1500 | $ 875,000 | $ - | 07/25/17 | 9 | Expired | $ - |
| 10/27/08 | First Colony/Genworth | 7592 | $ 4,750,000 | $ 492,960 | 10/27/14 | 6 | Expired | $ - |
| 11/06/08 | Sun Life Financial | 7134 | $ 1,500,000 | $ 205,440 | 11/06/14 | 6 | Expired | $ - |
| 01/13/09 | Lincoln National Life | 4836 | $ 300,000 | $ 40,312 | 01/13/17 | 8 | Expired | $ - |
| 01/16/09 | John Hancock | 1846 | $ 366,000 | $ - | 01/16/15 | 6 | Expired | $ - |
| 01/23/09 | Mass Mutual | 3190 | $ 2,000,000 | $ 103,344 | 01/23/18 | 9 | Expired | $ - |
| 05/28/09 | Lincoln National Life | 3107 | $ 10,000,000 | $ 1,429,944 | 05/28/17 | 8 | Expired | $ - |
| 01/27/10 | AXA Equitable | 3209 | $ 950,000 | $ 182,520 | 01/27/17 | 7 | Expired | $ - |
| 03/23/10 | Lincoln National Life | 2603 | $ 2,500,000 | $ 369,348 | 03/23/17 | 7 | Expired | $ - |
| 04/12/10 | West Coast Life | 0887 | $ 2,000,000 | $ 104,986 | 04/12/17 | 7 | Expired | $ - |
| 04/26/10 | West Coast Life | 4375 | $ 650,000 | $ - | 04/26/17 | 7 | Expired | $ - |
| 06/07/10 | Pacific Life | 3390 | $ 2,250,000 | $ 368,898 | 06/07/16 | 6 | Expired | $ - |
| 06/28/10 | Lincoln National Life | 6052 | $ 5,500,000 | $ 346,312 | 06/28/18 | 8 | Insufficient | $ - |
| 08/02/10 | Lincoln National Life | 2128 | $ 2,500,000 | $ 316,782 | 08/02/16 | 6 | Expired | $ - |
| 10/08/10 | Transamerica | 4274 | $ 1,500,000 | $ 130,517 | 10/08/16 | 6 | Expired | $ - |
| 10/08/10 | AXA Equitable | 6776 | $ 5,000,000 | $ 1,026,138 | 10/08/16 | 6 | Expired | $ - |
| 03/24/11 | Hartford | 0024 | $ 3,000,000 | $ 587,904 | 03/24/19 | 8 | Insufficient | $ - |
| 05/16/11 | Beneficial Life | 5588 | $ 1,100,000 | $ 179,652 | 05/16/17 | 6 | Expired | $ - |
| 06/02/11 | Columbus Life | 962U | $ 3,000,000 | $ 90,256 | 06/02/19 | 8 | | $ 11,282 |
| 06/14/11 | ING/Security Life | 5004 | $ 3,000,000 | $ 383,670 | 06/14/20 | 9 | | $ 85,260 |

| Settlement Date | Insurance Company | Policy Number (last 4 digits) | Face Value | Primary Reserve | End of PWCG Schedule Reserve Period (Date) | # Years Primary Reserves Set Aside | Status of Primary Reserves | Reserves as of 02/22/18 |
|---|---|---|---|---|---|---|---|---|
| 06/15/11 | Beneficial Life | 1631 | $ 900,000 | $ 12,888 | 06/15/17 | 6 | Expired | $ - |
| 09/01/11 | New York Life | 5621 | $ 3,500,000 | $ 495,243 | 09/01/20 | 9 | | $ 110,054 |
| 10/12/11 | North American for Life & Health | 8039 | $ 960,000 | $ - | 10/12/17 | 6 | Expired | $ - |
| 10/12/11 | North American for Life & Health | 8040 | $ 1,000,000 | $ - | 10/12/17 | 6 | Expired | $ - |
