# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>vs.<br><br>BRENDA BARRY; BAK WEST, INC.; ERIC CANNON; CENTURY POINT, LLC; CALEB AUSTIN MOODY (DBA SKY STONE),<br>        Remaining Defendants | Case No.  2:15-cv-02563-DDP-MAA<br><br>**ORDER PARTIALLY GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING PLAINTIFF'S MOTION TO EXCLUDE**<br><br>[Dkt. 482, 483, 490] |

## I.     INTRODUCTION

This order arises on cross-motions for Summary Judgment by Plaintiff Securities and Exchange Commission ("SEC") and remaining Defendants Brenda Barry, Bak West, Inc., Eric Cannon, Century Point, LLC, and Caleb Austin Moody (dba Sky Stone) ("Defendants"). The SEC seeks summary judgment on the unresolved claims: securities registration violations under the Securities Act of 1933 and broker-dealer registration violations under the Securities Act of 1934. Defendants seek summary judgment on the issues of whether the fractional interests in life settlements they sold are investment contracts and therefore securities under federal law and of whether their offerings are part of an integrated issue.

## II.    FACTUAL BACKGROUND

The parties are familiar with the facts, which remain largely unchanged from the court's order on the first motions for summary judgment. Dkt. 119. The relevant facts are restated below.

### A.     SALE OF LIFE INSURANCE POLICIES

Life settlement arrangements are arrangements where insureds sell their existing life insurance policies to investors, who then collect the benefit of the policy when the insureds pass away. Pacific West sells fractionalized interests in "Universal" or "Flexible Premium Adjustable" life insurance policies. *See, e.g.*, JA 35 at 650. These life insurance policies have both an insurance component (i.e., they pay out when the insured dies) and a savings component (i.e., they accumulate investment returns). *See* Dkt. 7-6, Declaration of Todd Brilliant in Support of Motion for Preliminary Injunction ("Brilliant Decl."), Ex. 4, October 23, 2013, deposition of Andrew B Calhoun ("2013 Calhoun Dep.") at 96-97.

### B.     PACIFIC WEST'S STATEMENTS REGARDING RETURNS

Pacific West advertises that its life settlement arrangements would pay "between 100% and 175% total fixed return on each investment." Dkt. 28-2,

Declaration of Andrew B Calhoun IV ("Calhoun Decl.") at ¶ 5 (referenced at Dkt. 106-209, JA 203); *see also* Brochure at 446 ("Policies offered by PWCG have a minimum total fixed return of 100%, meaning investors will double their money.")).

Pacific West states to investors that the rate of return ultimately depends on how many years the insured lives after Pacific West acquires their policy and "no one can predict exactly when" an insured will pass away. *See* Brochure at 446. Pacific West requires that each investor confirm their acknowledgment "that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with [Pacific West.]" *See, e.g.*, JA 25, Life Settlement Purchase Agreement at 553; JA 34, Life Settlement Purchase Agreement at 638; JA 104, Life Settlement Purchase Agreement at 1376) (stating that "[t]he life expectancy of any particular insured and the annual rate of return on a life settlement contract are only estimates and cannot be guaranteed").

## C.   PACIFIC WEST'S POLICY SELECTION PROCESS

Pacific West represents that it "purchase[s] select policies that meet [its] high standards for investment and sell[s] interests to qualified investors." Brochure at 443. Each policy "undergoes rigorous scrutiny using a predetermined set of criteria, and [Pacific West] select[s] the most desirable[.]" *Id.*

Pacific West's "goal is to select policies that will mature in 4 to 7 years." Calhoun Decl. at ¶ 4. In particular, Pacific West "purchases interests in the proceeds of life insurance policies at a discount to face value where the insureds are 75 years of age or older typically with a reduced life outlook due to chronic and degenerative health complications." *See* Brochure at 440. "In seeking to achieve the investment objective, [Pacific West] reviews over $250 million of face value policies each month, selects policies that are non-contestable, and only purchases policies that

have been issued by United States life insurance companies that are 'A-rated' or better as determined by Standard & Poors." *Id.*

Once Pacific West selects the policies to be purchased and sold to purchasers, *see*, e.g., 2013 Calhoun Dep. at 103-05; Brochure at 440, 443 & 447; Calhoun Decl. at ¶ 4, it determines a total fixed return of between 100% and 175% for each policy, *see* Calhoun Decl. at ¶ 5, determines the price Pacific West will pay for a policy, *see* Calhoun Dep. at 102- 07, sets the length of the contract period, which is typically four to seven years, *see* Calhoun Decl. at ¶ 4, and "determines an annual outlay amount necessary to keep the policy in- force for a defined number of years, at a minimum of 6 years, up to 9 years." *Id.* at ¶ 7).

