O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>   v.<br><br>BRENDA CHRISTINE BARRY/ BAK WEST, INC., ERIC CHRISTOPHER CANNON/ CENTURY POINT, LLC, and CALEB AUSTIN MOODY (dba SKY STONE)<br>               Defendants. | Case No.  2:15-cv-02563 DDP (MAAx)<br><br>**ORDER RE: REMEDIES** |

Further to the Court's order granting summary judgment, Dkt. 546, and having considered the parties' additional briefing and heard oral argument, the Court adopts the following order regarding remedies.

//

1  The SEC requests the following remedies:

2  (1) injunctive relief pursuant to Securities Act § 20(b) and Exchange Act § 21(d),

3  enjoining Defendants[1] from violating federal securities laws;

4  (2) disgorgement of all commissions Defendants received for selling unregistered

5  life settlement investment contracts;[2] and

6  (3) "substantial" civil penalties

(Dkt. 551 at 7). Each remedy is discussed in turn.

**A. Disgorgement**

The SEC requests a disgorgement award against Defendants in the full amount of profits received. Defendants argue that disgorgement is precluded by the Supreme Court's admonition that disgorgement must be "awarded for victims." *Liu v. SEC*, 140 S.Ct. 1936, 1940 (2020). Defendants dispute that disgorgement here would be awarded for victims, because the victims are investors who "are likely to be made whole" when they receive payouts from policies still held by the Receivership. (*See* Opp. at 20).

First, the Court disagrees with Defendants' characterization of the facts. The investors are not "likely to be made whole" by distributions from the Receivership. PCWG, often through Defendants, advertised a minimum fixed total return on investment of 100%. (Dkt. 28-2). The Receiver's net losses calculation is based on a "money in, money out" calculation, meaning the difference between the amounts

---

[1] Pacific West Capital Group, Inc., ("PWCG"), its principal Andrew B. Calhoun IV, and one of its sales agents Andrew B. Calhoun Jr. were dismissed as defendants pursuant to a settlement agreement. (Dkt. 165, 167, 168). Remaining defendants are former PWCG sales agents Brenda Christine Barry/BAK West, Inc. ("Barry"), Eric Christopher Cannon/Century Point, Inc. ("Cannon"), and Caleb Austin Moody/Sky Stone ("Moody") (collectively, "Defendants").

[2] Specifically, the SEC requests that the Court order disgorgement of: $681,000 in ill-gotten gains and $272,273.64 in prejudgment interest from Barry; $658,000 in ill-gotten gains and $263,077.89 in prejudgment interest from Cannon; and $540,000 in ill-gotten gains and $215,899.78 in prejudgment interest from Moody.

invested by investors (money-in) and amounts distributed to investors in return (money-out). (*See* Dkt. 375). This does not include investors' expectations, based on Defendants' representations, that they would double their investments "in typically 4 to 7 years" (Dkt. 7-66), and it does not account for the substantial delay in recouping the principal amount of their investments.

Second, *Liu* does not preclude disgorgement here. In *Liu*, the Supreme Court addressed whether courts may order disgorgement pursuant to the Securities Exchange Act provision for "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C § 78u(d)(5). Analyzing the history of equity courts, the Court held that courts may indeed order disgorgement in SEC actions so long as the award "satisfies the SEC's obligation to award relief 'for the benefit of investors'" and is "consistent with the equitable principles underlying § 78u(d)(5)." 140 S.Ct. at 1948, 1950. The Court remanded to the lower court to determine whether the disgorgement award at issue in *Liu* satisfied the SEC's obligation and adhered to equitable principles, despite not being distributed to victims, imposing joint-and-several liability, and not including—rather than deducting—business expenses. *Id.* at 1950.

After *Liu*, Congress added the following provision to the Securities Exchange Act:

> "In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."

15 U.S.C. § 78u(d)(7). Unlike §78u(d)(5), the new disgorgement provision does not include the phrase "for the benefit of investors." It is not clear whether Congress intended thereby to override *Liu*'s admonition that disgorgement awards must "satisfy[y] the SEC's obligation to award relief 'for the benefit of investors.'" *See, e.g.*, Neil Thoms Smith et. al., *Liu v. SEC: The Supreme Court Limits the SEC's Disgorgement Power and Sets the Stage for Future Legal Battles*, AMERICANBAR.ORG (Sep. 3, 2020),

3

1  https://www.americanbar.org/groups/business_law/resources/business-law-
2  today/2020-september/liu-v-sec-the-supreme-court-limits-the-sec/. The Ninth Circuit
3  has not yet addressed whether §78u(d)(7) overrides any of *Liu*'s admonitions. *Cf. SEC*
4  *v. Hallam*, 42 F.4th 316, 343 (5th Cir. 2022) (holding that §78u(d)(7)'s new text
5  distinguishes between disgorgement and equitable remedies, such that federal courts
6  may order "legal disgorgement" without meeting the standards for equitable
7  remedies).