| 10/28/11 | Lincoln National Life | 6462 | $ 400,000 | $ 15,492 | 10/28/17 | 6 | Expired | $ - |
| 11/04/11 | Transamerica | 9441 | $ 1,000,000 | $ 36,192 | 11/04/19 | 8 | | $ 9,048 |
| 12/20/2011 | Mass Mutual | 5490 | $ 4,450,000 | $ 350,532 | 12/20/17 | 6 | Expired | $ - |
| 01/13/12 | ING/Security Life | 2689 | $ 3,750,000 | $ 278,541 | 01/13/21 | 9 | | $ 61,898 |
| 02/08/12 | John Hancock | 0993 | $ 3,700,000 | $ 604,884 | 02/08/19 | 7 | Insufficient | $ - |
| 02/09/12 | ING/Reliastar | 671W | $ 700,000 | $ 88,432 | 02/09/20 | 8 | | $ 22,108 |
| 03/14/12 | AXA Equitable | 0426 | $ 500,000 | $ 92,984 | 03/14/20 | 8 | | $ 23,246 |
| 05/25/12 | Banner Life | 1757 | $ 2,000,000 | $ 269,402 | 05/25/18 | 6 | Insufficient | $ - |
| 07/12/12 | Mass Mutual | 6024 | $ 3,000,000 | $ 271,440 | 07/12/20 | 8 | | $ 67,860 |
| 10/03/12 | West Coast Life | 8770 | $ 700,000 | $ 58,290 | 10/03/18 | 6 | | $ 9,715 |
| 10/12/12 | Lincoln National Life | 8940 | $ 500,000 | $ 87,906 | 10/12/19 | 7 | | $ 12,558 |
| 02/05/13 | Columbus Life | 700U | $ 4,400,000 | $ 262,584 | 02/05/22 | 9 | | $ 116,704 |
| 02/25/13 | American General | 711L | $ 2,000,000 | $ 282,636 | 02/25/19 | 6 | Insufficient | $ - |
| 02/28/13 | Lincoln National | 7988 | $ 1,000,000 | $ 261,894 | 02/28/19 | 6 | Insufficient | $ - |
| 03/05/13 | American General | 166L | $ 500,000 | $ 65,850 | 03/05/19 | 6 | Insufficient | $ - |
| 04/04/13 | Met Life | 1592 | $ 962,158 | $ 109,968 | 04/04/19 | 6 | | $ 18,328 |
| 04/17/13 | Lincoln National | 7823 | $ 2,000,000 | $ 619,500 | 04/17/19 | 6 | Insufficient | $ - |
| 05/06/13 | Met Life | 1904 | $ 500,000 | $ 109,809 | 05/06/20 | 7 | | $ 31,374 |
| 05/09/13 | John Hancock | 2959 | $ 930,000 | $ - | 05/09/19 | 6 | None | $ - |
| 05/22/13 | American General | 603L | $ 2,000,000 | $ 283,560 | 05/22/19 | 6 | Insufficient | $ - |
| 06/14/13 | Sun Life Financial | 2456 | $ 2,554,719 | $ 181,573 | 06/14/20 | 7 | | $ 51,878 |
| 07/18/13 | New York Life | 6747 | $ 4,166,666 | $ 881,082 | 07/18/22 | 9 | | $ 391,592 |
| 08/07/13 | John Hancock | 8520 | $ 10,000,000 | $ 1,209,912 | 08/07/21 | 8 | | $ 453,717 |
| 08/19/13 | John Hancock | 9768 | $ 2,922,852 | $ 375,522 | 08/19/20 | 7 | | $ 107,292 |
| 08/19/13 | New York Life | 6799 | $ 4,166,666 | $ 881,082 | 08/19/22 | 9 | | $ 391,592 |
| 08/27/13 | Transamerica | 3264 | $ 1,500,000 | $ 163,016 | 08/27/21 | 8 | | $ 61,131 |