### D.   PREMIUM RESERVES

Another feature of Pacific West's life settlement arrangement is its "three-tiered premium reserve system[,]" which Calhoun claims is "unique in the industry." Calhoun Decl. at ¶ 7. "The central objective of [Pacific West's] three-tiered premium reserve structure is to sufficiently fund each universal life insurance policy acquired by the Trust." *Id.*; *see also* Brochure at 444 (describing Pacific West's policy "to pay premiums so that every policy is kept in force."). Pacific West claims to have large enough reserves to provide the Trust with sufficient funds to pay the premiums on the underlying policies for periods of generally six to nine years, which is longer than the estimated four to seven-year period for a policy to mature. *See, e.g.*, JA 35, Life Settlement Disclosure Form at 652; JA 36, Life Settlement Disclosure Form at 660; JA 37, Life Settlement Disclosure Form at 669; Brochure at 444).

According to Calhoun, Pacific West accomplishes this by doing the following: "Before making a bid on a policy, [Pacific West] carefully reviews various 'in-force' illustrations composed by the underwriting life insurance company (the 'carrier')." Calhoun Decl. at ¶ 7. "Based on the carrier's projected assumptions (i.e., cost of insurance (COI), existing cash surrender value (CSV), interest rates, mortality rates,

4

and expense charges), [Pacific West] determines an annual outlay amount necessary to keep the policy in-force for a defined number of years, at a minimum of 6 years, up to 9 years." *Id.*

"Based on this determination, [Pacific West] escrows a lump-sum amount in the primary premium reserve[,]" which is "funded by a designated percentage of all gross investment proceeds." Calhoun Decl. at ¶ 8. Pacific West has "also established two other general reserves that can be used to pay premiums should the primary reserve become depleted. The first general reserve is funded from 1% of all investor money for all policies. The second general reserve is funded from excess or unused premium dollars from any primary reserve due to the policy maturing before the primary premium reserve becomes depleted." Brochure at 444; *see also* Calhoun Decl. at ¶ 9. The Purchase Agreement describes the primary premium reserve, stating that it involves "the placement of funds for each policy's premiums in a premium escrow account sufficient to pay premiums for [6, 7, 8, or 9 years]." *See, e.g.,* JA 25, Life Settlement Purchase Agreement at 555; The secondary reserve is described in the Purchase Agreement as "an initial general premium reserve . . . established to pay premiums on policies not fully paid by [the primary reserve]. The money for the additional premium reserve comes from the distribution of 1% of all purchase money received by the Escrow Agent." *Id.* The tertiary reserve is "an additional general premium reserve . . . established to pay premiums on policies not fully paid [by the primary and secondary reserves]. The money for this premium reserve comes from unused premiums of matured policies and interest earned on the active premium escrow account." *Id.*

Finally, the Purchase Agreement explains that purchasers may have to make additional out-of-pocket payments—premium calls—if each of the three reserves is depleted. *See, e.g.*, JA 25, Life Settlement Purchase Agreement at 555; JA 34, Life Settlement Purchase Agreement at 640; JA 104, Life Settlement Purchase

1  Agreement at 1378) ("In the event all of the premium escrow accounts are depleted, in

2  order to safeguard the policy against a lapse in coverage, it will become the

3  responsibility of the Purchaser to make pro rata premium payments on any policy in

4  which they have an Interest.").

5  **E.     FUNDING AND MAINTENANCE OF LIFE SETTLEMENTS**

6  **ARRANGEMENTS**

7           Once Pacific West selects a policy based upon its "quality-based criteria," it

8  "raises capital from investors that are interested in life settlement investments."

9  Calhoun Decl. at ¶ 4; Brochure at 443. "Through the [Trust], [Pacific West] offers

10  universal life policies for purchase in fractional interests by qualified individual

11  investors." Calhoun Decl. at ¶ 4. "The Trust purchases policies from the policy owners

12  and is recorded as the new owner and beneficiary of the policy." *Id.* "When the

13  change of ownership and beneficiary have been officially recorded and recognized by

14  the life insurance company, [Pacific West] then sells fractional interests to investors

15  giving them a percentage of the face value as their beneficiary designation." *Id.* The

16  Trust "then issues an assignment of death benefit confirming the beneficiary

17  designation within a specific policy." *Id.*

18           After purchase but before the life settlement arrangement matures, the Trust

19  "makes required premium payments on policies, monitors the policy until the insured's

20  death, and handles all investment distributions." Calhoun Decl. at ¶ 6; JA 16,

21  Amended and Restated Trust Agreement at 396-97 (after the Trust sells the

22  fractionalized interests to Pacific West purchasers, the trustee purchases policies,

23  issues the life settlements, establishes and accounts for cash reserves for the

24  premiums, pays the premiums on policies, and distributes returns to purchasers)).

25  According to Calhoun, Pacific West and the Trust "provide[] all investors in the

26  Trust with complete documentation as to the policy, the insured, changes of

27  ownership and beneficiary, and all other information relevant to the investment."

28

Calhoun Decl. at ¶ 6. "When the policy matures, the life insurance company pays the death benefit to the Trust. The [Trust] then pays the specified beneficiary designation amount to all investors within the matured policy." Calhoun Decl. at ¶ 6.