8  That said, even under *Liu*, disgorgement is well within the Court's discretion in
9  this case. Courts have routinely allowed disgorgement in similar circumstances after
10 *Liu*. *See, e.g.*, *SEC v. Almagarby*, No. 17-62255-CIV, 2021 WL 4461831, at *3 (S.D. Fla.
11 Aug. 16, 2021) (awarding disgorgement and noting that *Liu* "made no ruling, as
12 Defendants suggest, that the SEC must identify specific victims to whom a
13 disgorgement award should be distributed, or that all disgorged funds must be
14 returned to investors, or that a disgorgement award should be limited to those funds
15 that could be returned to investors"); *Sec. & Exch. Comm'n v. Westport Cap. Markets,*
16 *LLC*, 547 F. Supp. 3d 157, 170 (D. Conn. 2021) (ordering disgorgement in spite of
17 defendants' argument that it "would be an inequitable windfall in contravention of the
18 Supreme Court's clear holding in *Liu*.").

19 Independent of its legal availability, Defendants consider disgorgement a
20 "draconian" punishment, disproportionate to the wrongfulness of their failure to
21 register with the SEC. (Dkt. 491 at 19). Indeed, unlike PWCG and Calhoun, the SEC did
22 not assert fraud claims against Defendants and the other sales agents named in the
23 Complaint. Nonetheless, the SEC seeks the same amount of disgorgement from
24 Defendants for failure to register as it sought from PWCG and Calhoun: all of their
25 profits.

26 The SEC is correct that the Court has discretion to order disgorgement of all of
27 Defendants' profits for their failure to register alone. *See, e.g.*, *SEC v. Platforms Wireless*
28 *Int'l Corp.*, 617 F.3d 1072, 1097 (9th Cir. 2010) (ordering disgorgement for failure to

4

1  register without ruling on liability for fraud); *SEC v. Thomas*, No. 2:19-cv-01515-APG-
2  VCF, 2021 U.S. Dist. LEXIS 238166, at *34 (D. Nev. Aug. 24, 2021) (ordering
3  disgorgement where defendants sold unregistered securities but were not involved in
4  the Ponzi scheme and were regularly reassured of the scheme's legality by
5  management). Where, as here, disgorgement is an available remedy, the Court has
6  broad discretion not only in determining whether or not to order disgorgement but
7  also in calculating the amount to be disgorged. *SEC v. Contorinis*, 743 F.3d 296, 301 (2d
8  Cir. 2014) (citation omitted). In exercising its discretion, the Court considers the totality
9  of circumstances underlying the present litigation.

10  Although the SEC did not bring fraud claims against Defendants, Defendants
11  were, in many cases, the sales agents who provided the allegedly misleading
12  information to investors. For example, Barry told investors that the risk of premium
13  calls was "negligible" because "plenty of funds" were available in reserves (Dkt. 106-4
14  at 113:10-24, 156:1-19) and that, if issued, premium calls would be a pro-rata share of
15  the premium amount listed on the disclosure form (*see* 106-65 at 155:5-19). Moody told
16  an investor that PWCG had "yet to use any funds from the secondary reserve[,] much
17  less the third" (Dkt. 7-59). Cannon told investors that PWCG had "accumulated
18  millions of dollars in the secondary and tertiary premium reserves," and that, because
19  PWCG had yet to dip into those reserves, he did not "anticipate" investors would be
20  subject to premium calls. (Dkt. 7-102, Dkt. 7-99). At the time that Defendants made
21  these statements, premium reserves for some of the policies in PWCG's portfolio had
22  in fact run out. (Dkt. 28-3 at ¶13).

23  Defendants claim they relied on information from Calhoun, who lied to or
24  misled Defendants. (*See, e.g.*, Dkt. 106-65 at 156:13-19). It is unclear how reasonable it
25  was for Defendants to parrot, without verifying, these statements to investors. That
26  said, Calhoun's reassurances mitigate, at least somewhat, Defendants' culpability for
27  misleading investors. *See SEC v. Thomas*, 2021 U.S. Dist. LEXIS 238166, at *34 (D. Nev.
28

Aug. 24, 2021) (finding that the SEC's requested penalties were too high because defendants were "regularly assured…of the scheme's legality").