| Settlement Date | Insurance Company | Policy Number (last 4 digits) | Face Value | Primary Reserve | End of PWCG Schedule Reserve Period (Date) | # Years Primary Reserves Set Aside | Status of Primary Reserves | Reserves as of 02/22/18 |
|---|---|---|---|---|---|---|---|---|
| 09/18/13 | New York Life | 6802 | $ 4,166,666 | $ 881,082 | 09/18/22 | 9 | | $ 391,592 |
| 10/04/13 | Transamerica | 2193 | $ 2,500,000 | $ 371,656 | 10/04/21 | 8 | | $ 139,371 |
| 10/29/13 | West Coast Life | 5690 | $ 1,000,000 | $ 119,511 | 10/29/22 | 9 | | $ 66,395 |
| 01/29/14 | Transamerica | 0192 | $ 1,000,000 | $ 50,406 | 01/29/20 | 6 | | $ 16,802 |
| 02/11/14 | Transamerica | 7424 | $ 1,160,000 | $ - | 02/11/20 | 6 | None | $ - |
| 03/26/14 | New York Life | 5542 | $ 3,000,000 | $ 210,080 | 03/26/22 | 8 | | 105,040 |
| 04/15/14 | West Coast Life | 0569 | $ 5,000,000 | $ 749,008 | 04/15/22 | 8 | | 282,003 |
| 04/21/14 | West Coast Life | 0373 | $ 5,000,000 | $ 748,968 | 04/21/22 | 8 | | 281,988 |
| 05/15/14 | Met Life | 2586 | $ 400,000 | $ 62,910 | 05/15/23 | 9 | | 34,950 |
| 05/16/14 | Met Life | 2589 | $ 250,000 | N/A | 05/16/23 | 9 | None | $ - |
| 05/22/14 | John Hancock | 3508 | $ 1,000,000 | $ 47,403 | 05/22/23 | 9 | | 26,335 |
| 08/15/14 | John Hancock | 7974 | $ 1,500,000 | $ 379,836 | 08/15/20 | 6 | | 126,612 |
| 08/20/14 | Penn Mutual | 3509 | $ 250,000 | $ 17,196 | 08/20/20 | 6 | | 5,732 |
| 09/10/14 | John Hancock | 7982 | $ 1,500,000 | $ 515,628 | 09/10/20 | 6 | | 171,876 |
| 09/12/14 | John Hancock | 3382 | $ 4,000,000 | $ 546,264 | 09/12/20 | 6 | | 182,088 |
| 11/17/14 | Transamerica | 7932 | $ 1,000,000 | $ 195,363 | 11/17/21 | 7 | | 83,727 |
| 12/21/14 | West Coast Life | 0466 | $ 2,000,000 | $ 207,368 | 12/21/21 | 7 | | 88,872 |
| 04/01/15 | West Coast Life | 5552 | $ 2,000,000 | $ 44,632 | 04/02/22 | 7 | | 25,504 |
| 04/16/15 | John Hancock | 0276 | $ 5,000,000 | $ 653,481 | 04/16/24 | 9 | | 435,654 |
| 04/21/15 | Lincoln National | 7806 | $ 500,000 | $ - | 04/21/25 | 10 | None | $ - |
| 04/28/15 | North American | 4500 | $ 500,000 | $ 12,268 | 08/06/21 | 6 | | 4,884 |
| 06/25/15 | Lincoln National | 9839 | $ 1,509,600 | $ - | 06/25/23 | 8 | None | $ - |
| 07/22/15 | AXA Equitable | 3657 | $ 2,000,000 | $ 253,840 | 07/22/23 | 8 | | 158,650 |
| 09/01/15 | West Coast Life | 4441 | $ 1,000,000 | $ 186,056 | 09/01/23 | 8 | | 139,542 |
| 04/07/16 | West Coast Life | 6364 | $ 1,000,000 | $ 152,191 | 08/11/25 | 10 | | 114,443 |
| | | | $ 232,104,905 | $ 24,646,047 | | 7.54 Average | | $ 4,918,697 |