### F.   RECEIVERSHIP

In 2018, after mediation, the SEC and the Trust both parties moved for the appointment of a receiver over the Trust, in connection with the Trust's consent to an injunction against future violations. The Court appointed Thomas C. Hebrank as Receiver over the Trust in February 2018.

## III.   PROCEDURAL BACKGROUND

On April 17, 2014, the SEC filed a Motion for Preliminary Injunction. Dkt. 6 The court denied the motion, finding that the SEC had not met its burden to show "undeniably significant" efforts of the Defendants' that would meet the definition of securities under Circuit precedent. *See* Dkt. 51, Order Re: Motion for Preliminary Injunction at 11 (citing *Noa v. Key Futures*, 638 F.2d 77, 79-80 (9th Cir. 1980); *SEC v. Glenn Turner*, 474 F.2d 476, 482 (9th Cir. 1973); *SEC v. Belmont Reid*, 794 F.2d 1386, 1391 (9th Cir. 1986)).

On March 24, 2016, the SEC and Defendants filed their first cross-motions for summary judgment in this case. Dkt. 104-105. The Court denied both motions, finding in the record a genuine dispute of material fact regarding whether the Defendants engaged in "undeniably significant" efforts sufficient to meet the definition of securities under Circuit precedent. Dkt. 119. Following the first cross-motions for summary judgment, the Trust, Calhoun, and Dotta were settled out of the litigation or otherwise dismissed.

## IV.   LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to

1  judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary

2  judgment bears the initial burden of informing the court of the basis for its motion and

3  of identifying portions of the pleadings and discovery responses that demonstrate the

4  absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S.

5  317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor

6  of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242

7  (1986). If the moving party does not bear the burden of proof at trial, it is entitled to

8  summary judgment if it can demonstrate that "there is an absence of evidence to

9  support the nonmoving party's case." *Celotex*, 477 U.S. at 323.

10       Once the moving party meets its burden, the burden shifts to the nonmoving

11  party opposing the motion, who must "set forth specific facts showing that there is a

12  genuine issue for trial." *Anderson*, 477 U.S. at 256. Summary judgment is warranted if

13  a party "fails to make a showing sufficient to establish the existence of an element

14  essential to that party's case, and on which that party will bear the burden of proof at

15  trial." *Celotex*, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a

16  reasonable jury could return a verdict for the nonmoving party," and material facts are

17  those "that might affect the outcome of the suit under the governing law." *Anderson*,

18  477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole

19  could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*

20  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

21       It is not the court's task "to scour the record in search of a genuine issue of

22  triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel have an

23  obligation to lay out their support clearly. *Carmen v. San Francisco Sch. Dist.*, 237

24  F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for

25  evidence establishing a genuine issue of fact, where the evidence is not set forth in the

26  opposition papers with adequate references so that it could conveniently be found." *Id.*

27                                   **DISCUSSION**

28

## V.   INVESTMENT CONTRACTS

The court finds that Defendants' life settlement arrangements are investment contracts and, therefore, securities. *See* 15 U.S.C.A. § 77b(a)(1) (Securities Act of 1933) *and* 15 U.S.C.A. §78c(a)(10) (Securities Act of 1934) (defining "security" to include "investment contract"). An investment contract is (1) a contract, transaction, or scheme whereby a person invests his money, (2) in a common enterprise, and (3) is led to expect profits, (4) solely from the efforts of the promotor or a third party. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Defendants dispute only the last element, averring that the SEC has failed to demonstrate that profits from the life settlement arrangements depended on the efforts of Defendants. *See* Def. Opp. at 4:16.

To meet the "efforts of others" element, "profits need not come 'solely' from the efforts of the promoters or others." *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980). The test is "whether the efforts made by those other than the investor are the *undeniably significant ones*, those *essential* managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) (emphasis added).

In *SEC v. Eurobond*, the Ninth Circuit analyzed whether defendant's sale of foreign treasury bonds, purchased by foreign currency loans carrying lower interest rates than those received on the bonds, constituted securities under the *Howey* test. *SEC v. Eurobond Exch., Ltd.*, 13 F.3d 1334, 1336 (9th Cir. 1994). The court found that defendant's efforts met the "efforts of others" element because the defendant determined when to purchase the bonds, and in what denominations and yields, as well as when to obtain the foreign currency loan, and from what bank and currency. *Id.* at 1341. The court thereby disagreed with defendant's argument that investors' profits depended solely on market forces—specifically, the difference between the interest rate received on the bond and the interest rate paid on the loans. *Id.* at 1339, 1341.