The SEC's settlements with Calhoun, compared to their settlement with sales agent Calhoun Jr., further support the notion that Calhoun's blameworthiness exceeds Defendants'. Calhoun was the founder, owner, and sole president of PWCG and, as discussed above, "controll[ed] the information provided to investors through the Sales Agent Defendants." (Complaint at ¶ 23). The SEC's settlement with Calhoun included disgorgement of $3,745,416, about half of his approximately $7,600,000 in profits from the life insurance investment contracts. (*Compare id.* ¶ 100 with Dkt. 165). Calhoun Jr., like Defendants, was a sales agent. The Calhoun Jr. settlement included disgorgement of $104,800, less than a quarter of his approximately $485,000 in profits. (*Compare* Complaint ¶ 102 with Dkt. 168). This settlement apportioning tracks the Court's understanding of the relative culpability of PWCG employees; that is, Calhoun, PWCG's founder and owner, was more culpable than Calhoun Jr. and Defendants, PWCG's sales agents.

Lastly, the Court considers Defendants' legitimate business expenses. *Liu*, 140 S. Ct. at 1950 ("We leave it to the lower court to examine whether including those expenses in a profits-based remedy is consistent with the equitable principles underlying § 78u(d)(5)."). It is incumbent on Defendants, not the Court, to identify these expenses. *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 467 (5th Cir. 2022) ("*Liu* does not require the district court to conduct its own search for business deductions that defendants have not identified."). Barry did not even approximate her legitimate business expenses, instead merely stating that the SEC's net profits account "does not take into account my business expenses." (Dkt. 492-1 ¶ 10). Cannon stated that he paid $86,479 in taxes on his PWCG income, but he did not specify whether that amount was accounted for in the SEC's approximation of his net profits. (*Compare* Dkt. 491-3 ¶ 7 *with* Dkt. 64 ¶ 105). Moody listed his tax payments and the total annual business expenses he deducted from his taxes from 2012-2014, but he did not itemize or describe

6

those expenses. (Dkt. 491-4 ¶ 7-9). Without clear information about the business expenses from any of Defendants, the Court is unable to conclude that those expenses "have value independent of fueling a fraudulent scheme." *Liu*, 140 S.Ct. at 1960.

That said, circumstances mitigating Defendants' culpability weigh against an order of full disgorgement. The Court instead orders Defendants to disgorge a third of their net profits, to be distributed to investors. Barry is ordered to disgorge $227,000, Cannon is ordered to disgorge $219,333.33, and Moody is ordered to disgorge $180,000.

### B. Prejudgment Interest on Disgorgement

The SEC further requests prejudgment interest on the disgorgement award. In deciding whether an award of prejudgment interest is warranted, a court should consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *SEC. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (citing *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833–34 (2d Cir. 1994)).

As to the third factor, the registration requirements of the Securities and Exchange aim to protect investors from fraud. See *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010); *Turbeville v. Fin. Indus. Regul. Auth.*, 874 F.3d 1268, 1270 (11th Cir. 2017). In particular, the broker-dealer registration requirement is "of the utmost importance in effecting the purposes of the Act because it enables the SEC to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records." *SEC v. Benger*, 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010) (internal quotations omitted). In this case, requiring better training, more experience, and more thorough records may well have prevented Defendants from misleading investors about the likelihood of premium calls and the track record of PWCG's portfolio. On the other hand, the first

1  and second factors—the need to fully compensate investors and the relative equities of
2  the award—weigh against ordering prejudgment interest. As discussed above, PWCG,
3  Calhoun, and Mills Potoczack & Company have agreed to settlements totaling more
4  than $106 million, which is the "total allowed investor net loss" claimed from the
5  receivership.³ The disgorgement order is sufficient to serve a deterrent function
6  without adding prejudgment interest. Accordingly, the Court declines to exercise its
7  discretion to order prejudgment interest.

**C. Injunctive relief**

The SEC seeks an injunction prohibiting Defendants from violating Section 5 of the Securities Act and Section 15(b) of the Exchange Act. (Dkt. 481-1 at 24). According to the SEC's oral argument, this permanent injunction would trigger a further "follow on" administrative procedure in which the SEC would seek to prevent Defendants from working in the securities industry.