In *Noa v. Key Futures* and *SEC v. Belmont Reid*, on the other hand, the Ninth

9

Circuit found that the challenged transactions did not meet the "efforts of others" element and thus were not securities. *Noa v. Key Futures*, 638 F.2d at 80; *SEC v. Belmond Reid & Co.*, 794 F.2d at 1391. Both cases involved the sale of gold or silver, paid in advance by investors. *Noa v. Key Futures*, 638 F.2d at 79; *Belmont Reid*, 794 F.2d at 1389. The court reasoned in both cases that the defendants' actions resembled a sale-of-goods or brokerage contract, rather than an investment contract relying on the managerial efforts of the promoters. *Noa v. Key Futures*, 638 F.2d at 79 ("Once the purchase of silver bars was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of Key Futures."); *Belmont Reid*, 794 F.2d at 1391 (agreeing with the district court that profits "depended upon the fluctuations of the gold market, not the managerial efforts of [the promoters]").

The SEC argues that the life settlement arrangements here are like the investments in *Eurobond*, because defendants determined which policies to purchase and how to keep the policies in force. *See* SEC's Mot. at 16:7-22. Defendants argue that their life settlement arrangements are like the transactions in *Noa* and *Belmont Reid*, because investors only relied on the managerial skill of Defendants "as an ordinary buyer…relies on an ordinary seller." *See* Def. Opp. at 10:7-18 (quoting *Belmont Reid*, 794 F.2d at 1391). That is, the profitability of the life settlement arrangements depended on the "implacable force" of the longevity of the insureds, as the profitability of the prepayment programs in *Belmont Reid* and *Noa* depended on the "implacable force" of fluctuations in the gold and silver market.

Resolving these arguments at the prior cross-motions for summary judgment stage, this Court held that disputed issues of material fact persisted regarding "whether defendants' activities were managerial or ministerial, and to the extent defendants' activities were managerial, whether those were undeniably significant in making the life settlement arrangement a success." Dkt 119 at *10. In the five years since this Court denied the parties' first cross-motions, it has become clear that significant

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

managerial efforts were necessary to effect the profitability of the life settlement

arrangements. Further, case law in this circuit and others regarding the proper

characterization of life settlement arrangements has increasingly found that life

settlement arrangements are securities under *Howey.* In light of this updated factual

and legal information, and having heard the parties' oral arguments, summary

judgment on behalf of the SEC is now appropriate.

Existing cases examining life settlement arrangements have tended to find that

they are investment contracts under the *Howey* test. *See Matter of Living Benefits

Asset Management*, 916 F.3d 528, 538-39 (5th Cir. 2019) (collecting cases, including

"rare exceptions" in which courts held that life settlement arrangements were not

securities). In *SEC v. Life Partners,* a divided panel of the D.C. Circuit held that life

settlement arrangements were not securities. *SEC v. Life Partners, Inc.*, 87 F.3d 536

(D.C. Cir. 1996) (hereinafter "*Life Partners*"). Analyzing *Howey*'s "efforts of others"

element, the court acknowledged that the efforts of promoters to locate life settlements

and complete actuarial analysis were "undeniably essential to the overall success of

the investment." *Id.* at 547 (quoting and agreeing with the district court's decision).

However, the court drew in part on the Ninth Circuit's reasoning in *Noa v. Key

Futures* to distinguish between pre-purchase and post-purchase efforts. *Id.* at 546.

Unlike post-purchase efforts, the court reasoned, pre-purchase efforts are

"insignificant to the question" of whether the "efforts of others" element is met. *Id.* at

546-57.

The dissent disagreed with the majority's devaluation of pre-purchase efforts.

*Id.* at 551. Instead, the dissent read *Howey* and cases interpreting its "efforts of others"

element to require an analysis of the "kind and degree of dependence between the

investors' profits and the promoter's activities." *Id.* Where, as in life settlement

arrangements, the pre-purchase activities of the promoter are "pivotal" to the success

of the investment, those activities suffice to meet the *Howey* requirement. *Id.* at 552.

The dissent distinguished life settlement arrangements from the sale of silver and gold in *Noa* and *Belmont Reid*, because the profits in life settlement arrangements require "special expertise to select items to purchase." *Id.* at 554. Although the defendants argued that the success of the life settlement arrangements depended only on the timing of the insureds' deaths, the dissent noted that the realization of profits in fact depended on whether the death occurred within the period estimated by the promoters. *Id.* at 556.

When the issue of life settlement arrangements came before the Eleventh Circuit, the court sided with the *Life Partners* dissent. *SEC v. Mutual Benefits Corp.*, 408 F.3d 737, 743 (11th Cir. 2005) (hereinafter "*Mutual Benefits*"). The distinction between pre-purchase and post-purchase managerial activities, the Eleventh Circuit reasoned, need not be a bright line rule. *Id.* at 744. Because the investors in life settlement arrangements relied on promoters "to identify terminally ill insureds, negotiate purchase prices, pay premiums, and perform life expectancy evaluations critical to the success of the venture," the "efforts of others" element was satisfied. *Id.* at 744-45.