The Court may, upon a proper showing, order injunctive relief for securities law violations. *SEC v. Arthur Young & Co.*, 590 F.2d 785, 787 (9th Cir. 1979); *SEC v. Martino*, 255 F. Supp. 2d 268 (S.D.N.Y. 2003). In doing so, the Court must assess the likelihood of future violations, given such factors as: (1) the degree of scienter, (2) the isolated or recurrent nature of the infraction, (3) Defendants' recognition of the wrongful nature of

---

³ Settlement amounts and interim distribution amounts are listed below:

| | | |
|---|---|---|
| 1. | PWCG Disgorgement (Dkt. 166) | $53,654,584.00 |
| 2. | PWCG Prejudgment Interest (Dkt. 166) | $5,859,747.58 |
| 3. | PWCG Civil Penalty (Dkt. 166) | $750,000.00 |
| 4. | Calhoun IV Disgorgement (Dkt. 165) | $3,745,416.00 |
| 5. | Calhoun IV Prejudgment Interest (Dkt. 165) | $409,045.99 |
| 6. | Calhoun IV Civil Penalty (Dkt. 165) | $320,000.00 |
| 7. | Calhoun Jr. Disgorgement (Dkt. 168) | $104,800.00 |
| 8. | Calhoun Jr. Prejudgment Interest (Dkt. 168) | $11,445.49 |
| 9. | Calhoun Jr. Civil Penalties (Dkt. 168) | $7,500.00 |
| 10. | MPC State Court Settlement (Dkt. 550) | $9,750,000.00 |
| 11. | Interim Investor Distribution (Dkt. 550) | $37,000,000 |

their conduct, (4) the likelihood, because of Defendants' occupation, that future violations might occur, and (5) the sincerity of Defendants' assurances against future violations. *SEC v. Murphy*, 50 F.4th 832, 841-42 (9th Cir. 2022) (internal citations omitted). The SEC has the burden to show a reasonable likelihood of future violations. *SEC v. Olins*, 762 F. Supp. 2d 1193, 1196 (N.D. Cal. 2011), as amended (Feb. 25, 2011) (internal citations omitted).

1. Scienter

Although scienter is not an element of the registration violations for which this Court found Defendants liable, the degree of Defendants' scienter regarding their failure to register does bear on the likelihood of Defendants' future violations. Defendants claim to have relied on Calhoun and his attorneys' representations that the investment contracts here were exempted from registration requirements. (Dkt. 491-2; 491-3; 491-4) (asserting, for example, that Calhoun "regularly made comments regarding how much he was spending on 'the best possible attorneys' to ensure that PWCG's business was in compliance with laws and regulations"). Although this Court held that Defendants' investment contracts were indeed federal securities requiring registration, Dkt. 546, the legal issue was close enough that Defendants could reasonably have believed Calhoun and his attorneys. Accordingly, Defendants' level of scienter regarding their failure to register weighs somewhat against a finding that future violations are reasonably likely.

2. Isolated or Recurrent Nature of Infraction

Defendants argue that their infraction was isolated, weighing against granting an injunction, because the infractions at issue here are Defendants' first violations of securities law. (Dkt. 552 at 7). Although Defendants' unregistered transactions were all part of a single scheme of life insurance investment contracts, Defendants were

involved in this scheme for several years.[4] *See SEC v. Alexander*, 115 F. Supp. 3d 1071, 1086 (N.D. Cal. 2015) (finding that the second factor weighed in favor of finding a likelihood of recurrence where defendants took part in a scheme "that spanned nearly two years and impacted dozens of investors"). Thus, the recurrent nature of Defendants' violations weighs somewhat in favor of a finding that future violations are reasonably likely.

  3. Defendants' Recognition of the Wrongful Nature of Their Conduct

  Defendants argue that they should not be penalized for arguing that life insurance investment contracts were not federal securities requiring registration (Dkt. 552 at 7). Even without penalizing Defendants for taking that position in defense of the SEC's claims, this Court considers Defendants' recognition of the wrongful nature of their misrepresentations to investors relevant to the likelihood of future violations.

  As discussed above, Defendants misled investors about such facts as the likelihood of premium calls and PWCG's track record. Defendants claimed that they did so based on information that Defendants received from Calhoun and presumed were true. (*See, e.g.*, Dkt. 106-73 at 105:3-22). Relevant to the question of the likelihood that they will violate securities laws in the future are Defendants' reactions after Calhoun informed Defendants in 2014 that primary reserves on some policies had run out (Dkt. 7-32 at 26:1-27:13), and after Defendants learned of the allegations underlying the SEC's claim in 2015. In particular, Cannon discounted the importance of these misrepresentations, claiming that many investors told him they were not concerned with PWCG's track record (Dkt. 106-173 at 118:19-119:14) and that the reliability of Calhoun's seven-year lifespan estimates "doesn't affect the investor" (*id.* 120:7-23). Cannon's statements "evidence[], at a minimum, a lack of sufficient attention…to the securities laws." *Olins*, 762 F. Supp. 2d at 1196 (analyzing the totality of defendant's

---

[4] Barry worked for PWCG since 2004. (Dkt. 28-8). Moody worked for PWCG since 2012. (Dkt. 491-4). Cannon worked for PWCG sitting 2007. (Dkt. 28-6).