The next circuit to weigh in on life settlement arrangements' satisfaction of the "efforts of others" was the Fifth Circuit.[1] *Matter of Living Benefits Asset Management*, 916 F.3d 528 (5th Cir. 2019) (hereinafter "*Living Benefits*"). The Fifth Circuit noted that the bright-line rule propounded by the *Life Partners* majority was since "widely criticized by both courts and commentators," and concluded that those criticisms were well-founded. *Id.* at 541. Thus, the court held that the defendants' pre-purchase efforts—in particular, its actuarial analysis and negotiation of purchase prices with insureds—satisfied *Howey's* "efforts of others" element. *Id.* at 540-41.

---

[1] The *Living Benefits* decision came after this Court's denial of summary judgment in 2017 and thus was briefed for the first time in connection with the second cross-motions for summary judgment here.

This Court agrees with the weight of federal authority finding that *Noa* does not require courts to disregard pre-purchase managerial efforts that are as specialized and essential to the profits of the venture as life settlement arrangements. *See, e.g.*, *Mutual Benefits*, 408 F.3d at 743 ("While it may be true that the "[efforts of others]" prong of the *Howey* test is more easily satisfied by post-purchase activities, there is no basis for excluding pre-purchase managerial activities from the analysis.") (internal quotations omitted). Having rejected a bright-line distinction between pre-purchase and post-purchase managerial efforts, the Court finds that Defendant exercised "essential managerial efforts" in selecting policies, negotiating prices with insureds, and maneuvering around loopholes that could prevent payout. Defendants' post-purchase efforts, although less uniquely integral to the success of the investment, also included the type of managerial efforts that typify "efforts of others" under *Howey*.

## A.   INVESTORS' DEGREE OF AGENCY IN SELECTION

Defendants contend that they afforded a greater "degree of agency" to their investors than the investors in *Mutual Benefits* and *Living Benefits*, because investors chose the specific policy they acquired a fractionalized interest in. *See* Def. Mot. at 9n31 (cataloguing citations to JA); *In re Nat'l Mortg. Equity Corp. Mortg. Pool etc.*, 723 F. Supp. 497, 505 (C.D. Cal. 1989) (hereinafter "*National Mortgage*"). Citing to *National Mortgage*, Defendants argue that investors' own role in selecting policies mitigates against the "efforts of others" on Defendants' part.

In *National Mortgage*, defendants sold pooled, mortgage-backed certificate to investor institutions. *Id.* at 500. Defendants selected the loans to sell to investors pursuant to "origination standards." *Id.* Those standards were negotiated between the investors and the defendants prior to the sale, and some investors further negotiated the right to extend the loans, approve replacements for paid-off mortgages, and replace bonds whose insurer they deemed unacceptable. *Id.* The court held that the "efforts of others" element was not satisfied. *Id.* at 505. Although investors claimed

they relied on defendants' discretion in selecting the loans, defendants only had the discretion to select loans that corresponded to the investors' origination standards. *Id.* Investors retained the power to set those origination standards and reject any loans that did not conform to those standards. *Id.* The investors' "control and discretion" meant that defendants' selection efforts were sufficient to meet the "efforts of others" test, the court held. *Id.*

Here, Defendants provided investors with basic information for the "specific policies currently in inventory" before investors committed money to the venture. *See* JS D26, D64. The policies in their inventory were those that Defendants had pre-selected. *See* Ex. 6 to SEC Mot. (advertising "policies *chosen* to meet our high standards" from a pool of over $250 million of policies defendants analyzed per month) (emphasis added). Investors did not negotiate standards to inform Defendants' pre-selection process. Instead, Defendants applied their own "rigorous scrutiny using a predetermined set of criteria" and based on their own "extensive analysis and experience." JS P35, P38, P50. Defendants' promotional materials identify this pre-selection as a factor guaranteeing success: "Since PWGG purchases policies before offering them, investors know exactly what the total return will be before purchasing an interest in the specific policy." *See* Brochure. Thus, unlike in *National Mortgage*, where investor institutions shared considerably in the selection efforts, here the essential efforts of the selection process were under Defendants' control. Investors did not exercise "control and discretion" over the selection process such that that they were not relying on Defendants' efforts.

## B.    VALUE OF DEFENDANTS' EFFORTS

In addition to the degree of investor agency in selecting policies, Defendants argue that any efforts it did provide were "insufficient to prove any essential managerial effort" on their part. Def. Opp. at 9:18-25. Defendants' argue that efforts to identify and select policies were pre-purchase efforts and do not, without more,

1  amount to essential managerial efforts. Further, their efforts in selecting policies,

2  locating investors, tracking insureds, managing reserves, making premium calls were

3  too "ministerial" to meet the *Howey* standards. Instead, Defendants maintain, the

4  profitability of their life settlement arrangements depended solely on a factor that

5  Defendants could not manipulate: the date the insureds passed away. *See, e.g.*, Def.

6  Mot. at 19-20.

7       In coming to this conclusion, Defendants contrast *Noa* and *Belmont Reid*,

8  precious metal investments that did not meet the "efforts of others" element, from

9  *Goldfield* and *Reynolds*, precious metal investments that did meet the "efforts of

10  others" element. Defendants argue that their life settlement arrangements did not

11  rely on "efforts of others" because the purchases "have an intrinsic value tied to

12  forces beyond the control of the promotor." *Cf. SEC v. Goldfield Deep Mines Co. of

13  Nevada*, 758 F.2d 459 (9th Cir. 1985); *SEC v. R.G. Reynolds Enterprises, Inc.*, 952

14  F.2d 1135, 1130 (9th Cir. 1991). But contrary to Defendants' representations, their

15  life settlement arrangements are more analogous to *Goldfield* and *Reynolds* than *Noa*

16  and *Belmont Reid*.

17       In *Noa* and *Belmont Reid*, the Ninth Circuit held that investors were not

18  relying on the efforts of others where promoters agreed to extract the metal and

19  deliver it to investors at a pre-fixed price. *Noa*, 638 F.2d at 79; *Belmont Reid*, 794

20  F.2d at 1390. What determined the profitability of the investments was not any

21  "essential managerial efforts" of the promoters, but rather the increase in the market-

22  value of gold and silver between the time of purchase and the time of delivery. *Noa*,

23  638 F.2d at 79; *Belmont Reid*, 794 F.2d at 1390.

24       But in *Goldfield* and *Reynolds*, also involving ore sales, the Ninth Circuit

25  found that the "efforts of others" element was satisfied. *Goldfield*, 758 F.2d at 464;

26  *Reynolds*, 952 F.2d at 1135. In *Goldfield*, the promotor offered a unique "dump ore

27  processing technique" that investors relied on to make a profit. *Goldfield*, 758 F.2d

28

15

at 464. In *Reynolds*, the promotor sold interests in gold from a new milling and refinery plant that the promoter was to finance and construct. *Reynolds*, 952 F.2d at 1129. The court reasoned in both cases that the promoters were not merely delivering pre-purchased metals, but rather engaging in "undeniably significant" efforts that "affect the failure or success of the enterprise." *See, e.g.*, *id.* at 1134-35. This distinguished the investors in *Reynolds* and *Goldfield* from those in *Noa* and *Belmont Reid*, who were depending on increases in the market price of silver and gold and not the unique technologies or contributions of the promoters.

Defendants suggest that the longevity of the insured is an analog to the market price factor in *Noa* and *Belmont Reid*; it is an intractable force that outweighs any import attributable to the efforts of the promotors. Indeed, Defendants' promotional materials include an admonition that "the exact date of passing is the single factor that determines the effective annual rate of return." *See* Brochure at 446. However, it is not the insured's death date alone that determines the profitability of the venture, but the accuracy of Defendants' estimation of the insured's lifespan. *See Life Partners*, 87 F.3d at 321 (Wald, J., dissenting). This estimation, based on multiple layers of actuarial analysis and Defendants' qualification of policies based on the insureds' health conditions and lifestyles, was the precursor to Defendants acquiring the policies. Investors were betting on Defendants' ability to select policies of insureds who would likely pass away within four to seven years. *See* Dkt. 28-2, Calhoun Decl. at ¶ 4.

Further, Defendants exercised pre-purchase efforts significant to the success of the investment when they weeded out policies with "possible loopholes that could affect the full payout." *See* Brochure at 445. For example, Defendants required insureds to submit a statement from their physician confirming the insured was of sound mental capacity and able to enter into the contract. Defendants also required a signed statement from the insureds' would-be beneficiaries acknowledging the

1  extinction of the beneficiaries' interests in the policy payout. *See* Brochure.

2  Defendants even negotiated discounted sales prices with insureds, increasing the rate

3  of return on investment. *See* Brochure at 446; JA P32, P34.

4        Accordingly, Defendants' efforts in selecting, vetting, and purchasing policies

5  were exactly the kind of specialized, "essential managerial" efforts that the Ninth

6  Circuit identified in *Goldfield* and *Reynolds*. Whereas in *Noa* and *Belmont Reid*,

7  investors captured a profit based on securing interests in gold and silver before the

8  market prices increased, investors in *Goldfield* and *Reynolds* relied on the unique

9  expertise and technology of their promoters to capture a profit. Likewise here,

10  investors did not rely on Defendants as investors would "in any sale-of-goods

11  contract in which the buyer pays advance of delivery." *See* Def. Mot. at 16, quoting

12  *Belmont Reid*, 794 F.2d at 1391. Instead, investors relied on Defendants to

13  accurately predict the timeframe during which an insured would pass away,

14  negotiate a reduced policy price that would increase the return on investment, and

15  avoid loopholes to payout.

16        Because this Court need not follow the *Life Partners* distinction between pre-

17  purchase and post-purchase efforts, this Court need not find that the Defendants'

18  efforts in tracking insureds, managing reserves, and making premium calls were also

19  managerial in order to hold that the "efforts of others" element was met.

20  Nonetheless, the evidence submitted by the SEC in connection with their second

21  Motion for Summary Judgment establishes that some of these post-purchase efforts

22  were indeed the kind of "essential managerial" efforts that the "efforts of others"

23  element requires.

24        Specifically, Defendants used pooled resources from the secondary and

25  tertiary reserves to "pick up" premium payments for policies whose insureds did not

26  pass away within the primary reserve period. *See* Ex. A to Kyle Jones Declaration

27  ("Bauer Deposition") at 163:17-165:2; Dkt 483-2 ("Hebrank Deposition") at 134:2-

28

135:7. The court-appointed receiver and SEC's retained expert agreed that these payments were "discretionary" or "judgmental decisions" on behalf of investors. *See* Bauer Deposition at 164:2; Hebrank Deposition at 134:22. The receiver also exercised discretion in letting negative policies lapse. *See* Dkt. 227 at 21.

Defendants argue that any action related to the reserve systems "cannot constitute essential managerial efforts" because the purchase agreements between Pacific West and investors did not obligate Pacific West to maintain the secondary or tertiary reserves. *See* Defendants' Motion at 22 (citing *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009), and *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1301 (9th Cir. 1979), for the proposition that only the objective contract terms, and not promotional representations, are relevant under *Howey*). Pacific West's reserve structure is not like the arguably illusory promises in *De Luz Ranchos* that were not essential to investors' decisions to invest. Here, the reserve structure was promised, relied upon, and executed. *See* Order Re: Parties' First Cross-Motions for Summary Judgment at p.10. Further, the reserve structure is indeed discussed in the Life Settlement Purchase Agreements. *See, e.g.*, JA 34 at 640.

Pacific West's design, promotion, and discretionary utilization of funds from the secondary and tertiary reserves also constitute "efforts of others" under *Howey*. Taken together with the managerial pre-purchase efforts Defendants undertook, discussed *supra*, Defendants clearly exercised the "undeniably significant" efforts required to support this Court's holding. *See Glenn W. Turner Enter., Inc.*, 474 F.2d at 482.

## VI.   REGISTRATION EXEMPTION

Having found in favor of the SEC on the issue of whether Defendants' life settlement arrangements were securities, the Court now turns to Defendants'

registration exemption arguments. Defendants do not claim that they registered any of their life settlement arrangements as federal securities. Thus, unless they can show an exemption to the registration requirements, Defendants engaged in unregistered offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act and violated the broker-dealer registration provisions of Section 15(a). Instead, Defendants contend that the intrastate offering exemption applies to at least some of the 133 life settlement arrangements. *See* Def. Opp. at 17.

### A.    BURDEN OF PROOF

In their motion for summary judgment, Defendants argue that the SEC has the burden to prove that Defendants' separate life settlement arrangement offerings are integrated into a single offering. Def. Mot. 23. That is not the case. The SEC need only prove (1) defendants, directly or indirectly, offered or sold securities, using interstate transportation or communication or the mails; and (2) no registration was in effect or filed with the SEC. *See* 15 U.S.C. §§ 77e(a), 77e(c). Defendants citations to irrelevant authority and reliance on irrelevant and inadmissible expert testimony do not support their contention otherwise.

Defendants first cite *SEC v. Wayland* for the proposition that the SEC must prove integration as part of their prima facia case. *See SEC v. Wayland*, 2019 WL 2620669, at *3 (C.D. Cal. Apr. 8, 2019). But the *Wayland* court analyzed integration as part of its determination that two distinct corporations were liable for securities violations conducted when only one of the corporations sold the securities. *Id.* at *2, *3 (citing *Rathbone, King & Seeley, Inc.*, 1987 WL 107900, at *4 (S.E.C. No-Action Letter Apr. 20, 1987)). That question is inapposite to the SEC's prima facie case here. Defendants' citation to *SEC v. Murphy* also does not support their proposition that the SEC must prove integration. *See* Def. Mot. 23-24 (citing *S.E.C. v. Murphy*, 626 F.2d 633, 645 (9th Cir. 1980)). The *Murphy* court did not analyze integration as part of the SEC's case, but rather as part of the defendants' assertion

of a registration exemption for private offerings. *Id.* at 644-45. Despite Defendants' attempt to argue otherwise, the SEC does not have a burden to prove integration of Defendants' offerings to state a claim for Section 5 violation.[2]

## B.    PART OF AN ISSUE

Defendants assert that they are exempt from registration requirements under an exemption for intrastate offerings. The intrastate exemption provides that:

> Any security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory.

15 U.S.C.A. § 77c (a)(11) (West 2012).

All offerings of common character issued by a corporation are part of a single issue for the purposes of the intrastate exemption. *Shaw v. United States*, 131 F.2d 476, 480 (9th Cir. 1942). After *Shaw*, the SEC promulgated a release note providing the following factors, "any one or more" of which may be determinative of whether an offering is part of an integrated issue:

> (1) are the offerings part of a single plan of financing;
>
> (2) do the offerings involve issuance of the same class of security;
>
> (3) are the offerings made at or about the same time;
>
> (4) is the same type of consideration to be received,
>
> and (5) are the offerings made for the same general purpose.

SEC Release Notice, Release No. 4434 (Dec. 6, 1961).

Since they are claiming the exemption, Defendants have the burden of proof to show its applicability, and the terms of the exemption will be strictly construed

---

[2] Defendants also submitted an expert report of former SEC attorney Marc Fagel, analyzing the factors used to determine whether offerings are integrated. Dkt. 483-2, Ex. A to Jones Decl. The SEC moved to exclude Fagel's testimony, arguing that Fagel was impermissibly asked to opine on a legal issue. Dkt. 490. The Court agrees and grants the SEC's motion.

against Defendants.[3] *Cap. Funds, Inc. v. SEC*, 348 F.2d 582, 586 (8th Cir. 1965). Defendants argue that, weighing the above factors here, their "133 separate life settlement arrangements" are not part of an integrated issue.

Regarding the first factor, Defendants argue that their offerings were not part of a single plan of financing, because purchasers each received fractional interests in discrete life settlement policies that were independent of each other and of the operations of PWCG overall. Def. Opp. at 15. As discussed above, all of the life settlement sales were connected by Defendants' "three-tiered premium reserve system." *See, e.g.*, JA 35 at 650. According to Defendants' own promotional materials, the purpose of the premium reserve structure "is to sufficiently fund each universal life insurance policy acquired by the Trust." Calhoun Decl. at ¶ 7. Even if Defendants used the funds towards the purchase of distinct life settlement arrangements, their venture involved a single plan of financing. *See Johnston v. Bumba*, 764 F. Supp. 1263, 1272 (N.D. Ill. 1991), aff'd, 983 F.2d 1072 (7th Cir. 1992) (holding that "even if the funds …were allocated toward the serial purchase of distinct lots of solar water heating units," offerings were part of a single plan of financing).

Regarding the third factor—whether offerings were made at or about the same time—Defendants note that their sales occurred over an eleven-year period and were "irregular." Def. Opp. 15. But Defendants sold life settlement interests continuously throughout the eleven-year period, and only occasionally showed a time lapse of a few months between sales. Dkt. 106-63, JA 61. A months-long gap is well within the bounds of offerings made "about the same time." *See SEC. v. Schooler*, 106 F. Supp. 3d 1157, 1164 (S.D. Cal. 2015), *aff'd in relevant part* 905 F.3d 1107, 1114 (9th Cir. 2018) (finding that the third factor did not weigh against a finding of integration, even where the gap between offerings was often between two and five years). Defendants

---

[3] As discussed above, Defendants are incorrect to suggest that the SEC has the burden of proof on this issue. *See* Def. Reply at 21 and Def. Opp. at 14.

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

1  have failed to carry their burden to show that their offers are not part of an integrated

2  issue.

3  **C.      INTERSTATE SALE**

4  Where an issuer invokes the intrastate exemption, the onus is on the issuer to

5  "take the greatest care" to make sure that no part of the issue is offered or sold to a

6  non-resident. SEC Release Notice, Release No. 4434 (Dec. 6, 1961). Here,

7  Defendants sold part of their issue to Nevada resident Samuel John Bainbridge.

8  Bainbridge testified at his deposition that Defendants used his Nevada phone

9  number and Nevada mailing address to provide "all the literature" pertaining to

10  Bainbridge's purchase. *See* Dkt. 106-3 at 51.

11  Instead of disputing Bainbridge's testimony, Defendants argue that the SEC

12  needed to show that "none of the 133 separate life settlement arrangements may be

13  exempted from registration" and that the SEC "cannot rely on a single sale to vitiate

14  the exemption as to every sale of every life settlement arrangement." Def. Opp. at

15  19. As discussed above, that is not the case. Exemptions from registration provisions

16  are construed narrowly in order to further the purpose of the Securities Act. *SEC v.*

17  *Murphy*, 626 F.2d at 641 (citations omitted). Accordingly, even one out-of-state

18  offer or sale defeats the exemption as to the entire offering. SEC Release Notice,

19  Release No. 4434 (Dec. 6, 1961); *SEC v. Galaxy Foods*, 417 F. Supp. 1225, 1243

20  (E.D.N.Y. 1976) (holding that the exemption was not available to any sales because

21  one interstate sale defeated the exemption). Here, Bainbridge's purchase was an out-

22  of-state offer and sale that defeated the exemption.

23  **D.      REGISTRATION VIOLATIONS**

24  Because Defendants did not establish an exemption to the registration

25  requirements of the Securities Act, their offer and sale of life settlement

26  arrangements violated Sections 5(a) and 5(c) of the Securities Act and 15(a) of the

27  Exchange Act.

28

## VII.   CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is GRANTED in part and Defendants' Motion for Summary Judgment is DENIED. In a separate order, the Court will address the issues of injunctive relief, civil penalties, and disgorgement. IT IS SO ORDERED.

Dated:  April 21, 2023

_____

Hon. Dean D. Pregerson