10

conduct which evidenced "a willingness to further his goals at the expense of total candor"). As to Cannon, therefore, the third factor weighs somewhat in favor of a finding he is reasonably likely to violate securities laws in the future. The SEC did not point to, and the Court could not locate, similar evidence of Moody or Barry minimizing the severity of the misrepresentations. Thus, as to Moody and Barry, the third factor weighs somewhat against a finding that they are reasonably likely to violate securities laws in the future.

4. Defendants' Occupations

The SEC argues that likelihood of recurrence weighs in favor of ordering an injunction, because nothing prevents Defendants from acting as unregistered brokers in the future. (Dkt. 493 at 16). But Defendants Barry and Moody represent that they do not plan to re-enter the securities industry. (Dkt. 552 at 7). Defendant Cannon represents that he wishes to remain in the financial services industry as an investment advisor. (Dkt. 551 at 2-3).

5. Sincerity of Assurances Against Future Violations

Each Defendant included in their declaration the same statement:

"I believe it is important to uphold the federal securities laws and will continue to do so in my future career." (Dkt. 491-2 at ¶9, 491-3 at ¶8, 491-4 at ¶10).

The SEC did not argue, in its briefing or at argument, that these assurances were not sincere, but even "sincere assurances of an intent to refrain from aiding and abetting future violations are insufficient, without more, to militate against an injunction." *SEC v. Fehn*, 97 F.3d 1276, 1296 (9th Cir. 1996). Thus, this factor weighs neither for nor against granting an injunction.

6. Conclusion

As to Defendant Cannon alone, the totality of circumstances warrant the imposition of an injunction.

**D. Civil Penalties**

1  Lastly, the SEC requests "substantial civil penalties be imposed" on each
2 Defendant. (Dkt. 551 at 7). Courts have discretion to determine the appropriate amount
3 of a civil penalty "in light of the facts and circumstances." *SEC v. Rajaratnam*, 918 F.3d
4 36, 44 (2d Cir. 2019) (citation omitted). The Securities and Exchange Acts each provide
5 that penalties shall be assessed according to a three-tier system. For each tier, the Court
6 may impose a penalty up to the "gross amount of pecuniary gain." 15 U.S.C. §§
7 77t(d)(2), 78u(d)(3)(B). The first, or lowest tier applies to any violation of the securities
8 laws; the second tier applies to violations that involve fraud, deceit, or manipulation,
9 or a deliberate or reckless disregard of a regulatory requirement; and the third, or
10 highest tier applies to violations described in the second tier, and such violation
11 directly or
12 indirectly resulted in substantial losses or created a significant risk of substantial losses
13 to other persons. For each violation, for the period at issue, the maximum first tier
14 penalty is the greater of: (1) $7,500 for a natural person, and $75,000 for any other
15 person; or (2) the "gross amount of pecuniary gain" to the defendant as a result of the
16 violation. 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i).
17  Here again, the SEC's settlements with Calhoun, PWCG, and Calhoun Jr. are
18 instructive. Calhoun agreed to pay a $320,000 civil penalty and Calhoun Jr. agreed to
19 pay a $7,500 penalty. (Dkt. 165, 168). These amounts reflect the totality of
20 circumstances discussed above, in which Calhoun and PWCG hold more culpability
21 than their sales agents. Accordingly, the Court finds a Tier 1 penalty appropriate.
22 Rather than assess the total amount of pecuniary gain, which is already accounted for
23 in the disgorgement section above, the Court orders each Defendant to pay a civil
24 penalty of $15,000, to be sent to the Treasury.
25 //

**D. Conclusion**

In sum, the Court orders as follows:

- <u>Disgorgement</u>: Brenda Barry is ordered to disgorge $227,000, Eric Cannon is ordered to disgorge $219,333.33, and Caleb Moody is ordered to disgorge $180,000, to be distributed to investors.
- <u>Injunction</u>: Eric Cannon is hereby enjoined from future violations of Section 5 and 15(a) of the Securities and Exchange Acts.
- <u>Civil Penalties</u>: Brenda Barry, Eric Cannon, and Caleb Moody shall pay Tier 1 Civil Penalties in the amount of $15,000 each, to be sent to the Treasury.

**IT IS SO ORDERED.**

Dated: July 12, 2023

_____
DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE